**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

**K.B., by and through his Parent,
K.B.,**

       Plaintiffs**.**

No.:_____

**v.**

**MEMPHIS-SHELBY COUNTY SCHOOLS,**

       Defendant.

---

**COMPLAINT**

---

**COMES THE PLAINTIFFS, K.B.,** through his parent, K.B. They show:

**I.**      **INTRODUCTION**

1. This case involves Defendant's blatant denial of a free appropriate public education (FAPE) to a child with autism (autism, Autism Spectrum Disorder, and/or ASD), intellectual disability, and attention deficit hyperactivity disorder (ADHD), and Defendant's continued refusal to fulfill its obligations under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq*., (IDEA).

2. Administrative exhaustion occurred through a state due process hearing on March 22-23, 2022, and April 8, 2022, before Tennessee Administrative Judge Phillip Hilliard.

3. The hearing concluded partially favorably to Plaintiffs, with a Final Order (Final Order) from the Administrative Law Judge (ALJ) on May 18, 2022. (Final Order attached hereto as Exhibit A). In particular, the Final Order correctly determined that Defendant did not provide K.B.

with a FAPE at any time in the 2020-2021 school year and in the 2021-2022 school year through

October 18, 2021.[1] However, the ALJ erred in finding that Defendant has provided a FAPE to K.B.

since October 18, 2021. Not only has Defendant failed to provide a FAPE to K.B., but Defendant

has been and, upon information and belief, continues to be incapable of providing a FAPE because

it does not currently employ the necessary personnel to provide a FAPE and to fulfill the

accommodations, placement, and related services as agreed to by K.B.'s Individualized Education

Program (IEP) team. Finally, Plaintiffs are also appealing the compensatory education award as

insufficient to address and remedy the consequences of Defendant's failure to provide K.B. a

FAPE.

4.   This appeal is timely, brought within sixty (60) days after the issuance of the Final Order

in the administrative proceeding. Plaintiffs seek, *inter alia*, *de novo* review and reversal of part of

the ALJ's decision, an opportunity to present additional evidence given the continuing nature of

the violations in this case, compensatory education and damages, and reasonable attorneys' fees

and costs under 20 U.S.C. § 1415.

## II.      PARTIES AND JURISDICTION

5.   K.B. is a now nine-year-old child with autism, intellectual disability, and ADHD. K.B.'s

disabilities are lifelong, multiple, severe, and obvious. His disabilities are so severe that he was

attending a multi-faceted agency providing all-day intensive Applied Behavior Analysis (ABA)[2]

---

[1] The Final Order mistakenly uses the date "October 18, 2001," (see Ex. A) but the facts and context confirm that the ALJ should have written 2021.

[2] "Innovations In Learning, PC, is a multi-faceted agency. We provide intensive ABA services to children with Autism and related disorders... In all areas of our work we take pride in using empirically based interventions. We develop objective and measurable goals that allow close monitoring of treatment efficacy." https://innovationsinlearning.net. "The effectiveness of ABA-based intervention in ASDs has been well documented through 5 decades of research by using single-subject methodology and in controlled studies of comprehensive early intensive behavioral intervention programs in university and community settings. Children who receive early intensive behavioral treatment have been shown to make substantial,

services in lieu of a public elementary school prior to moving into the Memphis-Shelby County Schools district in the summer of 2020, despite being school-aged.

6. K.B. resides with his father, Mr. K.B. (Father[3]), (collectively, Plaintiffs) in Memphis, Tennessee. Mr. K.B. brings this action individually and as the parent to his son, K.B.

7. K.B. started attending school in the Memphis-Shelby County Schools district in 2020.

8. Defendant Memphis-Shelby County Schools (also doing business as the Shelby County Board of Education and referred to as MSCS, the District, and Defendant) receives state and federal funding to provide special education to persons with a disability under the IDEA, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504), and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 *et seq*., (ADA).

9. This action arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§1400 *et seq*. Jurisdiction is conferred upon this Court by the IDEA, 20 U.S.C. §§1415(i)(2)(A) and 1415(i)(3)(A), which provides district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

10. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiffs reside within the Western District of Tennessee and all events and omissions giving rise to this Complaint occurred in this judicial district.

---

sustained gains in IQ, language, academic performance, and adaptive behavior as well as some measures of social behavior, and their outcomes have been significantly better than those of children in control groups." Scott M. Myers, MD, Management of Children With Autism Spectrum Disorders, Pediatrics, 2007

[3] Father and son share the same initials. Thus, Mr. K.B. will be referred to alternatively as Mr. K.B. and/or Father. K.B., the student, will be referred to by his initials.

### III.   BACKGROUND

11. The Final Order (Ex. A) contains a lengthy recitation of the facts established at the administrative due process hearing. This Complaint will lay out some of the facts in order to provide context and will incorporate by reference almost all of the ALJ's findings of fact in the Final Order as specified below.

12. K.B. was born on November 5, 2012, in Norfolk, Nebraska, where he lived with his mother, his father (Mr. K.B.), and siblings.

13. Mr. K.B. first noticed that K.B. did not appear to be developing in the same way as his other child (K.B. is the middle child of the relationship between Mr. K.B. and K.B.'s mother; the two never married) when K.B. was approximately two years old. His parents took him to the doctor who told them that K.B. had signs of autism.

14. As a result, K.B. began receiving early intervention services in the home through an Individualized Family Service Plan (IFSP). IFSPs are covered by the IDEA and are written plans to provide early intervention services to infants and toddlers in order to, *inter alia*, "enhance the development of infants and toddlers with disabilities, to minimize their potential for developmental delay, and to recognize the significant brain development that occurs during a child's first 3 years of life." 20 U.S.C. § 1431; *defined by* 20 U.S.C. § 1436.

15. K.B. transitioned from his IFSP to an Individualized Education Program (IEP) on February 11, 2016, through Norfolk Public Schools, Nebraska.

16. Although Mr. K.B. and K.B.'s mother ended their relationship and Mr. K.B. moved out of the house he shared with her and their children in 2016, Mr. K.B. nonetheless maintained a relationship with his children.

4

17. At some point between 2016 and 2018, K.B. and his siblings moved with their mother to Indiana.

18. On May 31, 2018, the Gary Community School Corporation[4] completed an "Education Evaluation Report" (Indiana Education Evaluation Report), a reevaluation of K.B.'s needs.[5] (attached hereto as Exhibit B). The Indiana Education Evaluation Report contains, *inter alia*, the following information:

- the evaluation start date was April 25, 2018 (*Id.* at 1);

- K.B. was in preschool at the time at Mary M. Bethune Early Child Dev Ctr [sic] (*Id.*);

- the purpose of the reevaluation was to "determine continued eligibility of special education services under a different category" (*Id.*);

- K.B. had been receiving services for Developmental Delay and Language Impairment (*Id.*);

- K.B. had been tested for autism on September 16, 2016 and diagnosed with autism spectrum disorder (*Id.*);

- K.B. exhibited deficits in almost all areas of testing (Ex. B *generally*);

- K.B. was "distractible" during testing and "needed cues to and attend to test items" (*Id.* at 2);

- the Development Assessment of Young Children, Second Edition (DAYC-2) is a test that was "developed to measure the abilities of young children" in the areas of

---

[4] Gary Community School Corporation is a public school district in Gary, Indiana. *See* https://www.garycsc.k12.in.us; *see also* https://nces.ed.gov/ccd/districtsearch/district_detail.asp?ID2=1803870.

[5] The IDEA requires local educational agencies (LEAs) to conduct reevaluations of students who have been found eligible for special education services. 20 U.S.C.S. § 1414(a)(2). An LEA must reevaluate a student if (1) the LEA determines that the educational or related services needs of the child warrant a reevaluation or (2) the child's parent or teacher requests a reevaluation. 34 C.F.R. § 300.303(a).

cognition, communication, social-emotional, physical development, and adaptive behavior, and K.B.'s standard score was 82 which is below average and in the 12th percentile (*Id*. at 3);

- K.B. was using a "mature grasp" on his pencil with his thumb and two fingers (*Id*. at 4);

- K.B. was unable to fold paper or use scissors except to snip (*Id*.);

- occupational therapy for K.B. was recommended (*Id*. at 5); and

- K.B. obtained an Autism Index score of 116 in the 86th percentile on the Gilliam Autism Rating Scale, Third Edition (GARS-3) "within the Very Likely Probability of ASD [Autism Spectrum Disorder] range, Requiring Very Substantial Support-Level 3" (*Id*.).

19. The final pages of the Indiana Education Evaluation Report (Ex. B) – which were the only pages that Mr. K.B. and his girlfriend, Eboni Guy, received when they picked up the children in Indiana to move to Memphis – include the following information:

- that K.B. was formally diagnosed with autism by Dr. Elizabeth Magno on December 6, 2017 (Ex. B at 1, 5); and

- that K.B.'s "adaptive skills are within the Below Average to Extremely Low range, as measured by the ABAS-3 and DAYC-2. In addition, he exhibits multiple symptoms of Autism Spectrum Disorder-as measured by the GARS-3." (*Id*.).

20. The Indiana Education Evaluation Report then defines Autism Spectrum Disorder per the Indiana State Board of Education and concludes that K.B.'s "assessment data and outside diagnosis of Autism Spectrum Disorder fulfills this eligibility for Autism Spectrum Disorder (Severity Level 3-Requiring Very Substantial Support). Eligibility for special education as a student with Autism Spectrum Disorder disability shall be determined by the multidisciplinary team." (*Id*.).

21. The Indiana Education Evaluation Report next defines a language and speech impairment per Indiana State guidelines and concludes that "[K.B.] meets the guidelines… as a student with a Language Impairment." (*Id*. at 6).

22. Since July 2020, K.B. has been living with his father, Mr. K.B., within the geographical boundaries of MSCS.

23. K.B. and his siblings moved to Memphis in July 2020 to live with their father after their mother was arrested and incarcerated.

24. K.B currently lives with three of his siblings, his father, and his father's girlfriend, Eboni Guy (Ms. Guy).

25. As soon as Mr. K.B. learned that his three children, including K.B., were going to be living with him, Mr. K.B. started making calls to try to register his children in school in the District.

26. Mr. K.B. told MSCS employees that K.B. is autistic because he knew that his son had previously attended a general education classroom and would need assistance given the severity of his disabilities.

27. Amongst other actions Mr. K.B. took to both inform the Defendant and seek assistance for his son, Mr. K.B. provided the Defendant with a copy of the Indiana Education Evaluation Report (Exhibit B) and signed consent on September 25, 2020, for the Defendant to receive a copy of K.B.'s records from Innovations In Learning (Innovations) where K.B. had been receiving full-time ABA services in Indiana in lieu of general education public school. Mr. K.B. provided consent for Defendant to receive the records because Innovations would not release the records to him directly.

28. Ms. Guy also told the Defendant that K.B. is autistic. Ms. Guy primarily communicated with the employees at K.B.'s school, Lucie E. Campbell Elementary School.

29. By October 5, 2020[6], MSCS had received a fax from Innovations containing thirty-five (35) pages of records. (Innovations records attached as Exhibit C). The Innovations records cover the services K.B. received from August 7, 2018, to March 17, 2020, only four months prior to K.B.'s move into MSCS (which triggers Defendant's legal obligations to him under the IDEA). (Ex. B). The records include an Initial Diagnostic Evaluation and Master Treatment Plan that provides information that in 2018, K.B. had already been diagnosed with autism and was receiving both speech and occupational therapies. (*Id*.). The records also set out in great detail the 37.5 weekly hours of ABA[7] services K.B. had received at Innovations in Indiana, including 1:1 therapy from a Registered Behavior Technician (RBT), supervised by a Board Certified Behavior Analyst (BCBA).[8] The records also include results from Verbal Behavior Milestones Assessment and Placement Program (VBMAPP) testing with an update as recent as January 14, 2020. *See*, https://www.vbmappapp.com/about. VBMAPP "is an assessment tool used with individuals diagnosed with autism spectrum disorder and other language delays." Barnes CS, Mellor JR, Rehfeldt RA. *Implementing the Verbal Behavior Milestones Assessment and Placement Program (VB-MAPP): Teaching Assessment Techniques*. Anal Verbal Behav. 2014 Jan 1;30(1):36-47. doi:

---

[6] The fax from Innovations has a fax date stamp of September 25, 2020, but Lashonda Geter did not scan the documents to herself until October 5, 2020. Coincidentally, on October 5, 2021, an MSCS employee – Cynthia Houston – emailed a different set of the Innovations documents (containing one (1) additional page) with date stamps of both September 25, 2020, and September 28, 2020, to another MSCS employee, Nia Coleman. The complete set of records is attached as Exhibit C to this complaint.
[7] ABA therapy is the gold standard for treatment of autism and is also used to help many different kinds of learners. *See, e.g.*, https://www.autismspeaks.org/applied-behavior-analysis. ABA is provided by BCBAs (defined below) and RBTs (defined below). *Id*.
[8] "The Board Certified Behavior Analyst® (BCBA®) is a graduate-level certification in behavior analysis. Professionals certified at the BCBA level are independent practitioners who provide behavior-analytic services. BCBAs may supervise the work of Board Certified Assistant Behavior Analysts® (BCaBAs®), Registered Behavior Technicians® (RBTs®), and other professionals who implement behavior-analytic interventions." https://www.bacb.com/bcba/. BCBAs, after completing graduate level coursework, must take and pass an exam. BCBA certification is governed by the Behavior Analyst Certification Board (https://www.bacb.com/about/) who also promulgates and enforces an ethics code (https://www.bacb.com/ethics-information/ethics-codes/). In Tennessee, BCBAs are also licensed by the state Department of Health's Applied Behavior Analyst Licensing Committee.

8

10.1007/s40616-013-0004-5.   PMID:   27274972;   PMCID:   PMC4883535;   *see   also* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4883535/.   VBMAPP is used to determine a child's current skill level, as well as to identify instructional goals and objectives. *Id*. The Innovations records also set goals for K.B. to transition to an IEP with a behavior intervention plan (BIP) by August 2020. (Ex. B).

30. MSCS employees immediately began circulating the Innovations records. The records were received by at least seven (7) people within a few days after their initial receipt, including the school secretary at Lucie E. Campbell Elementary School, people working in the District's registration office (Division of Student Equity, Enrollment, & Discipline, also known as the SEED office), a director in the Department of Exceptional Children (the designated special education department at MSCS) with almost fifty (50) years of special education experience, two other managers in the Department of Exceptional Children, the school psychologist assigned to Lucie E. Campbell Elementary School (who received the records in December 2020), a special education teacher at Lucie E. Campbell Elementary School, and the advisor from the Department of Exceptional Children assigned to Lucie E. Campbell Elementary School.

31. Nonetheless, Defendant's position prior to the due process hearing was that it did not know – until the spring of 2021 – that K.B. has autism (or either of his other two disabilities). The Defendant took the legal position that the Innovations records were not part of K.B.'s education records, even though education records for students often include records from outside providers and prior schools.[9]

---

[9] The Family Educational and Privacy Rights Act (FERPA) defines the term "education records" to mean "those records, files, documents, and other materials which-- (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C.A. § 1232g(a)(4)(A). Nothing in subsection (B) of this part of the statute exempts records from prior placements. The IDEA similarly contemplates the use of records and evaluations from sources other than the school in which the child is registered. For example, the District is charged with

32. To the extent that part of the premise for Defendant's erroneous position that the Innovations records were not part of K.B.'s education records was that the Innovations records were not included in a paper file maintained by Defendant (and Plaintiffs do not concede that point as a matter of law), that argument also fails. It is true that Defendant failed to produce any paper file maintained by Lucie E. Campbell Elementary School for K.B. containing the Innovations records and that Counsel for the school district asserted that she had personally checked and that no such file existed. However, on May 11, 2022, more than a month after the due process hearing had concluded and a mere week before the ALJ issued his Final Order in this case, undersigned counsel attended an unrelated meeting at Lucie E. Campbell Elementary School with Mr. K.B. and Ms. Guy that Defendant's attorney also attended. At the conclusion of the meeting, Plaintiffs requested – yet again – a copy of K.B.'s school files, as well as the school files of two of his siblings. Defendant's attorney responded that she had already produced everything for K.B. and expressed frustration at the request. Despite this and the prior assurances that no such files existed, after an approximately one-hour delay, Defendant's attorney provided a copy of two, previously withheld, files for K.B. Contained within one of those files was a copy of the Innovations records. The Innovations records were, therefore, included in a paper file maintained by Defendant; despite its failure to timely produce those files in discovery.

33. These two, previously withheld, files include documents that were indisputably responsive to timely-filed discovery requests, a pre-hearing order dated October 11, 2021, federal regulations

---

obtaining records from the child's prior school district when a child transfers. *See* 20 U.S.C. § 1414(d)(2). Likewise, when conducting evaluations and reevaluations, the IEP team ***shall*** consider "existing evaluation data" including "evaluations and information provided by the parents of the child." 20 U.S.C. § 1414(c). Although Mr. K.B. did not personally hand the records to Defendant, he signed a consent in order for the records to be transmitted to MSCS. The Innovations records are precisely the kinds of records that IEP teams often request from parents in order to more fully understand – and therefore accommodate – children with disabilities.

implementing the IDEA (*see* 34 C.F.R. § 300.613(a)), and state law (*see* TENN. CODE ANN. § 49-10-606(c)).

34. Defendant's withholding from production these two files is not the only documented instance of its failure to comply with its discovery obligations in the administrative proceeding. For example, Plaintiffs produced emails between K.B.'s second-grade teacher and Ms. Guy that were not produced in reciprocal discovery. Further, Defendant's attorney elicited testimony during the due process hearing from Rebecca Fik, a manager in MSCS's Department of Exceptional Children, about an attachment to an email that had not previously been produced and should have been, *i.e.* was responsive to Plaintiffs' discovery requests and was the subject of Defendant's line of questioning to one of its own employees and witnesses.

35. The above-described discovery violations materially prejudiced Plaintiffs even though the documents contained in K.B.'s paper file at Lucie E. Campbell Elementary School were ultimately produced on March 4, 2022, as attachments to various emails in electronic discovery.[10]

### IV.   THE ALJ'S FINAL ORDER

36. This Complaint incorporates by reference the facts as recited in the following paragraphs from the Final Order (Exhibit A) as follows:

 a. Paragraphs 1-21.

 b. Paragraph 22 with the exception that Plaintiffs disagree that Ms. Guy told Stacey Davis that K.B. is autistic; Ms. Guy told Tenecia Davis who was a secretary at Lucie E. Campbell Elementary School that K.B. is autistic.

---

[10] Plaintiffs filed a Motion for Supplemental Findings of Fact and for Sanctions on May 15, 2022, explaining and arguing their legal position and the prejudice suffered, but the ALJ summarily dismissed it without requiring response from the Defendant largely for being moot given the posture of the case (three days before the ALJ's Final Order issued). Plaintiffs' Motion is part of the record before the Tennessee Administrative Procedures Division, and Plaintiffs incorporate by reference all of their arguments therein.

c. Paragraph 23-31.

d. Paragraph 32 with the exception that Plaintiffs argue that the Innovations records should have been admitted fully into evidence as part of K.B.'s education records.

e. Paragraphs 33-50.

f. Paragraph 51, although Plaintiffs note that the preferred term for disabilities is "disabilities" and not "handicaps,"[11] as that term is now considered outdated.

g. Paragraphs 52-110.

h. Paragraph 111 with the exception that Plaintiffs assert that Defendant did not attempt to schedule another meeting with Mr. K.B., despite his requests to do so and despite the requests of Ms. Guy to do so, until August 2021.

i. Paragraphs 112-127.

j. Paragraph 128 with the clarification that Ms. Guy was the victim of a carjacking that resulted in the loss of the family vehicle in early January 2022.

k. Paragraph 129-167.

l. Paragraph 168 with the clarification that Mr. K.B. and Ms. Guy work together to parent Mr. K.B.'s children. As is further explained by Paragraph 169, Ms. Guy asked for a copy of K.B.'s schedule. Ms. Guy did so on her own behalf and on Mr. K.B.'s behalf.

m. Paragraphs 169-193.

n. Paragraph 194 with the clarification that Dr. Irby determined K.B.'s full-scale IQ to _**be**_ 70 (second percentile).

---

[11] By 1992, the United States had recognized that the term "handicapped" was inappropriate, and Congress amended applicable laws to use of the terms "disability" and person and/or individual with a disability. *See* Rehabilitation Act Amendments of 1992, Bill HR-5482.

o.  Paragraphs 195-200.

p.  Plaintiffs dispute Paragraph 201 as accurately or meaningfully describing the teaching methodologies Defendant's employees use. Plaintiffs do not incorporate Paragraph 201 by reference.

q.  Paragraph 202 is factually incorrect and not supported by the record. Plaintiffs do not incorporate Paragraph 202 by reference. The testimony at the due process hearing was that Defendant employs only one (1) BCBA. At the time of hearing, the Defendant employed **_no_** RBTs. Plaintiffs further state, upon information and belief, that as recently as June 10, 2022, Defendant still employed no RBTs on its staff, despite the fact that Defendant is the largest school district in the state of Tennessee and amongst the largest 25 school districts in the nation. *See* http://www.scsk12.org/about/. According to MSCS's website, MSCS serves over 110,500 students with almost 14,000 employees. (*Id*.). According to the Centers for Disease Control (CDC), one in 44 children has been identified with autism spectrum disorder. *See* https://www.cdc.gov/ncbddd/autism/ data.html.

r.  Paragraphs 203-205.

s.  Plaintiffs dispute Paragraph 206 as factually incorrect (although Plaintiffs agree that K.B.'s iReady scores indicate that he was – and continued to be – three (3) or more grade levels below his typical peers in math, working at a kindergarten level), and Plaintiffs do not incorporate it by reference. K.B.'s overall iReady math scores decreased twenty (20) points from August 2021 to January 2022. Regardless of the precise scoring, K.B. remained on the kindergarten level between those two testing dates (*i.e.* he did not make any meaningful progress).

t.  Paragraph 207, although Plaintiffs would again clarify that K.B.'s iReady reading scores between August 2021 and January 2022 demonstrate that he did not make any meaningful progress in that time and continued to read on a kindergarten level.

u.  Plaintiffs dispute Paragraphs 208-222 as an accurate reflection of the records. Although K.B.'s IEP Progress Notes have some narratives that state that he is "making some progress," no progress as measured by any objective data is included. K.B.'s IEP Progress Reports either indicate that more time is needed or that he has a mix of "some" and "little to no progress." More specifically:

   i.  In the first reporting period, the status summary narrative states, "Although [K.B.] is showing little progress, he need [sic] more time to accomplish these goals."

   ii.  In his mid-first reporting period report, the narrative lists "more time is needed" under every goal.

   iii.  In the second reporting period report, the narrative presents conflicting information. For example, the note from November 17, 2021, states that, "[K.B.] struggles with Kindergarten sight word cognition," and the note from January 19, 2022, states that, "According to iReady Data, [K.B.] is reading on a Kindergarten level." However, another note from January 19, 2022, states that, "[K.B.] can identify given sight words through daily repetition. When sight word is shown within an unknown sentence, [K.B.] struggles to identify sight word."

   iv.  Also in the second reporting period report, the note from November 17, 2021, states that, "[K.B.] does not understand the concept of adding and

14

subtracting…," and the note from January 19, 2022, states that, "[K.B.] can add and subtract single-digit numbers ***with one-on-one assistance.***" (emphasis added).

v. Also in the second reporting period report, the note from November 17, 2021 states that, "[K.B.] struggles with identifying numbers 0-20…:" and the note from January 19, 2022 states that, "[K.B.] can count to 20 ***with assistance***. [K.B.] still struggles with identifying his numbers to 20." (emphasis added).

vi. Also in the second reporting period report, under his speech language goals, K.B. appears to have maintained constant levels (i.e. did not have significant improvement). The Annual Goal Status Narrative for January 17, 2022, states that, "[K.B.] is making progress with this goal and accuracy maintains the same at this time [labeling pictures with 50% accuracy and 60% accuracy when demonstrated]."

vii. Also in the second reporting period report, K.B. was noted to still be using one-word responses as of January 17, 2022.

viii. Also in the second reporting period report, three of K.B.'s speech goals were "not addressed due to prerequisite goal unmet."

ix. By the third reporting period, K.B.'s goals numbered 1 and 2 still had the same narrative: "More time is needed."

x. On March 30, 2022, in the third reporting period for his speech language goals, the narrative states that, "[K.B.'s] accuracy remains the same this

reporting period. K.B. is able to label action verbs with 50% accuracy and 60% when demonstrated."

v.  Paragraphs 223-226, with the clarification that K.B. did not receive any occupational therapy whatsoever throughout the 2021-2022 school year.

w.  Paragraph 227 with the correction that Ms. Wyatt, Defendant's sole BCBA on staff, recommended that an ABLLS (ABLLS-R is the Assessment of Basic Language and Learning Skills – Revised) be provided. An ABLLS is not only used in the context of ABA. Rather, an ABLLS "is an assessment tool, curriculum guide, and skills-tracking system used to help guide the instruction of language and critical learner skills for children with autism or other developmental disabilities." *See* https://partingtonbehavioranalysts.com/products/ablls-r-the-assessment-of-basic-language-and-learning-skills-revised.

x.  Paragraph 228.

y.  Paragraph 229, although Plaintiffs dispute that "social emotional learning" is synonymous with in-house ABA therapy services. This is particularly true because ABA therapy services, as discussed above, are provided by highly trained BCBAs and RBTs. While the precise number of autistic children enrolled in MSCS is unknown to Plaintiffs at this time, given the prevalence of autism in the United States and given the large student body population, it defies logic that one (1) BCBA and no (0) RBTs can provide such "in-house ABA therapy services." Indeed, this is an important fact because it demonstrates Defendant's complete inability to provide a FAPE to K.B. because his IEP team decided that he needed

16

the services of an RBT under the supervision of a BCBA as recommended in the Independent Educational Evaluation (IEE) completed by Dr. Sarah Irby.

z.  Paragraph 230-234.

aa. Paragraph 235, with the clarification that Paragraph 236 describes those items upon which K.B.'s IEP team agreed but failed to include in the draft of his IEP dated March 14, 2022.

bb. Paragraph 236.

cc. Paragraph 237 is incorrect, and Plaintiffs do not incorporate it by reference. Plaintiffs participated in the March 14, 2022, IEP team meeting, but disagreed with the draft provided because it did not include the agreed-upon items as detailed in Paragraph 236. Plaintiffs therefore sent a marked draft back to Defendant for correction on May 5, 2022 (part of the delay was that the due process hearing occurred in the interim with both pre- and post-hearing briefing requirements and deadlines). Defendant did not send a revised draft to Plaintiffs until May 24, 2022, which was three (3) days before the end of the 2021-2022 school year.

dd. Plaintiffs dispute Paragraph 238 as being applicable to all children under all circumstances and do not incorporate it by reference. Some autistic children require intensive clinical treatment and services. The leading study on the effectiveness of ABA is the Lovaas study in which compared an experimental group of 19 children who received 40 hours of ABA per week for two years to comparison groups. Lovaas O. "*Behavioral Treatment and Normal Educational and Intellectual Functioning in Young Autistic Children*." Journal of Consulting and Clinical Psychology, 1987; Vol. 55, No. 1: pp3-9. Nine (9) out of nineteen (19) children in

the ABA group attained average cognitive functioning, and were able to perform in school with minimal supports, compared to only one (1) of forty (40) children in the control group. *Id*. *See, also*, Cohen, H., Amerine-Dickens, M. and Smith, T. "*Early Intensive Behavioral Treatment: Replication of the UCLA Model in a Community Setting*." Journal of Developmental Pediatrics, 2006; Vol. 27, No. 2: pp145-155 (Replicated 1987 Lovaas study; compared 21 children who received 35 to 40 hours of ABA per week to a control group of 21 age- and IQ-matched children in public school special education classes; the ABA group obtained significantly higher IQ and adaptive behavior scores than control group; six (6) of twenty-one (21) ABA children were fully included in regular education without assistance at year three, and eleven (11) others were included with support (for 17 out of 21 placed in regular education), compared to only 1 of 21 comparison children in regular education). See, also, Dawson, G. et al, "*Randomized, Controlled Trial of an Intervention for Toddlers With Autism: The Early Start Denver Model*." Pediatrics, 2010; Vol. 125, No. 1: pp17-23 http://pediatrics.aappublications.org /content/125/1/e17.full.pdf+html; Maglione, M.A. et al, "*Nonmedical Interventions for Children With ASD: Recommended Guidelines and Further Research Needs*," Pediatrics, 2012;Vol. 130;S169 http://pediatrics.aappublications.org/content /130/ Supplement_2/S169.full.html; Dawson G., "*Behavioral interventions in children and adolescents with autism spectrum disorder: a review of recent findings*." Current Opinion in Pediatrics, 2011; Vol 23: pp 616–620; McEachin J, et al. "*Long-Term Outcome for Children With Autism Who Receive Early Intensive Behavioral*

*Treatment*." American Journal on Mental Retardation, 1993; Vol. 97, No. 4: pp 359-372.

    ee. Plaintiffs would clarify the term "ABA methodologies" in Paragraph 239 as being insufficiently defined by Defendant. Plaintiffs do not know what is meant by "ABA methodologies" when describing what occurs in MSCS classrooms. Furthermore, Paragraph 239 does not distinguish between types of classrooms (i.e. general education classrooms, resource classrooms, or functional skills classrooms, for example). Plaintiffs do not incorporate Paragraph 239 by reference.

    ff. Plaintiffs have the same objection to Paragraph 240 as to 239, and do not incorporate it by reference.

    gg. Plaintiffs disagree with Paragraph 241 and do not incorporate it by reference.

    hh. Paragraphs 242-243.

    ii. Plaintiffs disagree with Paragraph 244 and do not incorporate it by reference.

37. The bottom line is that Defendant – despite information from Mr. K.B. and Ms. Guy and despite extensive records from K.B.'s prior placement – failed to identify K.B. as a child with a disability and failed to provide him with a FAPE at any time during the 2020-2021 school year. At no point during the 2020-2021 school year did K.B. have an IEP or receive a single related service as required by the IDEA: no accommodations, no special education, no special transportation, no speech language therapy (despite being largely nonverbal and engaging in echolalic speech), and no occupational therapy (despite needing both of these therapies prior to moving into the Defendant's district) (and this list is not exhaustive).

38. The IDEA imposes an affirmative duty upon the Defendant – and every other school district – to actively and systematically "identify[], locate[], and evaluate[]" all children with

disabilities within its jurisdiction "who are in need of special education and related services" and to "develop[] and implement[]" a "practical method… to determine which children with disabilities are currently receiving needed special education and related services." *See* 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a)(1)(ii). These duties are commonly referred to as the "child find" obligation, and they apply to all children within the District – even "highly mobile children" – who are "reasonably suspected" of having a disability in need of special education:

> This mandate is . . . an ***affirmative obligation*** of every local educational agency (LEA) to identify students who are ***reasonably suspected*** of having disabilities and to evaluate those students to determine whether they are eligible for special education services. *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007). The child find requirement is not limited to children enrolled in the public school system; it extends to "[a]ll children with disabilities residing in the State, including . . . children with disabilities attending private schools . . . ." 20 U.S.C. § 1412(a)(3)(A); *see also Doe v. Metro. Nashville Pub. Schs.*, 9 F. App'x 453, 455 (6th Cir. 2001).

*Ja.B. v. Wilson Cty. Bd. of Educ.*, No. 3:20-CV-00955, 2022 WL 326273, at *1 (M.D. Tenn. Feb. 2, 2022) (emphasis added); *see also* 34 C.F.R. § 300.111(c)(1) and (2) ("Child find also must include [c]hildren who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade; and [h]ighly mobile children, including migrant children.").

39. The Defendant's duty to identify students in need of special education services is "absolute" and "'is triggered when the [school] has reason to suspect a disability and reason to suspect that special education services may be needed to address that disability.'" *Wiesenberg v. Bd. of Educ.*, 181 F. Supp. 2d 1307, 1311 (D. Utah 2002) (*quoting Dep't of Educ., State of Hawaii v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1194 (D. Hawaii 2001)). While the District's knowledge of a disability "may be inferred from written parental concern, the behavior or performance of the child, teacher concern, or a parental request for an evaluation," *Wiesenberg*, 181 F. Supp. 2d at

1311 (*citing* 20 U.S.C. § 1415(k) (8) (B) (i-iv)), a parent is under no obligation to affirmatively request that the District fulfill its child find obligation to identify and evaluate a child, *see E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist.*, 2008 WL 4615436, at *1 (N.D. Cal.2008) ("A key component of the child find concept is that ***school districts have an affirmative duty, even in the absence of a parental request***, to identify children who may be eligible (and could benefit from) a special education program") (emphasis added) (*citing* 20 U.S.C. § 1412(a)(3)(A) ("All children with disabilities . . . are [to be] identified, located and evaluated."); *N.G. v. Dist. of Columbia*, 556 F. Supp. 2d 11, 25-27 (D.D.C. 2008) ("The Court begins with the premise that the Child Find obligation extends to all children *suspected* of having a disability, not merely to those students who are ultimately determined to be disabled… This statutory mandate is clear. Furthermore, this Court has held on numerous occasions that as soon as a student is identified as a potential candidate for special education services, [the District] has a duty to locate that student and complete the evaluation process."; "This Court has repeatedly found that when a district is aware that a student may have a disability… it has an obligation to evaluate the student, even if that student is homeless, a migrant, or unenrolled.") (*citing* 34 C.F.R. § 300.111(c)(1) ("Child find also must include children who are suspected of being a child with a disability…")).

40. As the Court of Appeals for the Sixth Circuit has made clear, a school district may not avoid discovery of a child's need. Rather, a violation exists where "school officials ***overlooked clear signs*** of disability and were ***negligent*** in failing to order testing, ***or*** [where] there is ***no rational justification*** for not deciding to evaluate." *Bd. Of Educ. Of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (emphasis added; internal citations omitted). Here, the evidence demonstrates that the District ignored clear signs of K.B.'s disabilities and negligently failed to order the required testing and that there was no rational justification for that failure.

41. The Defendant overlooked clear signs of K.B.'s disability and was negligent in its failure to order the testing required when presented with such evidence. No rational justification exists – and the District offers none – for its continued failure to evaluate K.B., to identify him as a child with a disability in need of special education and related services, and to develop and implement an appropriate IEP. As such, the Defendant violated its child find obligations.

*42.* Under the IDEA, the District is required to have an IEP in effect at the beginning of each school year for each child with a disability within its jurisdiction. *See* 20 U.S.C. § 1414(d)(2)(A)-(C); 34 C.F.R. § 300.323(a); *see also* 34 C.F.R. § 300.320. A "child with a disability" is a child who has been evaluated in accordance with the IDEA as qualifying in one of the enumerated categories of disability, including autism. *See* 34 C.F.R. § 300.8. In evaluating any child, the District "must administer such assessments and other evaluation measures as may be needed to produce the data identified under" the IDEA. 34 C.F.R. § 305(c). These include evaluations provided by the parent, current classroom-based, local, or State assessments, classroom-based observations, and observations by teachers and related service providers, including records from prior institutions, where applicable. *Id. See also,* 20 U.S.C. 1414(d)(2)(C)(iii); 34 C.F.R. § 300.323 (requiring, in the case of transfer students, the new school district "in which the child enrolls must take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous public agency in which the child was enrolled.").

*43.* Through this requirement, the IDEA places the responsibility on the District to obtain all necessary information needed to evaluate a child suspected of having a disability through both its own assessments and observations and through gathering assessments and observations by others, including prior service providers.

44. It is undisputed that Defendant failed to have an IEP in effect for K.B. for the entirety of the 2020-2021 school year.

45. It is also undisputed that Defendant failed to have an IEP in effect at the beginning of the 2021-2022 school year.

46. Alternatively, Defendant did not adopt the IEP from K.B.'s prior school district as required by the IDEA. When a child with a disability moves from one state to another within the same school year, the new school district "must provide the child with [a FAPE] (***including services comparable to those described in the child's IEP from the previous public agency***), until the new public agency" evaluates the child and, if appropriate, develops, adopts and implements a new IEP. 34 C.F.R. § 300.323(f) (emphasis added). In evaluating a child who transfers from an out-of-state school district, the IDEA requires the District to ensure that "assessments of children with disabilities who transfer from [one] school district to another school district in the same academic year are coordinated with such children's prior and subsequent schools, as necessary and ***as expeditiously as possible, to ensure prompt completion of full evaluations***." 20 U.S.C. § 1414(b)(3)(D) (emphasis added).

47. To the extent that Defendant claims that K.B. transferred into the District during the 2020-2021 academic year (in that Defendant elicited testimony at the due process hearing and has stated through its counsel that it believes that K.B. was not enrolled until some time after the 2020-2021 school year had already begun) and was under no obligation to have an IEP in place for that school year, this does not relieve it from its duties under the IDEA. Instead, such a scenario would have required Defendant to provide K.B. with appropriate services comparable to those described in his IEP from his prior school district during that year and to coordinate with K.B.'s prior school district as expeditiously as possible to promptly complete full evaluations of K.B. As detailed above, this

did not happen. Despite have information in July 2020 – and no later than October 2020 – indicating that K.B. had an IEP from his prior school district, the Defendant did not seek out records from the prior school district until the spring of 2021 (Ex. 55; and even then did not obtain a copy of his most recent IEP which the Indiana Evaluation Report (Ex. B`) makes clear that he had in 2018 at the very least) and did not attempt to begin the process of evaluating K.B. until September 2021. Nothing about the months-long delay in the Defendant's actions – which stretched out the entirety of the 2020-2021 academic year – can be accurately described as "expeditious" or "prompt," and it is undisputed that the Defendant never even attempted to provide K.B. with services comparable to those described in his IEP from his previous school district. As such, even under this theory, the Defendant violated its obligations under the IDEA.

48. The Final Order correctly concluded that Defendant failed to identify K.B. as a child with a disability, violated its Child Find mandate, and failed to provide a FAPE to K.B. from the time he moved into the District until October 18, 2021.

49. The Final Order, however, is in error in two significant ways: (1) it concludes that Defendant has provided a FAPE to K.B. since October 18, 2021[12], which it has not; and (2) it fails to adequately provide a remedy.

---

[12] What the ALJ actually decided was that Plaintiffs had not provided sufficient evidence of harm or a deficit as a result of the Defendant's failures and errors since October 18, 2021. Plaintiffs categorically dispute that conclusion as a matter of law. Furthermore, the ALJ was extremely rigid in the time he allotted each party to present their case. The Final Order states that the parties only requested two days, but that is not correct. Furthermore, the Defendant made extraneous and numerous objections – almost all of which were ultimately denied – during the hearing which caused the hearing to take much longer than originally anticipated. At the same time that the due process hearing for this nine year-old child with severe disabilities was occurring, a celebrity and his celebrity wife had a **six week** trial over defamation claims. The irony and discrepancy in these procedures is not lost on Plaintiffs. By so severely time-limited the parties' ability to present their case, the ALJ did not allow Plaintiffs the full due process expected and required by the IDEA.

## V.     CONTINUING VIOLATIONS

50. At no point has Defendant provided K.B. with a FAPE. Put simply, to date, Defendant has failed to make an offer of FAPE to K.B. that it can actually provide because it does not employ the necessary personnel.

51. The lack of necessary personnel impacts not only K.B., but any other similarly-situated child within the district who has autism and/or other developmental or cognitive delays or impairments that necessitate the use of ABA therapies in order to have a FAPE.

52. K.B. made very little progress – if any – over the course of the 2021-2022 school year.

53. Defendant did not provide K.B. occupational therapy, which his IEP team agreed he needed, at any point during the 2021-2022 school year.

54. Defendant did not provide K.B. any one-on-one instruction during the 2021-2022 school year.

55. K.B.'s IEP team agreed that he needed the services of an RBT under the supervision of a BCBA.

56. As of June 10, 2022, the Defendant did not employ a single RBT.

57. Dr. Sarah Irby is a child psychologist who conducted the Independent Educational Evaluation (IEE) of K.B. in January 2022. Her full report is attached to this Complaint as Exhibit D, and is fully incorporated herein.

58. Dr. Irby's report sets forth recommendations for K.B. Even though K.B.'s IEP team agreed that K.B. needed almost all of Dr. Irby's recommendations, K.B. did not receive any of those recommended services and accommodations.

59. The failure to provide the necessary accommodations, special education, and related services – particularly, but not limited to, those recommended by Dr. Irby – is Defendant's failure to provide K.B. a FAPE.

## VI.    CAUSES OF ACTION

### a.   Plaintiffs' Claims under IDEA

60. All prior paragraphs are incorporated herein by reference.

61. K.B. is a student with disabilities as that term is defined by the IDEA. He was, and is, eligible for a FAPE under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq*., (IDEA).

62. Mr. K.B. is the parent and legal guardian of K.B. who receives special education services under the IDEA. Mr. K.B. brings this action in his own right and on behalf of his son, K.B.

63. Under the IDEA, the District is required to provide "all children with disabilities have available to them a free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). "Special education" is defined to mean "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(29). "Related services" include psychological services, social work services, and counseling services as may be required to assist the child with a disability to benefit from special education. 20 U.S.C. § 1401(26).

64. Through the IDEA, Congress has conditioned the federal funds provided to states to assist in educating children with disabilities on the state's "pledge[] to comply with a number of statutory conditions," which include providing a FAPE to all eligible children. *Endrew F. ex rel. Joseph F.*

*v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017); *see also* 20 U.S.C. § 1414. A FAPE must include "specially designed instruction . . . to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(9). To that end, schools must devise and implement an IEP for disabled children. *Id*. at § 1401(9)(D). The IEP is "[t]he centerpiece of the [IDEA's] educational delivery system." *Endrew F.,* 137 S. Ct. at 994 (quoting *Honig v. Doe,* 484 U.S. 305, 311 (1988)); *see also* 20 U.S.C. §1414(d)(1)(A). It "is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability and potential for growth." *Id*. at 999; *see also Coventry Pub. Sch. v. Rachel J.,* 893 F. Supp. 2d 322, 332 (D.R.I. 2012) ("[A]n IEP must target 'all of a child's special needs,' whether they be academic, physical, emotional, or social.").

65. The IDEA requires a school district to use a "variety of assessment tools and strategies" to "gather relevant functional and developmental information about the child" when evaluating whether a child is a child with a disability. 34 C.F.R. § 300.304. To determine eligibility, a school district is to review "existing evaluation data," including evaluations obtained from the parent of the child and from the prior school district; current classroom-based assessments and observations; and observations by teachers and related service providers." 34 C.F.R. § 300.305(a); *see also,* 20 U.S.C. 1414(d)(2)(C)(iii); 34 C.F.R. § 300.323. [O]n the basis of that review, and input from the child's parents," a school district then determines "whether the child has a particular category of disability." *Id*.

66.    Federal law also distinguishes between educational and academic performance and establishes that educational performance is a broad concept. Accordingly, schools – including the Defendant – must assess students in all areas of suspected disability. *See* 20 U.S.C. § 1414(b)(3)(B). Those areas are defined by federal regulation, and academic performance is only

27

one of the areas in which students must be assessed. *See* 34 C.F.R. § 300.304(c)(4). In addition to grades and standardized tests scores, schools must consider how the student's social-emotional conditions adversely affect their non-academic performance in social, behavioral, and other domains as well. *Id.*

67.     Defendant has both substantive and procedural obligations under the IDEA:

> Procedural violations generally concern "the preparation of an IEP," such as the evaluation, placement, and IEP-formation procedures outlined in § 1414. Substantive violations concern the substance of the IEP; namely, whether the school has provided "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."

*L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 789, 2018 WL 3966517 (6th Cir. 2018). To satisfy its procedural obligations, a school designates an IEP Team (comprised of teachers, school officials, and the child's parent(s)) tasked with preparing a "comprehensive plan . . . in compliance with a detailed set of procedures." *Endrew F.*, 137 S. Ct. at 994. *See also* 20 U.S.C. § 1414(d)(1)(B). An actionable procedural violation of the IDEA exists where the school district's violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process; **_or_** (3) caused a deprivation of educational benefits. *See* 20 U.S.C. § 1415(f)(3)(E)(ii) (emphasis added).

68.     To meet its substantive obligations, a school must provide an IEP that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 997. Thus, a substantive violation of the IDEA exists where a FAPE is not provided.

69.     Parents who consider their child's placement and / or IEP inappropriate have a right to an impartial due process hearing by a state or local educational agency. *See* 20 U.S.C. § 1415(f) & (g). Agreeing to an IEP does not preclude a parent from disputing its reasonableness later. *See*

*e.g., Letter to Lipsitt*, 52 IDELR 47 (2008) ("Parents may file a due process complaint regarding an IEP even when they previously agreed to it."); *cited in A.B. v. Franklin Twp. Cmty. Sch. Corp*., 898 F. Supp. 2d 1067, 1076 (S.D. In. 2012). Accordingly, that Mr. K.B. signed at least some of K.B.'s IEPs does not foreclose his claim that those IEPs failed to provide K.B. with a FAPE.

70.     As set out above, Defendant failed its child find obligations to identify K.B. as a child with a disability and to evaluate him in all areas of suspected disability during the 2020-2021 academic year. By failing its child find obligations, Defendant committed both procedural and substantive violations of the IDEA. Procedurally, the Defendant's failure to comply with its child find obligations clearly impeded K.B.'s right to a FAPE due to his substantial disabilities and significantly impeded his father's opportunity to participate in decision-making. The Defendant also deprived K.B. of educational benefit, as K.B. could have received no educational benefit in the 2020-2021 academic year due to Defendant's failure to identify his profound disabilities, which require K.B. to be provided with substantial accommodations and related services to access his education. He received none. While only one of these factors is required to be met for an IDEA violation, *see* 20 U.S.C. § 1415(f)(3)(E)(ii), all three exist here.

71.     Defendant's failure to comply with its child find obligation was also a substantive violation of the IDEA because it resulted in Defendant failing both to identify K.B. as a child with a disability and to develop and implement and appropriate IEP that provided a FAPE, including related services, for more than an entire academic year.

72.     Defendant has also denied K.B. a FAPE throughout the 2021-2022 academic year. K.B.'s first IEP as an MSCS student is dated August 23, 2021, after the beginning of the 2021-2022 academic year. That IEP categorizes K.B. as having a developmental delay as his disability category, as that was his prior category in Indiana that notes that K.B. had a prior autism spectrum

disorder diagnosis. His present levels of performance are identified as being in the first percentile in basic reading skills and in the third percentile in basic math skills. He was unable to do any simple addition or subtraction. The IEP also noted that K.B. has limited turn-taking in conversation. Nonetheless, the IEP provided only eight (8) minutes of language therapy per week, sixty (60) minutes each of co-teaching in mathematics and reading, and RTI2[13] intervention of forty-five (45) minutes per day, all in the general education classroom setting.

73.     Defendant acknowledged that the August 23, 2021 IEP[14] was a "placeholder" IEP to provide Defendant more time to fully evaluate K.B. in order to finally develop a more comprehensive IEP. It cannot be disputed that both this "placeholder" IEP and the more comprehensive IEP could and should have been developed during the 2020-2021 academic year.

74.     Following the filing of the underlying Due Process Complaint, Defendant reconvened K.B.'s IEP team on October 18, 2021. At that meeting, the IEP team reviewed and considered Defendant's school psychologist's (William Graves) evaluation. Although Defendant's school psychologist's evaluation contains errors – including an insensitive and offensive reference to "mental retardation"[15] – his evaluation is most notable for what it failed to include. The Defendant's school psychologist failed to analyze all of the data that Defendant had in its

---

[13] As previously discussed, RTI2 is **_not_** special education or a related service. *See supra* fn13.

[14] Note that the draft October 4, 2021 IEP (Ex. 39 at 14) does not change any of the special education and related services from the August 23, 2021 draft IEP (Ex. 38 at 14).

[15] Administrative law judges in Tennessee's Administrative Procedures Division who hear special education cases are required to undergo specialized training in the IDEA (and, presumably, the appropriate nomenclature of disability). Nonetheless, the ALJ used the outdated term "handicap." Mr. Graves, the Defendant's school psychologist who conducted an evaluation of K.B. in September 2021 and whose very job is to evaluate students suspected of having a disability – used an even more offensive term in his psychoeducational evaluation presented at the October 18, 2021 IEP meeting (a meeting occurring after the filing of the underlying Due Process Complaint). That term has been considered outdated since at least October 5, 2010 – more than 10 years prior – when President Obama signed federal legislation entitled "Rosa's Law" which replaced that term in federal legislation with the term "intellectual disability." *See* https://www.govinfo.gov/content/pkg/PLAW-111publ256/pdf/PLAW-111publ256.pdf.

possession in evaluating K.B. He also failed to consider the Innovations records, even though he had directly received those documents on December 11, 2021, and even though – as Plaintiffs now know – a copy of those records existed in K.B.'s physical file at Lucie E. Campbell Elementary School. Although these records were in Defendant's possession, Defendant's school psychologist reports – erroneously – that "[p]revious psycho-educational records were not able to be obtained from the school district in Indiana." He declined to consider any speech evaluations, although one had been completed on August 17, 2021, and could not consider any occupational therapy or physical therapy evaluations because none were conducted until after the October 18, 2021 IEP meeting. This is true even though a District-employed occupational therapist sent an email on May 10, 2021, inquiring as to whether an occupational therapist had been made part of the IEP team. Although Defendant's school psychologist issued a "corrected" evaluation, he made only typographical changes (and removed the term "mental retardation"); he made no substantive changes and considered no additional evidence.

75.     At the conclusion of the October 18, 2021 IEP meeting, the IEP team agreed that K.B. should be placed in a functional skills classroom for academic instruction and should join his nondisabled peers in the general education setting for recess, lunch, and support classes (such as physical education, music, and art). However, the subsequent IEP generated by the Defendant does not conform to what the IEP team agreed. Most notably, the IEP fails to reflect any of the time that K.B. is to spend in the general education setting. Furthermore, as a result of Dr. Irby's observations as part of her IEE, Mr. K.B. learned that K.B. has two lunch periods each school day (one with his functional skills class and one with the general education students). Thus, the Defendant made the affirmative unilateral decision (and without parental consent) to provide K.B. – a student with

established significant deficits – even less instructional time than every other student at Lucie E. Campbell.

76.    The errors contained within this IEP have been compounded because Defendant failed to provide a copy to Mr. K.B. until it was produced as part of the discovery in the underlying administrative procedure and litigation in February 2022 – four (4) months after the October 18, 2021 IEP meeting. As a result, Mr. K.B. was denied the opportunity to address the inconsistencies between the IEP teams agreed-upon course of action and the reality of his son's academic life. Failure to provide a written copy of the IEP for Mr. K.B. to review and sign is a procedural violation of the IDEA.

77.    Similarly, Defendant failed to provide Mr. K.B. with an IEP or an addendum following a January 7, 2022 IEP meeting in which Mr. K.B. accepted special transportation after the family car was stolen at gunpoint earlier that week. This is yet another procedural violation of the IDEA.

78.    The next IEP draft (dated March 14, 2022) stems out of a February 28, 2022 IEP meeting at which K.B.'s IEP team considered Dr. Irby's IEE, as well as the occupational therapy and physical therapy evaluations completed since the October 18, 2021 IEP meeting. The timing of the meeting itself is yet another example of Defendant's wonton disregard for any kind of expediency in this case. Both the occupational and physical therapy evaluations were conducted in October 2021. While it is reasonable to require some time after the evaluations to generate a report, four (4) months passed after their completion. As a result of reviewing Dr. Irby's evaluation and receiving input from the physical therapist, the occupational therapist, K.B.'s speech language therapist, and observations from his classroom teacher, the team adopted many of Dr. Irby's recommendations, including addition "social behavior" to be provided by an RBT under the

supervision of a BCBA, adding an RBT to K.B.'s classroom to "focus on [K.B's] needs," half of his speech language sessions to be provided on-one-one, and added occupational therapy.

79.     K.B.'s draft IEP dated March 14, 2022, contains several changes from his previous IEP, including the provision of "social behavior" for 30 minutes, twice a week, increased language therapy, and added occupational therapy. However, the March 14, 2022 draft IEP fails to include several items on which the IEP team agreed would be included:

- It does not specify that an RBT is to be added to K.B.'s classroom.
- It does not specify that the RBT is to be assigned primarily to K.B.
- It does not specify that half of K.B.'s language therapy is to take place in a group setting and that half is to be provided individually.
- It does not specify that K.B. is to participate with the general education population during lunch, recess, and support classes.

80.     Additionally, although K.B.'s IEP team agreed that K.B. needed a qualified RBT in his classroom, Defendant's employees testified during the due process hearing that Defendant did not employ any – not one – qualified RBTs at the time of the meeting or when the March 14, 2022 draft IEP was issued and that only one (1) qualified BCBA was currently employed by the District. This means that when K.B.'s IEP team recommended that an RBT be added to K.B.'s classroom and assigned primarily to K.B. in order to provide him with a FAPE, the Defendant was **_incapable_** of providing that resource and, thus, of providing K.B. with a FAPE. Plaintiffs subsequently learned on June 10, 2022, that the Defendant has yet to employ a single qualified RBT. Put simply, to date, the Defendant has failed to make an offer of FAPE to K.B. that it can actually provide.

81.     Defendant's failure to provide K.B. with a FAPE throughout the 2021-2022 school year is also evidenced in his IEP progress reports and other educational records as is described in paragraphs above. Furthermore, K.B.'s IEP Progress reports support Dr. Irby's recommendations

for additional one-on-one support for K.B. and support the conclusion that failure to adopt those recommendations is a failure to provide a FAPE to K.B.

82.     Finally, Defendant has failed to provide K.B. with a FAPE due to its failures in transportation. Defendant did not offer K.B. special transportation, a recognized "related service" in the IDEA, until the October 18, 2021 IEP meeting, despite his obvious and severe social-emotional and language impairments. In the absence of these special transportation services, at the start of the school year, K.B. was riding the bus. However, in the first week of school, the Defendant placed K.B. on the wrong bus at the end of the school day. Although no physical harm came to K.B. as a result of this negligent act, Mr. K.B. and Ms. Guy used their meagre resources to buy a car so that K.B. would no longer have to be subjected to the Defendant's whims as to which bus on which he would be placed at the end of a school day.

83.     Unfortunately, Ms. Guy was the victim of a carjacking in early January 2022, and, out of sheer necessity, Mr. K.B. requested special transportation for K.B., again subjecting him to the transportation whims of Defendant. Defendant convened an IEP meeting and added special transportation to K.B.'s IEP. While Defendant provided correct transportation for K.B.'s two siblings who are not children with disabilities, K.B.'s transportation route sent him to the wrong school. Even though Defendant was aware of this pending Due Process complaint detailing the extent of K.B.'s disabilities, even though the responsible employee – a director in Defendant's Department of Exceptional Children – had previously received an email about this student in which she mistakenly believed he was zoned for Lucy Elementary School only to quickly learn that he was zoned for Lucie E. Campbell Elementary School, even though she has over 48 years of special education experience including substantial experience with children with autism, and even though she heads up special transportation within the District's Department of Exceptional Children, she

failed to notice that K.B. had been scheduled to go to the wrong elementary school.  And, once again, the District put K.B. on a bus going to the wrong location.

84.     Accordingly, Defendant has failed to provide K.B. with a FAPE for the entirety of the 2021-2022 academic year.

### b.  Compensatory Education

85.     All prior paragraphs are incorporated herein by reference.

86.     The ALJ's Final Order correctly found that the Defendant violated its child find obligations and that it denied K.B. a FAPE from his move into the District until October 18, 2021. However, it did not also recognize Defendant's continued failure to provide a FAPE to K.B. since then (which has occurred), and it did not properly consider the available administrative remedies that it could to fully compensate K.B. for the many and ongoing deficits in his educational programming.

87.     For IDEA violations, the district court may award "appropriate" compensatory relief. 20 U.S.C. §1415(i)(2)(C)(iii). Given that K.B. was denied an IEP and any related services for more than a school year and that Defendant failed to provide FAPE even after K.B. did receive an IEP (including, but not limited to, the lack of provision of any ABA services and any occupational therapy until the summer of 2022), the Final Order's award of 180 sessions of 30 minutes each of ABA services only is simply inappropriate and inadequate.

### c.  Attorneys' Fees

88.     All prior paragraphs are incorporated herein by reference.

89.     As the Final Order (Ex. A) shows, the ALJ named Plaintiffs the prevailing party on the following issues:

a. that MSCS committed a child find violation and denied K.B. a FAPE from October 5, 2020, through the end of the 2020- 2021 school year and from August 9, 2021, to October 18, 2021, of the 2021-2022 school year. This is roughly one full school year, which would equate to 180 days;

b. that MSCS failed to provide K.B. an IEP reasonably calculated to enable K.B. to make progress appropriate in light his circumstances and thereby denied him a FAPE from October 5, 2020, through the end of the 2020-2021 school year and from August 9, 2021, to October 18, 2021, of the 2021-2022 school year; and

c. that K.B. is entitled to compensatory education.

90. Administrative law judges do not have the authority to award the substantial attorneys' fees and costs (monetary relief) under the IDEA. For those, Plaintiffs are required to file this action under the IDEA.

91. The IDEA assures an award of reasonable attorneys' fees as part of the costs for a "prevailing party" in an impartial due process hearing conducted under the IDEA. 20 U.S.C. §1415.

92. Plaintiffs meet the definition of "prevailing party" with the respect to the above-enumerated issues in Paragraph 89.

93. Since Plaintiffs obtained relief based on the merits of the substantive claims enumerated in Paragraph 89, they meet the definition of "prevailing party" under the IDEA.

94. Plaintiffs' counsel have expended a great amount of time pursuing K.B.'s rights, and counsel continues to be required to spend additional time pursuing these fees as well as the additional rights for K.B. as plead in this complaint.

95. Plaintiffs seek to recover their litigation costs, reasonable attorneys' fees for Janet H. Goode and Michael F. Braun, expert witness fees, and other costs recoverable under the IDEA for being the prevailing party on the substantive part of due process hearing as found in the Final Order.

## VII.   RELIEF SOUGHT

96. The foregoing paragraphs are incorporated.

97. Plaintiffs request reversal of the parts of the due process administrative Final Order in which they were not the prevailing party. Plaintiffs further seek the introduction of additional evidence in this case given the continuing nature of Defendant's violations and the discovery abuses during the predicate administrative proceeding

98. Plaintiffs also seek a declaration that Defendant violated and continues to violate the IDEA in the provision of FAPE, along with an Order of injunctive or "any appropriate relief" including:

(1) requiring Defendant to be responsible for payment of private placement (at a private school) at a placement of Mr. K.B.'s choosing given that Defendant continues to be wholly incapable of providing a FAPE to K.B.;

(2) compensatory education, including but not limited to the hours of speech language therapy, occupational therapy, and ABA services that Defendant denied K.B. as a result of its child find violations and failure to provide a FAPE and the hours of those services needed to place K.B. in the position that he would have been in had Defendant not denied K.B. a FAPE;

(3) reimbursement for the out-of-pocket expenses Plaintiffs have incurred as a result of Defendant's violations, most notably the purchase of a vehicle to transport K.B. safely to and from school;

(4) litigation costs, reasonable attorneys' fees for Janet H. Goode and Michael F. Braun, expert witness fees, and other costs recoverable under the IDEA for being the prevailing party on those issues identified in this complaint and as identified in the Final Order (Ex. A). Plaintiffs request a Court-ordered schedule with a hearing date or briefing date for submission of the dollar amounts of the fees and costs, along with any supporting documentation/testimony (in the event stipulation of attorneys' fees and costs is not possible). In the event the parties are not able to stipulate to the amount of attorneys' fees and costs, Plaintiffs intend to seek the additional fees and costs that will be incurred in this action once the final amount is known;

(5) Reasonable attorneys' fees and costs under IDEA in this action;

(6) Any other such relief as the Court deems appropriate and as the cause of justice may require.

Date:   July 18, 2022

_s/Janet H. Goode_____
Janet H. Goode, TN BPR #35872
917 Cooper Street
Memphis, TN 38104
901-308-7511
janet@janetgoodelaw.com


_s/ Michael F. Braun_____
MICHAEL F. BRAUN (BPR 032669)
5016 Centennial Boulevard, Ste. 200
Nashville, TN 37209
(615) 378-8942

**Attorneys for Plaintiffs**