# Exhibit A
# Final Order from the Administrative Judge
# dated May 18, 2022



**State of Tennessee**

# Department of State

Administrative Procedures Division
312 Rosa L. Parks Avenue
8th Floor, William R. Snodgrass Tower
Nashville, Tennessee 37243-1102
Phone:  (615) 741-7008/Fax: (615) 741-4472

**May 17, 2022**

Janet Goode, Esq.
Goode Law
917 South Cooper Street
Memphis, TN 38104

Laura Bailey, Esq.
Shelby County Schools
160 S. Hollywood, #218
Memphis, TN 38112

Michael F. Braun, Esq.
Law Office of Michael Braun
5016 Centennial Blvd., Ste. 200
Nashville, TN 37209

Taylor Jenkins, Esq.
Andrew Johnson Tower, 9th Floor
710 James Robertson Parkway
Nashville, TN 37243

**RE: K.B., THE STUDENT, AND K.B., THE STUDENT'S PARENT V. SHELBY COUNTY SCHOOLS, APD Case No. 07.03-214603J**

Enclosed is a *Final Order*, including a *Notice of Appeal Procedures,* rendered in this case.

Administrative Procedures Division
Tennessee Department of State

Enclosure(s)

**BEFORE THE TENNESSEE DEPARTMENT OF EDUCATION DIVISION OF SPECIAL EDUCATION**

IN THE MATTER OF:

K.B., THE STUDENT, and
K.B., THE STUDENT'S PARENT,
    *Petitioners,*
*v.*

SHELBY COUNTY SCHOOLS,
    *Respondent.*

APD Case No. 07.03-214603J

## FINAL ORDER

This contested case, arising from claims made under the Individuals with Disabilities Education Act (IDEA), was heard before Administrative Judge Phillip R. Hilliard on March 22-23, 2022, and April 8, 2022.  The Petitioners, K.B., the student and Mr. K.B., the student's parent, are represented by attorneys Janet Goode and Michael Braun.  The Respondent, Shelby County Schools (Memphis Shelby County Schools or "MSCS"), is represented by attorney Laura Bailey.

The due process complaint was filed on October 6, 2021.  Per the ORDER SETTING PREHEARING CONFERENCE entered on October 11, 2021, the parties were advised that the hearing would be scheduled "for up to three (3) business days," and that "[a] request for additional hearing days shall only be granted at the discretion of the Administrative Judge upon a showing of good cause."  The ORDER SETTING HEARING entered on December 17, 2021, reflects that the parties requested two (2) days for hearing – February 8-9, 2022.  An ORDER OF CONTINUANCE issued on February 2, 2022, continued the case based on a showing of extraordinary circumstances, and the case was rescheduled to be heard, by agreement of the parties, on March 22-23, 2022, by ORDER SETTING HEARING entered February 18, 2022.  To ensure the hearing concluded within the time allotted, the parties were provided a finite amount of time to make

opening statements and closing arguments, and to examine witnesses.  Unfortunately, the parties did not conclude their proof within the 2 days they had requested for hearing and asked the tribunal for one additional day of hearing, which request was granted.

An ORDER OF CONTINUANCE entered on March 31, 2022, set post-hearing filing dates as follows: the transcript was to be filed no later than April 14, 2022; the Petitioners were to file proposed findings of fact and conclusions no later than April 20, 2022; and the Respondent was to file proposed findings of fact and conclusions of law no later than April 22, 2022.  Pursuant to an Order entered on April 22, 2022, the deadlines to file proposed findings of fact and conclusions of law were extended to April 25, 2022, and April 28, 2022, respectively.

The issue in this case is whether K.B. was denied a free and appropriate public education (FAPE) and, if so, the appropriate remedy.  Based on review of the entire record, it is **DETERMINED** that the Respondent did not provide K.B. with a FAPE during the 2020-2021 school year through October 18, 2001, because MSCS violated its procedural child find obligation, as well as its obligation to provide K.B. with an appropriate individualized education program (IEP). This violation deprived K.B. of an educational benefit and significantly impeded Mr. K.B.'s opportunity to participate in the decision-making process of his son's education. Therefore, the Petitioners are the prevailing party on those claims, and K.B. is awarded compensatory education in the form of 180 sessions, at 30 minutes per session, of in-house ABA services at MSCS, to be performed by a Registered Behavior Technician, supervised by a Board-Certified Behavior Analyst.  These services shall be provided in addition to the services already being provided to K.B. under his current IEP.

Witnesses who testified at the due process hearing, in the order they first appeared,[1] were: (1) Mr. K.B., the parent; (2) Dr. Sarah Irby, Petitioners' expert; (3) Ms. Eboni Guy, Mr. K.B's

---

[1] Some witnesses testified for both parties.

girlfriend; (4) Ms. Lashonda Geter, Financial Secretary at Lucie E. Campbell Elementary School; (5) Ms. Stacey Davis, MSCS Manager of Registration and Enrollment; (6) Ms. Rebecca Fik, MSCS Director for Exceptional Children and Health Services; (7) Ms. Nia Coleman, MSCS Advisor for Exceptional Children and Health Services; (8) Ms. Shavonica Williams, speech pathologist for MSCS;  (9) Ms. Julia Cole, professional school counselor at Lucie E. Campbell Elementary School; (10) Mr. Zucchineus Carruth, employee at Lucie E. Campbell Elementary School; and (11) Ms. Jennifer Wyatt, special education teacher with MSCS.

## FINDINGS OF FACT[2]

1.      K.B., the student, was born on November 5, 2012, in Norfolk, Nebraska, and is currently 9 years old.

2.      Mr. K.B., the parent, is the student's father.

3.      In 2016, Mr. K.B. moved out of the home he had shared with K.B., K.B.'s mother, and K.B.'s two biological siblings.

4.      Mr. K.B. saw these children, including K.B., regularly from the time Mr. K.B. moved out through 2018.

5.      Between the time that K.B. was roughly 6 to 8 years old (2018-2020), K.B.'s father did not see K.B. in person.

6.      K.B. and his siblings moved to Memphis in July 2020 to live with Mr. K.B. after their mother was arrested and incarcerated.

7.      Since that time, K.B. has been living with Mr. K.B., his siblings, and Ms. Eboni Guy (Mr. K.B.'s girlfriend), within the geographical boundaries of MSCS.

---

[2] References to the Due Process Hearing Transcript are noted as Hrg. Tr., Vol. ___, [page number]:[line numbers]. References to Exhibits are noted as Hrg. Ex. ____ at [page number].

8.      Ms. Guy has no legal relationship to K.B., but she does serve as a primary caregiver for K.B. and his siblings.

9.      Both Mr. K.B. and Ms. Guy sent emails from Mr. K.B.'s email account to MSCS.

10.     On July 14, 2020, an email was sent from the email account of Mr. K.B. to MSCS for the purpose of notifying MSCS that K.B. and his siblings needed to be registered to attend MSCS schools.

11.     On July 17, 2020, Mr. K.B. received an email from an MSCS employee, Ms. Angelia Dixon, attaching a letter listing all of the documents required for registering the children in an MSCS school.

12.     Ms. Dixon worked in the Registration/Enrollment Office, Division of SEED (Student Equity, Enrollment & Discipline).

13.     The MSCS 2020-2021 school year began on August 31, 2020, and ended on June 18, 2021.

14.     There are 180 school days in a school year.

15.     On September 1, 2020, Ms. Guy sent an email from Mr. K.B.'s email address to Ms. Dixon regarding immunization records.

16.     A further exchange of emails ensued on September 1, 2020, resulting in Mr. K.B. sending immunization records to Ms. Dixon, and Ms. Dixon advising Mr. K.B. that he should contact the school the children would be attending in order to register the children.

17.     The emails between Mr. K.B.'s email account and Ms. Dixon did not mention or reference that K.B. was a student with a disability, that K.B. had previously been diagnosed with autism, or that K.B. needed special education services.

18.     Mr. K.B. spoke to Ms. Dixon on the telephone on several occasions between May and September of 2020.

19.     In the earliest of those telephone conversations, Mr. K.B. told Ms. Dixon that one of the children he was trying to register was autistic.

20.     Mr. K.B. told MSCS employee Zacchineus Carruth that K.B. had a disability. Mr. Carruth advised that he would "take care of it."

21.     Ms. Guy told Mr. Carruth that K.B. was autistic.

22.     Ms. Guy told Ms. Lashonda Geter and Ms. Julia Cole (MSCS employees at Lucie E. Campbell Elementary School), as well as Ms. Stacey Davis (the Manager of Registration and Enrollment for MSCS's SEED department), that K.B. is autistic.

23.     Ms. Lashanda Geter is the financial secretary at Lucie E. Campbell Elementary School.

24.     On October 2, 2020, Mr. K.B. having contacted Lucie E. Campbell Elementary School regarding enrolling his children, including K.B., Ms. Geter emailed other MSCS employees to see what assistance could be provided to Mr. K.B.

25.     Ms. Guy told Ms. Geter that K.B. had "never been in a school system."

26.     On October 5, 2020, at 10:12 a.m., Ms. Geter scanned a fax from the fax machine at Lucie E. Campbell Elementary School to herself. (Hrg. Ex. 14).

27.      The scanned fax documents were 35 pages of records concerning K.B. from Innovations in Learning, a learning center in Merrillville, Indiana.

28.     The documents contain a cover page with Mr. K.B.'s signature dated September 25, 2020, authorizing the disclosure of K.B.'s records from Innovations in Learning to "Lucy Elementary School."

29.     A different version (66 pages as opposed to 35) than what Ms. Geter scanned to herself on October 5, 2020, was purported to have originally been faxed from Innovations in Learning to Lucy Elementary School on September 25, 2020, to a Ms. Morton.  (Hrg. Ex. 54).

30.    Ms. Cynthia Houston, a Lucie E. Campbell Elementary School special education teacher, emailed the 66 pages of documents to Ms. Nia Coleman, an advisor for Lucie E. Campbell in the Department of Exceptional Children, on October 5, 2021, at 4:38 p.m. EDT.

31.    Lucy Elementary School is another MSCS elementary school, different from Lucie E. Campbell Elementary School.

32.    The records from Innovations in Learning first contain a document entitled "Initial Diagnostic Evaluation and Master Treatment Plan," which indicates an evaluation date of August 7, 2018, (at which time K.B. would have been six years and nine months old) and includes the following purported[3] information:

- K.B.'s mother reported that his word usage was limited, mostly echoing someone else or labeling a reinforcing item in the environment.

- K.B.'s mother reported that K.B. attended at least two special needs programs while in preschool.

- K.B.'s mother reported that K.B. required intensive teaching to stay on task, did not initiate social interaction (though he would imitate the actions of others), that he did not engage in pretend play (though he played with most toys "as designed"), that he engaged in repetitive behaviors (humming and covering his eyes and jumping in place), that he did not want others to touch his toys and that he would engage in tantrum behaviors if anyone did so, that if the doors were not shut in the rooms in which he was located he would engage in tantrum behaviors, and that he attempted to elope from his mother when in public.

33.    The "Behavioral Observations" in the "Initial Diagnostic Evaluation and Master Treatment Plan" include the following purported observations:

- K.B. made eye contact with a therapist but did not otherwise respond to being greeted.

- He identified a toy car, saying "car," and lined all the cars up in rows.

---

[3] The Innovations in Learning records were admitted into evidence for notice purposes, only. Therefore, while no judgment can be made about the truth of the matters asserted therein, the documents are being considered by the tribunal in determining whether the information in the documents formed, in any part, the basis for signs of a disability that should have led MSCS to perform an evaluation of K.B.

- When K.B.'s sister refused his trying to take a toy from her, K.B. began to cry, scream, and grunt.

- K.B. grunted during the session, but never used words beyond his saying "car," as noted above.

34.     The "Summary and Recommendations" in the "Initial Diagnostic Evaluation and Master Treatment Plan" identify K.B. as having a primary diagnosis of "Autism Spectrum."

35.     The "Master Treatment Plan" recommended Applied Behavioral Analysis (ABA) therapy for 35 hours per week for communication, social skills, daily living skills, problematic behaviors, and parent training.

36.      The "Master Treatment Plan" recommended 1:1 therapy, with sessions being conducted by Registered Behavior Technicians (RBT), supervised by a Board-Certified Behavioral Analyst (BCBA).

37.     The plan further stated objectives and goals for K.B. to reach while at Innovations in Learning and at home.

38.     The Innovations in Learning records also included what is titled a "Semi-Annual Diagnostic Evaluation and Master Treatment Plan," indicating an evaluation date of January 14, 2020, and purporting to show how K.B. had performed since the "Initial Diagnostic Evaluation and Master Treatment Plan."

39.     The "Semi-Annual Diagnostic Evaluation and Master Treatment Plan" noted that K.B. made some progress between September 11, 2018, and January 14, 2020, but also notes that K.B. would remain in ABA therapy with sessions being conducted by Behavior Technicians, supervised by a BCBA.

40.     The plan further stated objectives and goals for K.B. to reach while at Innovations in Learning and at home.

41.     Ms. Geter showed the faxed Innovations in Learning records to Lucie E. Campbell Elementary School counselor Ms. Julia Cole because Ms. Geter was unsure what to do with the records when she received them.

42.     After showing the Innovations in Learning records to Ms. Cole, Ms. Geter placed the paper copy in K.B.'s physical file at Lucie E. Campbell Elementary School.

43.     Ms. Cole and Ms. Geter called the SEED office to determine where to send the documents.

44.     It is the protocol of the SEED Department to contact the Department of Exceptional Children when it receives documents that suggest an enrolling student may have a disability.

45.     MSCS' Department of Exceptional Children oversees all MSCS students with disabilities.

46.     On October 5, 2020, at 11:28 a.m., EDT, Ms. Geter forwarded (by email) the scanned Innovations in Learning records to Stacey Davis, an MSCS employee working in the SEED.

47.     Ms. Stacey Davis works in the SEED department as the Manager of Registration and Enrollment.

48.     Ms. Davis forwarded (by email) the Innovations in Learning records she received from Ms. Geter to Rebecca Fik on October 6, 2020, at 12:44 pm EDT.

49.     Ms. Fik is a director in MSCS' Department of Exceptional Children.

50.     Ms. Fik has worked exclusively in special education for 48 years, first as a teacher and then, starting in 2002, as an administrator.

51.     Ms. Fik holds an undergraduate degree in special education from the University of Alabama, and has teaching endorsements in multiple handicaps, general special education, and intellectual disability.

52.     She has a Master's degree in administration and supervision administration, K-12.

53.     Ms. Fik began her special education teaching career at an all-special education school that ultimately became a school for students aged 18-22 who could participate in a work-based learning program.

54.     Early in her teaching career, many of Ms. Fik's students remained her pupils from year to year for 6-7 years.

55.     Ms. Fik has taught every age group of special education student from ages 7-22.

56.     Ms. Fik has taught many children with differing levels of autism.

57.     Ms. Fik has been trained – both formally and through on-the-job experience – in the IDEA and the obligations the IDEA places on MSCS.

58.     During the hearing, Ms. Fik confirmed that if a child from out-of-state did not have an IEP but had been receiving services in a non-school setting, then MSCS would need to gather all the information and decide, as a team, what is needed. The information that MSCS needed to gather typically includes documentation from the school district that the child previously attended.  (Hrg Tr., Vol V., 563:20-23).

59.     Ms. Stacey Davis also forwarded the records (by email), at 10:59 a.m. on October 9, 2020, to Gloria Lindsey Tate and Adrienne Martin, both of whom are employees in the Department of Exceptional Children for MSCS.

60.     Ms. Davis' email to Ms. Tate and Ms. Martin was substantially similar to the email she sent to Ms. Fik, including the statement "[p]er the attached documents, [K.B.] has autism."

61.     Ms. Tate is the manager in the Department of Exceptional Children responsible for Lucie E. Campbell Elementary School.

62.     Based on the fact that the Innovations in Learning records stated K.B. had autism, Ms. Davis sent the records to Ms. Lindsey Tate and Ms. Martin "in case [K.B.] fell under special services."

63.     During the hearing, Ms. Fik testified that the Innovations in Learning records are the type of records that "flag the school's responsibility to follow-up," by having the manager over that school work with the advisor to schedule individualized education program (IEP) meetings or other things necessary to see that a student is properly served. (Hrg. Tr., Vol V., 560-567).

64.     Ms. Fik further testified that the Innovations in Learning records indicated that K.B. "might have a disability" (Hrg. Tr., Vol. VI, 657:4-5), that autism was the suspected disability based on the records (Hrg. Tr., Vol. V, 576:19-23), and that the receipt of such records would be the starting point to convene a meeting, request additional assessments to make an eligibility determination, (Hrg. Tr., Vol. V, 577) and to start the process of writing an IEP for the student.  (Hrg. Tr., Vol. V, 572:4-8).

65.     On October 6, 2020, at 1:00 pm EDT, just 16 minutes after she received the forwarded Innovations in Learning records from Ms. Davis, Ms. Fik forwarded (by email) the records to Ms. Lori Meeks, writing "[s]end by SEED. See if he is registered. Check address."

66.     Ms. Fik specifically forwarded Ms. Davis' email with the attached Innovations in Learning records to Ms. Meeks because Ms. Meeks was the manager assigned to Lucy Elementary School.

67.     Ms. Meeks is also a manager who is responsible for "the autistic program."

68.     Because K.B. was actually assigned to Lucie E. Campbell Elementary School and not Lucy Elementary School, and per Ms. Fik's request, Ms. Meeks then turned over the records to the team assigned to Lucie E. Campbell Elementary School.

69.     Ms. Meeks forwarded (by email) the Innovation in Learning records to Nia Coleman at 12:19 p.m. on October 6, 2020.

70.     Ms. Nia Coleman is an advisor in the Department of Exceptional Children.  She is the advisor for Lucie E. Campbell Elementary School.

71.     Prior to being an advisor, Ms. Coleman was a special education teacher with approximately fourteen (14) years of experience.

72.     She has some experience working with children with autism.

73.     Advisors support schools with IEP compliance.

74.     Ms. Coleman acknowledged receipt of the Innovation in Learning records within half an hour of receiving them on October 6, 2020.

75.     Ms. Davis again sent the Innovations in Learning records she received from Ms. Geter to Ms. Lindsey Tate, Ms. Martin, and Ms. Fik on October 27, 2020, writing "I have advised the GOS at Lucie E. Campbell to enroll the following student in his/her age-appropriate grade level. However, the DEC would need to review the attached to determine SPED services."

76.     On or about October 27, 2020, Ms. Davis instructed Ms. Geter and the Principal of Lucie E. Campbell Elementary School to enroll K.B. in his age-appropriate grade level, which, at that time, was second grade.

77.     While the actual registration date is unknown, K.B. received a device (computer or tablet) from MSCS that he used to attend school remotely at some point beginning in September or October 2020, after K.B. was "strictly registered."

78.     At the time of K.B.'s enrollment, all MSCS schools were operating remotely, and students attended school virtually through Microsoft Teams as a result of the state of emergency caused by the COVID-19 pandemic.

79.     K.B. had trouble logging on to the devices provided to him by MSCS for the purpose of receiving school instruction virtually because of issues with the device, its password, and wifi connectivity.

80.     K.B. was unable to work independently during the 2020-2021 school year and was easily distracted.

81.     Ms. Guy told K.B.'s teacher, Ms. Glover, that K.B. was unable to work independently.

82.     Ms. Guy told Ms. Glover that K.B. is autistic.

83.     Ms. Guy communicated that K.B. was having trouble with the learning process because he didn't know how to work his device (tablet).

84.     At some point, Ms. Glover reached out to Ms. Guy regarding school assessments and advised she would speak with Ms. Guy to provide some suggestions to help K.B., but that conversation never happened.

85.     Ms. Coleman sent an email to Stacey Davis on December 11, 2020, in which she stated that she was only informed about K.B. and his situation on December 11, 2020, because the original correspondence was sent to a different advisor who had been out on leave.  She further noted that she would ensure K.B. received the additional support that he needed.

86.     Lucie E. Campbell Elementary School typically obtains prior records for a child who has moved from another state, but Ms. Coleman gets involved if the school is having a hard time obtaining those records.

87.     Ms. Coleman sent the Innovation in Learning records (by email) to MSCS school psychologist William Graves on December 11, 2020.

88.     Ms. Coleman and Mr. Graves conversed about the records, and Mr. Graves determined that "it would have to be treated like an S Team."

89.     "S Team" is short for "Student Review Process Team."

90.     The S Team's purpose is to "gather all of the information that is available, sit down as a team and determine what other information is needed to make the child eligible for an IDEA disability."

91.     An S Team meeting is part of an "initial referral process."

92.     Mr. Graves emailed Ms. Coleman on December 14, 2020, advising that he had reviewed the Innovations in Learning records that "made a diagnosis of autism" for [K.B.], but that the information was "almost three years old" and did not contain sufficient assessments that he would require in order to diagnose autism.

93.     Mr. Graves concluded that the records "will not be of any use to determine eligibility for special education services" and that "[w]e are most likely looking at doing an initial referral and would need a current hearing and vision screening."

94.     Upon receipt of Mr. Graves email, Ms. Coleman believed the next steps to be the initiation of the S Team process.

95.     Although K.B. attended school virtually in the 2020-2021 school year, all students came in person to take state-mandated testing in May 2021.

96.     K.B.'s Tennessee Comprehensive Assessment Program (TCAP) results for the second-grade show that he did not complete any of the subscore categories, and it was considered an "invalid attempt." On the second page, the note reads "[K.B.] did not complete this assessment."

97.     K.B.'s report card, which purports to have been printed on the last day of 2020-2021 school year (June 18, 2021), indicates the following grades:

- For English Language Arts-2 K.B. has grades for the 3rd (82) and 4th (74) quarters, only;

- For Music, K.B. has grades and conduct scores of "Excellent;"

- For Math, K.B. has no grades, and only one conduct score (Satisfactory), for the 1st quarter;

- For P.E., K.B. has grades and a conduct score of "Excellent" for the 2nd, 3rd and 4th quarters;

- For Science, K.B. has neither grades nor conduct scores;

- For Social Studies, K.B. has grades in the 3rd (100) and 4th (74) quarters, only; and

- For Visual Arts, K.B. has grades of "Excellent" for all four quarters.

98.     In the "Teacher Comments" section of his report card, a typewritten notation reads "[K.B.] has never attended any classes.   Please contact me concerning grades and attendance."[4]

99.     MSCS provided special education supports and services to other special education students virtually during the 2020-2021 school year.

100.    K.B. did not receive any special education supports or services for the school year 2020-2021.

101.    On March 25, 2021, Ms. Cole sent Ms. Guy a text message asking Ms. Guy to schedule a hearing and vision screening for K.B. as part of the S Team initial referral process.

102.    The purpose of the hearing and vision screening is to ensure that a student has appropriate visual and auditory accommodations, if needed, for any assessments done as part of

---

[4] Other than the TCAP document and report card, there are no educational records concerning K.B.'s performance for the 2020-2021 school year in the hearing record.

the evaluative process.   It both aides the student and helps ensure valid results on any assessments performed.

103.    On April 20, 2021, Ms. Guy emailed Ms. Cole photographs of 4 pages from an "Indiana Education Evaluation Report" dated May 31, 2018. (Hrg. Ex. 59).

104.     On May 10, 2021, Patricia Rudd (a speech language therapist at MSCS) emailed Ms. Nia Coleman and Mr. William Graves, attaching an "updated Education Eval. Report" that "include[d] all of the missing pages" and a report card from an Indiana preschool.  (Hrg. Ex. 55).

105.    Ms. Rudd spoke to Mr. K.B. and scheduled a "Re-eval/IEP meeting" for May 24, 2021.

106.    The "Indiana Education Evaluation Report" contains, among other things, the following information:

- The evaluation start date was April 25, 2018;

- K.B. was in preschool at the time at Mary M. Bethune Early Child Dev Ctr [sic];

- The reason K.B. was referred for a reevaluation was to "determine continued eligibility of special education services under a different category;"

- At the time of the reevaluation, K.B. was receiving services for Developmental Delay and Language Impairment;

- K.B. had been tested for autism on September 16, 2016, and was formally diagnosed with autism on December 6, 2017;

- K.B. obtained a composite score in the 1st percentile (Extremely Low Range) for conceptual behavior, which included those needed to communicate with others, apply academic skills, and manage and accomplish tasks;

- K.B. obtained a composite score in the 3rd percentile (Low Range) for social behavior, which includes behaviors needed to engage in interpersonal interactions, act with social responsibilities, and use leisure time;

- K.B. obtained a composite score in the 16th percentile (Below Average Range) for practical behavior, which includes behaviors needed to address personal and health needs, take care of home and classroom work, and function in a community;

- In a Development Assessment of Young Children, Second Edition (DAYC-2), a test said to be "developed to measure the abilities of young children" in the areas of cognition, communication, social-emotional, physical development, and adaptive behavior, K.B. obtained a score in the 12th percentile (Below Average Range);

- K.B. was using a "mature grasp" on his pencil with his thumb and two fingers;

- K.B. was unable to fold paper or use scissors except to snip;

- Occupational therapy was recommended for K.B.;

- K.B. obtained an Autism Index score in the 86th percentile on the Gilliam Autism Rating Scale, Third Edition (GARS-3) – "within the Very Likely Probability of ASD [Autism Spectrum Disorder] range, Requiring Very Substantial Support-Level 3."

107.    The Indiana Education Evaluation Report concludes that K.B. met the criteria for Autism Spectrum Disorder and Language Impairment, but that he no longer met the criteria for Developmental Delay.

108.    It also states that eligibility for special education as a student with Autism Spectrum Disorder disability shall be determined by the multidisciplinary team.

109.    At the May 24, 2021, meeting, MSCS intended to discuss whether K.B. should be treated as an out-of-state transfer student based on the Indiana Education Evaluation Report.

110.    At some point before May 24, 2021, Mr. K.B. cancelled the meeting due to either a scheduling conflict or a family emergency.

111.    Conversations were held between MSCS and Ms. Guy about rescheduling the meeting prior to end of the 2020-2021 school year, but no agreement was ever reached as to a date.

112.    Lucie E. Campbell Elementary School usually does not conduct meetings over the summer.

113.    No meetings were held nor were any evaluations performed over the summer between the 2020-2021 and 2021-2022 school years.

114.    A medical evaluation (the hearing and vision screening) was performed on June 23, 2021.

115.    On June 23, 2021, Ms. Guy texted Ms. Cole regarding the hearing and vision screening information.

116.    Ms. Cole did not respond, and Ms. Guy inquired of Ms. Cole again, by text, on July 15, 2021.

117.    Ms. Cole responded on July 15, 2021, to advise that MSCS had not received the hearing and vision screening report.

118.    On July 29, 2021, an email was sent from Mr. K.B's email to Ms. Cole, attached to which was a form signed by a physician showing that a medical evaluation (the hearing and vision screening) had been performed on June 23, 2021.  The form was signed on July 26, 2021.

119.    The form includes, among other things, the following information:

- K.B.'s functioning is limited given his diagnosis of autism;

- K.B.'s prognosis is stable, with appropriate and timely resources;

- K.B.'s diagnosis significantly impacted school behavior and learning as it requires appropriate classroom modifications and an individualized learning plan;

- K.B.'s diagnosis also impacts his interactions with peers and teachers;

- There were no other medical conditions or disorders that could be the cause of educational/behavioral difficulties; and

- The physician's recommendation was to proceed with an IEP.

120.    The first day of the 2021-2022 school year was August 9, 2021.

121.     K.B. continued his enrollment at Lucie E. Campbell Elementary School for the 2021-2022 school year and is currently in the 3rd grade.

122.     On August 9, 2021, MSCS sent an invitation to Mr. Bardwell to schedule an IDEA eligibility meeting for the purpose of considering whether K.B. was IDEA eligible "as an out-of-state student." That meeting was held virtually on August 16, 2021.

123.     During the first week of school, K.B. boarded the wrong bus at the end of one school day.

124.      K.B. would not have been able to tell the bus driver his full name, his address, or any identifying information.

125.     Someone from Lucie E. Campbell Elementary School drove all three children home from school in his or her personal vehicle.

126.     Mr. K.B. and Ms. Guy did not have a vehicle at that time, but they had been contemplating purchasing one.

127.     K.B. boarding the wrong bus expedited Mr. K.B. and Ms. Guy's purchasing a vehicle, which they did on August 14, 2022, for $19,008.45.

128.     Mr. K.B. and Ms. Guy made a $1,400 down payment, plus approximately 4 monthly payments, until the vehicle was stolen in January or February of 2022 during a carjacking.

129.     On August 16, 2021, K.B.'s IEP Team agreed to treat his May 2018 Gary, Indiana Eligibility Evaluation as sufficient for out-of-state eligibility, and MSCS obtained consent to reevaluate K.B. under Tennessee eligibility standards.

130.     K.B.'s IEP Team met on August 23, 2021, to develop an IEP in light of his "out-of-state eligibility status."

131.    The IEP developed as a result of the IEP meeting on August 23, 2021, categorizes K.B. as having a developmental delay as his primary disability category, and notes that K.B. had a prior autism spectrum disorder diagnosis.

132.    In the IEP developed as a result of the IEP meeting on August 23, 2021, K.B.'s present levels of performance are noted to be in the first percentile in basic reading skills and the third percentile in basic math. He was unable to do any simple addition or subtraction.

133.    K.B.'s present levels of performance for pre-vocational skills noted that he was polite and had the ability to get along with his peers, but that he struggled to work alone without redirection/reassurance and to stay on task.  He also struggled with his temper in all situations, in following directions, and in reciting or rewriting personal data.

134.    K.B.'s present levels of performance for social/emotional behavior noted again that he was polite and cooperative, following directions and using respectful language, but that he inappropriately laughed out loud and demonstrated limited turn-taking in conversation, which negatively impacted his interaction with staff and peers.

135.    The IEP developed as a result of the IEP meeting on August 23, 2021, placed K.B. full time in a general education classroom with eight (8) minutes of language therapy per week, sixty (60) minutes each co-teaching in mathematics and reading per day, and forty-five (45) minutes of "RTI2 intervention" per day, all in the general education classroom setting.

136.    The RTI2 intervention involved the resource (special education) teacher pulling out K.B. for 45 minutes per day.

137.    Mr. K.B. and Ms. Guy did not check the box that either of them agreed with the August 23, 2021, IEP, but they did both sign the document.

138.    An August 23, 2021, "Prior Written Notice" document stated MSCS' perspective that the August 23, 2021, IEP, allowed K.B. to be in the "least restrictive environment."

139.    The same prior written notice also noted that updated data was needed for program planning purposes and to confirm K.B.'s eligibility for special education services.

140.    The prior written notice stated that the following were considered as the basis for the IEP:  I-Ready diagnostic for Reading, KTEA-3 for Math, Language Reports, general education teacher's report, parent's input, out-of-state documents, and the IEP Team's input.

141.    As testified to by Ms. Fik, K.B. should not have been the general education class for his academic instruction given his IQ and other deficits.  Instead, K.B. should have been in a special education class for his academic instruction.

142.    On September 14, 2021, Mr. William Graves, school psychologist for Lucie E. Campbell Elementary School, completed a psychoeducational evaluation of K.B., finding that K.B. appeared to meet the Tennessee eligibility criteria for IDEA services for Autism Spectrum Disorder and Intellectual Disability, subject to K.B.'s IEP Team's final determination.

143.    Mr. Graves' report, in the "Relevant Background Information" notes that "[K.B.] received services in special needs programs in Nebraska and Indiana prior to moving to Memphis last school year."[5]

144.    As to sources of information for K.B.'s evaluation, Mr. Graves listed the following:  parent interview, teacher interview, and records review.  Under records review, the vision and hearing screening are noted.

145.    Mr. Graves' report lists the following as instruments administered and/or observations: Weschler Nonverbal Scale of Ability (WNV), Woodcock-Johnson IV Tests of Achievement (WJ-V), Vineland-3Adaptive Behavior Scales, Parent/Caregiver Form, Vineland Adaptive Behavior Scales- Teacher Form, Gilliam Autism Rating Scale (GARS-3), Behavioral

---

[5] Other than in the Independent Education Evaluation Report, *infra* at p. 25, the record does not contain any references to special education services provided to K.B. in Nebraska.

Assessment System for Children (BASC3), Systematic Adaptive Behavior Characteristics Checklist; and classroom observations (classroom, hallway, and lunchroom).

146.    K.B. obtained a "Full-Scale IQ score" of 48 (45-59 at the 90% confidence level), which placed K.B. in the extreme low range for cognitive functioning.  Mr. Graves noted that K.B. only performed 2 of the 4 subtests because K.B. did not seem to comprehend what was expected of him.

147.    Mr. Graves' report states that due to K.B. perhaps not comprehending some of what was expected of him, the IQ score was an "estimate of [K.B's] level of cognitive function based on this limited sample of testing."

148.    Mr. Graves observed K.B. in the classroom for about thirty minutes in his third-grade math class. Based on that observation, Mr. Graves concluded that K.B. did not seem to comprehend the lesson or the operation of multiplication.

149.    Mr. Graves did note that K.B. demonstrated appropriate and good behavior during the lesson and followed directions to put his school materials away and line up for lunch.

150.    Mr. Graves attributed K.B.'s appropriate and good behavior to his observing his classmates and "doing what they do."

151.    During a lunchtime observation, Mr. Graves noted a classmate helped K.B. get his lunch, and that K.B. followed his classmates to the correct table.  K.B. did not talk to his classmates or interact with them, but he exhibited no behavior issues.

152.    As to academic achievement, as measured by the Woodcock-Johnson IV, K.B. demonstrated sills at or below kindergarten level and significantly below expectation for grade level.

153.    On reading, K.B. could identify letters but could not read any words or comprehend reading passages.

154.    In math, K.B. could recognize and write numbers but not perform any mathematical operations.

155.    K.B. could write his name and letters but no other words or sentences.

156.    Mr. Graves determined that most of K.B.'s verbal expression is echolalic – he echoes what he hears.

157.    As to adaptive functioning, Mr. Graves' evaluation determined that K.B. was in the low range (1st percentile) for home adaptive functioning and also in the low range for adaptive functioning at school.

158.    K.B. was evaluated on August 17 and October 7, 2021, by an MSCS speech language pathologist. MSCS's speech language evaluations showed that K.B. lacked spontaneous speech and used echolalic speech (simply echoing what one hears).

159.    Mr. Graves' evaluation does not mention a speech language evaluation having been performed.

160.    On October 18, 2021, the IEP Team convened in person to review the results of the initial evaluation/re-evaluation and determine eligibility for K.B.'s special education and related services under Tennessee's eligibility standards.

161.    Mr. Graves reviewed his report with Mr. K.B and Ms. Guy during the October 18, 2021, IEP meeting and resolution session meeting.

162.    At the October 18, 2021, IEP meeting, the IEP team concluded that K.B. met the Tennessee eligibility standards for autism spectrum disorder and intellectual disability.  Mr. K.B. and Ms. Guy were in agreement with the eligibility determination but reserved the right to challenge the evaluations and to request an independent educational evaluation.

163.    Following the IEP meeting on October 18, 2021, K.B.'s placement changed from a general education classroom to a functional skills classroom for academic instruction, the

general education classroom for lunch, recess, and support classes, and added speech language therapy.  K.B.'s IEP was changed accordingly.

164.    It was also agreed upon that language goals would be added to the IEP.

165.    Mr. K.B. did not receive a copy of the October 18, 2021, IEP, until some point after October 18, 2021.

166.    Mr. K.B. signed a document, including a prior written notice, dated October 18, 2021, that has a box checked to signify that "[a] draft IEP was developed, and a copy was provided at least 48 hours prior to my child's IEP team meeting."  The bottom of the form states the "[d]ate IEP was given to the parent(s)" was November 31, 2021.

167.    MSCS did generate a written IEP as a result of the IEP meeting on October 18, 2021, and Ms. Coleman emailed Ms. Cynthia Houston (a special education teacher at Lucie E. Campbell Elementary School) a copy of that IEP on October 26, 2021.

168.    Mr. K.B. never asked for a schedule of K.B.'s day in the wake of the October 18, 2021, IEP meeting.

169.    Ms. Guy asked Ms. Cole and Ms. Houston for a copy of K.B.'s schedule in the wake of the October 18, 2021, IEP meeting.

170.    Neither Mr. K.B. nor Ms. Guy were provided with a schedule of K.B.'s day in the wake of the October 18, 2021, IEP meeting.

171.    The IEP team agreed that K.B. would attend lunch, recess, and support classes in the general education setting.

172.    The IEP developed as a result of the October 18, 2021, IEP meeting does not specifically reflect any time that K.B. spends with his non-disabled peers in the general education setting.

173.    Support classes include art, music, P.E., library, recess, and lunch.

174.    MSCS employee Jordan Harbor conducted an occupational therapy (OT) evaluation on October 26-27, 2021.  The evaluation contains the following findings:

• K.B. scored in the very low range (standard score of 65) in visual motor integration;

• "A standard score was not available for the visual perceptual subtest… It appeared that [K.B.] may not have fully grasped the directions for this subtest as, toward the end of the subtest, he began choosing the first option on every test item.";

• K.B. was only able to write 10 uppercase letters from memory;

• K.B. was unable to write any lower-case letters from memory;

• K.B. exhibited "definite dysfunction" in the areas of social participation and hearing in the classroom setting in a sensory processing measure;

• K.B. exhibited "some problems" in the areas of planning and ideas in the home setting in a sensory processing measure.

175.    In conclusion, the OT evaluation recommended OT for K.B.

176.    K.B. currently has two (2) lunches in his schedule; one with his functional skills class and one with the general education population.

177.    Mr. K.B. does not agree that K.B. should have two lunch periods.

178.    K.B. has gained weight since October 2021, which Mr. K.B. and Ms. Guy attribute to K.B. eating lunch twice each school day.

179.    The total amount of time in K.B.'s current schedule for academic instruction time is 3 hours and 15 minutes.

180.    K.B. is currently in a classroom in which the other students have varying developmental levels or skill acquisition levels.

181.    Sarah Irby, Ph.D., BCBA, performed an Independent Education Evaluation (IEE) of K.B. in late December of 2021 and early January of 2022.   A copy of the IEE report was provided to K.B.'s family on January 26, 2022, and to counsel for both parties on January 28, 2022.

182.    Dr. Irby is a child psychologist, licensed in Tennessee and Mississippi, who is in private practice.  She also serves as a clinical assistant professor at the University of Memphis School of Psychology, where she is the director of the school psychology program.

183.    Dr. Irby's field of study for both her masters and doctoral degrees was school psychology.

184.    Dr. Irby is also a Board-Certified Behavior Analyst (BCBA).

185.    Dr. Irby's evaluation included results from the following psychodiagnostics procedures:

> • Autism Diagnostic Observation Schedule, Second Edition (ADOS-2) – Module 1
> • Behavior Assessment System for Children, Third Edition – Parent Rating Scales-Child (BASC-3 PRS)
> • Behavior Assessment System for Children, Third Edition – Teacher Rating Scales-Child (BASC-3 TRS)
> • Behavioral Observations
> • Classroom Observation
> • Comprehensive Test of Nonverbal Intelligence, Second Edition (CTONI-2)
> • Conners, Third Edition – Parent Short Form (Conners-3)
> • Conners, Third Edition – Teacher Short Form (Conners-3)
> • Parent Semi-Structured Clinical Interview
> • Records Review
> • Social Responsiveness Scale, Second Edition (SRS-2) – Parent
> • Social Responsiveness Scale, Second Edition (SRS-2) – Teacher
> • Vineland Adaptive Behavior Scales, Third Edition –Domain-Level Parent/Caregiver Form
> • Vineland Adaptive Behavior Scales, Third Edition –Domain-Level Teacher Form

186.    Dr. Irby diagnosed K.B. with Autism Spectrum Disorder, requiring substantial support for deficits in social communication and in restricted, repetitive behaviors, intellectual disability, and Attention Deficit/Hyperactivity Disorder.

187.    Dr. Irby made a number of recommendations including, among other things, that K.B. "be enrolled in a classroom setting appropriate for a child with ASD, intellectual disabilities, and ADHD.   Services should focus on behavioral, speech/language, and occupational therapies; self-help skills," "additional one-on-one support from a teacher or

classroom assistant to increase attention to tasks [a]s well as instruction in a small-group or low student to teacher ratio," "language therapy at school for 1-2 hours per week in a one-on-one setting," "Applied Behavior Analysis (ABA) therapy at school, which supports the learning of new information (i.e., skill acquisition) through teaching and repetition using discrete-trials and natural environment teaching techniques. Services should be provided under the supervision of a licensed behavior analyst."

188.    ABA is a method by which skills are broken down into basic building blocks in conjunction with using positive reinforcement, negative enforcement, and other techniques to modify a behavior.

189.    On September 28, 2021, in a text message to Petitioners' counsel, Dr. Irby opined about what recommendations she would make for a child such as K.B.   Some of those recommendations are similar or the same to Dr. Irby's ultimate conclusions.

190.    As part of her review of records, Dr. Irby requested and obtained records from Norfolk Public Schools, Nebraska, which included an Individualized Family Service Plan (IFSP) and an IEP (dated February 11, 2016).

191.    The Nebraska records state that K.B. was mostly nonverbal.

192.    At the time of Dr. Irby's evaluation, K.B.'s communication and social skills were consistent with the Nebraska records, but he had experienced a decline in overall adaptative skills.

193.    At the time of Dr. Irby's evaluation, K.B.'s conceptual skills were rated the same or similar as in the Indiana Evaluation Report. In both evaluations, K.B. was easily distracted.

194.    Dr. Irby determined K.B.'s IQ to have been 70 (second percentile).

195.    Dr. Irby recommended ABA techniques be used under the supervision of a BCBA.   These techniques can help an autistic child with communication skills and social reciprocal play.

196.    Children can benefit from ABA therapy when they are in a setting with others who are of a similar developmental or skill acquisition level.

197.    However, it is also important to have models that are further along in a skill set in order to give others something to emulate and learn from.

198.    Dr. Irby recommended occupational therapy because she noted K.B. had difficulty in grasping items such as a pencil and other toys.

199.    Dr. Irby recommends several things for nonverbal autism students, as a matter of course.   These include the following:

- 1-2 hours, per week, of speech therapy (for autistic students who are non-verbal); and

- To conduct an occupational therapy evaluation

200.    Autism is a life-long condition.   But students with autism can make strides under the right circumstances and teaching methods.

201.    MSCS uses ABA methodologies in its teaching techniques for special education students.

202.    MSCS has both BCBAs and Registered Behavior Technicians on staff.

203.    In January of 2022, Mr. K.B. requested that MSCS provide transportation for K.B. because Mr. K.B.'s vehicle was stolen from Ms. Guy during a carjacking crime, and neither Mr. K.B. nor Ms. Guy had another vehicle.

204.    The request was approved at a January 7, 2022, IEP meeting, as a related service.

205.    On the first day of his special transportation, the bus took K.B. to Lucy Elementary School instead of Lucie E. Campbell Elementary School.

206.    K.B.'s iReady math scores from August 30, 2021, and November 21, 2021, indicate that he was three (3) or more grade levels below his typical peers, working at a kindergarten level.   His individual scores in "numbers and operations" and "algebra and algebraic thinking" went down.  His score in measurement and data went up.

207.    His iReady reading scores from August 20, 2021, to January 20, 2022, indicate that he was three (3) or more grade levels below his typical peers, reading on a kindergarten level.   His overall score increased by one point.   His individual scores in "phonics" and "comprehension: literature" went down.   His individual scores in "hi-frequency words" and "vocabulary" went up.  His individual score in "comprehension: informational text" stayed the same.

208.    K.B.'s progress monitoring reports for the 2021-2022 school year reflect that he is making some progress in many areas with continued difficulties in others.

209.    In the second reporting period of the "1st Progress" monitoring report, he is noted as making some progress, but that he needs more time to accomplish the goals.

210.    In the first reporting period of the "Mid- 1st Progress" monitoring report, more time was said to be needed to meet the annual goals.

211.    In the fourth reporting period of the "2nd Progress monitoring report," the narrative states that more time is needed to attain the annual prevocational goal, but that he had made progress.   He made no progress in the areas of staying on task and beginning an assignment without teacher reassurance.

212.     He struggled with sight word recognition, but the fourth reporting period of the "2nd Progress monitoring report" noted that he was reading on the kindergarten level according to other data ("the I-ready data").

213.     The fourth reporting period of the "2nd Progress monitoring report" noted some progress was made on letters/sound relationships and locating specific word patterns and sight words, though he was struggling with some facets of both items.

214.     The fourth reporting period of the "2nd Progress monitoring report" noted that some progress was being made with number identification and addition and subtraction of single digit numbers, though K.B. needed assistance to accomplish the objectives.

215.     The fourth reporting period of the "2nd Progress monitoring report" noted that while his overall accuracy levels remained consistent, progress was being made in labeling and identifying common objects.

216.     He made some progress in identifying single objects and identifying school objects, but no progress in using safety signs in the community.

217.     While he was still noted to still be using one-word responses as of January 17, 2022, he was making some progress in naming actions.

218.     The objectives of using nouns plus actions and following two-step positional directions were not covered during the fourth reporting period of the "2nd Progress monitoring report" period.

219.     He made some progress in following single step instructions and in communicating his wants and needs, but he continued to require hand-over-hand or repetitive demonstration to accomplish some objectives and made no progress in using picture exchange to select an activity of choice.

220.    The mid-2nd Progress monitoring report for the 3rd reporting period noted that several objectives were not covered during the grading period, and therefore more time was needed to accomplish the goal.

221.    In that reporting period, K.B. was said to be making some progress in identifying objects, naming actions, following one step directions, and using functional signs.

222.    The mid-3rd Progress monitoring report for the 5th reporting period and the 3rd Progress Monitoring Report noted very similar, or the same, findings to the mid-2nd.

223.    MSCS held another IEP team meeting on February 28, 2022.

224.    At that meeting, MSCS' Occupational Therapist, based on her occupational therapy evaluation, recommended that K.B. receive 10 (ten), 30-minute sessions of occupational therapy per IEP cycle.

225.    The IEE recommended an occupational therapy evaluation, with Dr. Irby not being aware that one had already been performed.

226.    The IEE recommended that a functional behavior assessment may be needed if the accommodations provided did not address behavioral difficulties.

227.    At the February 28, 2022, meeting, Ms. Jennifer Wyatt, a BCBA employed by MSCS recommended an ABLES functional behavior assessment, specific to ABA therapy.

228.    The IEE recommended ABA therapy at school, under the supervision of a licensed behavior analyst (BCBA).

229.    Ms. Wyatt also recommended that K.B. receive social emotional services twice per week in 30-minute sessions.  In MSCS IEPs, social emotional services are synonymous with in-house ABA therapy services.

230.    The IEP meeting notes provide that "additional support with RBT certification will be added to the classroom."

231.     The IEE recommended additional one-on-one support from a teacher or classroom assistant.

232.     Ms. Wyatt recommended adding an additional support person to K.B.'s classroom, whose responsibility would be to focus on K.B.'s needs.  This person was to be a behavior specialist with RBT credentials.

233.     The IEE recommended that K.B. receive 1-2 hours per week of language therapy in a one-on-one setting, and that it may be beneficial for K.B. to receive additional therapy from a local service provider apart from MSCS.

234.     MSCS's speech language therapist, Ms. Shavonica Williams, noting that K.B. had made some progress in his speech, recommended that K.B. receive speech language therapy sessions.  These would be provided with half of the sessions in a one-on-one setting and half in a small group setting.

235.     A draft IEP was completed with the aforementioned recommendations, dated March 14, 2022.

236.     The draft IEP does not contain the following items recommended at the February 28, 2022, IEP meeting:

- That an RBT will be added to the classroom, or that the RBT will focus on K.B.'s needs;

- That the speech language therapy will take place in a group setting for one-half and the other half one-on-one; and

- That K.B. will have lunch, recess, and support classes in the general education setting.

237.     The Petitioners neither approved nor disapproved the March 14, 2022, draft IEP.

238.    It is preferable for a child to learn in a school environment, versus a clinical setting in which the child would receive 6-plus hours, per day, of intensive ABA therapy in a one-on-one setting without interaction with peers.

239.    When MSCS notes the use of social emotional services in an IEP, they are referring to the use of ABA methodologies in the classroom.

240.    In employing those services, MSCS uses a one-on-one dynamic to teach in discrete trials, which are then generalized into the classroom.  This helps the student to learn new academic and functional skills (such as writing one's name, making a snack, or other things to help a student be more independent in his learning experience during the school day).

241.    K.B. is making progress in his current setting, which is a "behavior intervention and communication" (functional skills) class, which is designed for children with severe autism disorders and communication deficits.

242.    In that setting, some of K.B. classmates are a mix of some who are more disabled and some who are less, providing him the opportunity to be a model and to have others to model in the same class.

243.    At some points during the day, children who are at the same or similar level of disability are placed in a group to work on skills that the other children have already mastered.

244.    K.B. has recently performed well in the functional skills class, having no major behavioral problems associated with his autism, and has started to become more independent in the classroom.

## ANALYSIS

The U.S. Supreme Court held in *Schaffer v. West* that the burden of proof is on the party "seeking relief."  546 U.S. 49, 51 (2005).  Thus, when a parent files a request for a due process hearing, the parent bears the burden of proof in the due process hearing.  *Id.* at 56; *see also*,

*Cordrey v. Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990).  In this case, the Petitioners bear the burden of proof.

## CHILD FIND

School districts are required to identify students suspected of having a disability who are "in need of" special education and related services. 20 U.S.C. §1401 (3)(A).  Students who are eligible for special education and related services are entitled to an IEP.  *Bd. of Educ. of the Hendrick Hudson School Dist. v. Rowley*, 458 U.S. 176, 181 (1982).  In developing educational programs and determining appropriate services for those students through an IEP, school districts must comply with the substantive and procedural requirements of the IDEA and related state law.  *See Id.* at 182.  However, parents are not entitled to relief for minor procedural violations alone.  A determination of whether a student received FAPE must be based on substantive grounds.  34 C.F.R. § 300.513(1).

When a procedural violation is alleged, a violation exists only if a procedural violation "(1) impeded the child's right to FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of FAPE to the parent's child; or (3) caused a deprivation of educational benefit."  34 C.F.R.  § 300.513(2).  Only procedural violations that result in substantive harm constitute a denial of FAPE and justify relief.  *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001); *see also Bd. of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007).

Under the IDEA, school districts have an obligation to identify, locate, and evaluate all children reasonably suspected of a disability, commonly referred to as "child find." 34 C.F.R. § 300.111; 20 U.S.C. § 1412(a)(3).  The mandate is an affirmative obligation. *Ja.B. v. Wilson Cty. Bd. of Educ.*, No. 3:20-CV-00955, 2022 WL 326273, at *1 (M.D. Tenn. Feb. 2, 2022).

Petitioners claim that MSCS violated the 'child find' requirement of the IDEA by failing to evaluate K.B. for special education. Petitioners also claim that MSCS personnel were aware of K.B.'s autism, and that it impacted his education.  To prove that a delayed evaluation for a student constitutes a procedural violation of IDEA's child find requirements, a petitioner "must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." *Bd. of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007).  For a student to be eligible to receive benefits as a disabled child under the IDEA, "three criteria must be met: (1) the child must suffer from one or more of the categories of impairments delineated in IDEA, (2) the child's impairment must adversely affect his educational performance, and (3) the child's qualified impairment must require special education and related services." *Jackson v. Nw. Local Sch. Dist.*, No. 1:09-CV-300, 2010 WL 3452333, at *6 (S.D. Ohio Aug. 3, 2010), *report and recommendation adopted*, No. 1:09CV300, 2010 WL 3474970 (S.D. Ohio Sept. 1, 2010).  Thus, the fact that a child may have a qualifying disability does not necessarily make him "a child with a disability" eligible for special education services under the IDEA.  *Id*. The child must also need special education and related services.  *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 225 (D. Conn. Aug. 19, 2008), *aff'd*, 370 Fed. Appx. 202 (2nd Cir. 2010).  "[A] child 'needs special education' if he cannot attain educational standards in the general education environment." *J.M. v. Summit City Bd. of Educ.,* No. CV1900159KMESK, 2020 WL 6281719, at *10 (D.N.J. Oct. 27, 2020), *referencing Durbow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1194–95 (11th Cir. 2018).  Thus, "to violate child find, the school district must have been on notice not only of the student's disability but also of the student's need for special education services." *Northfield City Bd. of Educ. v. K.S. on behalf of L.S.*, No. CV 19-9582 (RBK/KMW), 2020 WL 2899258, at *9 (D.N.J. June 3, 2020); *A.P.*, 572 F. Supp. 2d at 225 (*citing* 20 U.S.C. §

1412(a)(3)(A)) (holding that the child find provision itself applies only to children with disabilities "who are in need of special education and related services").

## Child Find in the 2020-2021 School Year

MSCS was provided information that should have led it to evaluate K.B. to determine whether he was eligible for special education services.  This information came in three different forms.  One, MSCS employees were told by Mr. K.B and Ms. Guy that K.B. was autistic, or that he had a disability; two, MSCS was provided written records that were circulated up and within its chain of command identifying K.B. as autistic and showing that he had previously been provided supports and services typical of special education students; and three, K.B.'s disabilities are so profound that it would or should have been apparent that he needed to be evaluated.  Despite this information, MSCS did not seek to begin evaluating K.B. until May of 2021 – at the end of the 2021 school year.  These circumstances show that MSCS was negligent in its failure to timely conduct an evaluation of K.B.

Mr. K.B. and Ms. Guy told several MSCS employees that K.B. was autistic, or that he had a disability.  This began with Mr. K.B. telling MSCS employee Ms. Angelia Dixon, who worked in registration for MSCS, that K.B. was autistic.  Mr. K.B. also told MSCS employee Zachinneus Smith, who worked at Lucie E. Campbell Elementary School, where K.B. attended, that K.B. had a disability.  Ms. Guy was more specific – she told Mr. Smith that K.B. had autism.  Ms. Guy further told Lashonda Geter, a financial secretary at Lucie E. Campbell Elementary School; Ms. Stacey Davis, Manager of Registration and Enrollment for MSCS' SEED Department; Ms. Julia Cole, the school counselor at Lucie E. Campbell Elementary School; and Ms. Patrice Glover, K.B.'s second grade teacher, that K.B. was autistic.  No less than 6 MSCS employees, four of whom worked at Lucie E. Campbell Elementary School, were told that K.B. is autistic.

MSCS was provided with written records identifying K.B. as autistic and showing that he had previously been provided supports and services, albeit in a "learning center" as opposed to a public school, typical of those provided to special education students.  On October 5, 2020, Ms. Geter had records in her possession that she placed in K.B.'s physical file at Lucie E. Campbell Elementary School, from Innovations in Learning, a learning center in Merrillville, Indiana, indicating K.B. had attended the center from September 11, 2018, to January 14, 2020.[6]  (Hrg. Ex. 14).  These records state that K.B.'s mother told Innovations in Learning that K.B. had social and academic difficulties and that he had attended at least two special needs programs while in preschool.   The records state that an evaluation was performed including behavioral observations, that K.B. had a diagnosis of autism, and recommended services in the form of Applied Behavioral Analysis (ABA) therapy for 35 hours per week for communication, social skills, daily living skills, problematic behaviors, and parent training.  The documents also state that 1:1 therapy, with sessions being conducted by Registered Behavior Technicians supervised by a Board-Certified Behavioral Analyst (BCBA) were recommended.  The documents further state that a follow-up evaluation was performed on January 14, 2020, finding that while K.B. had made some progress, he would remain in ABA therapy conducted by Behavior Technicians supervised by a BCBA.  The plans stated goals and objectives for K.B. to reach while at Innovations in Learning and at home.

The Innovations in Learning records were then circulated through the MSCS chain of command, beginning on October 5, 2020, when Ms. Geter sent them to Ms. Cole, the school counselor at Lucie E. Campbell Elementary School.  On that same date, after contacting the SEED Department, Ms. Geter sent the documents to Ms. Stacey Davis at SEED.  Ms. Davis sent

[6] Mr. K.B. signed an authorization form for Innovations in Learning to release and provide the documentation to MSCS. The authorization form notes that the records were to be released to "Lucy Elementary School."  But the records did find their way to Lucie E. Campbell Elementary School.

the records to Ms. Rebecca Fik, who is a director in MSCS' Department of Exceptional Children. Ms. Fik sent the records to Lori Meeks, the manager of the autistic program at Lucy Elementary School.  Because K.B. was actually assigned to Lucie E. Campbell Elementary School, not Lucy Elementary School, and per Ms. Fik's request, Ms. Meeks then turned over the records to the team assigned to Lucie E. Campbell Elementary School.  At Lucie E. Campbell Elementary School, the documents were sent to Ms. Nia Coleman, the advisor in charge of children under the Department of Exceptional Children's purview at Lucie E. Campbell Elementary School. Among other duties, advisors such as Ms. Coleman support schools with compliance regarding individualized education program (IEPs)[7] for special education students.  Ms. Gloria Lindsey Tate, the manager in the Department of Exceptional Children responsible for Lucie E. Campbell Elementary School and Adrienne Martin, who is also with MSCS' Department of Exceptional Children, both also received the documents from Ms. Davis.  By October 9, 2020, the records had made it to the top of the MSCS chain of command for students with disabilities and back to Ms. Coleman, who helped oversee the special education programs at Lucie E. Campbell Elementary School.  On October 27, 2020, Ms. Davis again sent the records to Ms. Tate, Ms. Martin, and Ms. Fik to say that she had advised Lucie E. Campbell Elementary School to enroll K.B. in his appropriate grade level, but that the Department of Exceptional Children would need to review the Innovations in Learning records "to determine SPED [special education] services." Setting aside the fact that many MSCS employees had been told of K.B.'s autism, the actions taken in the wake of receiving the Innovations in Learning records, alone, show that the records were sufficient – in the words of MSCS employee and witness Ms. Rebecca Fik, who sits near the very top of the chain of command for MSCS special education students – to serve as the

---

[7] This term is synonymous with Individual Education Plan.

starting point to convene a meeting and request additional assessments to make an eligibility determination and start the process of writing an IEP for the student.

It is around this time – at the end of October of 2020 – that K.B. was considered as being registered with MSCS as a student.  At that time, all MSCS schools were operating remotely, and students attended school virtually through Microsoft Teams as a result of the state of emergency caused by the COVID-19 pandemic.

Nothing more happened until December 11, 2020, when Ms. Coleman sent the Innovations in Learning records to Lucie E. Campbell Elementary School psychologist, William Graves.[8]  Mr. Graves emailed Ms. Coleman on December 14, 2020, advising that he had reviewed the Innovations in Learning records.  He noted that the records "made a diagnosis of autism" for K.B., but that the information was "almost three years old" and did not contain sufficient assessments that he would require in order make such a diagnosis.  Mr. Coleman and Mr. Graves conversed about the records and determined that the situation "would have to be treated like an 'S Team.'"[9]  The trail then goes cold until more than 3 months later, on March 25, 2021.

On March 25, 2021, Ms. Julia Cole, Lucie E. Campbell Elementary School counselor, sent a text message to Ms. Guy asking Ms. Guy to schedule a hearing and vision screening for K.B. as part of the S Team initial referral process.  The purpose of the hearing and vision

---

[8] Also on December 11, 2020, Ms. Coleman emailed Ms. Davis suggesting that she did not know about K.B., or his situation, until December 11, 2020, and that she would "ensure K.B. received the additional support he needed."  However, Ms. Coleman had acknowledged receipt of the information from Ms. Meeks within a half an hour of receiving it on October 6, 2020.

[9] "S Team" is short for student review process team, who performs the initial referral process for prospective special education students, and whose purpose is to gather all of the information that is available and sit down as a team to determine whether and what other information is needed to make the child eligible for an IDEA disability.

screening is to ensure that a student has appropriate visual and auditory accommodations, if needed, for any assessments done as part of the evaluative process. It both aides the student and helps ensure valid results on any assessments performed. On June 23, 2021, the hearing and vision screening was completed. On that same date, Ms. Guy reached out to Ms. Cole for a fax number to which the paperwork could be submitted. Ms. Cole did not respond, and Ms. Guy inquired again on July 15, 2021. Ms. Cole responded that MSCS still did not have the paperwork. On July 29, 2021, the paperwork, which indicated there were no hearing or vision concerns that might impact K.B.'s ability to be correctly evaluated, was sent by Mr. K.B., or Ms. Guy, to MSCS.

Meanwhile, on April 20, 2021, Ms. Guy emailed Ms. Cole photographs of 4 pages from an "Indiana Education Evaluation Report" (the Indiana documents) dated May 31, 2018.[10]  (Hrg. Ex. 59). Then on May 10, 2021, Ms. Patricia Rudd, a speech language therapist for MSCS, emailed an updated document to Ms. Coleman and Mr. Graves that included more pages of the report than were originally made available to MSCS. (Hrg. Ex. 55). Ms. Rudd then spoke to Mr. K.B., and a "Re-eval/IEP" meeting was scheduled for May 24, 2021 – some ten months from when Mr. K.B. first attempted to register K.B., with Mr. K.B. and Ms. Guy having told several MSCS employees that K.B. was autistic, and 7 months after MSCS' receipt of the Innovations in Learning paperwork.

The Indiana documents showed an evaluation date, for K.B., of April 25, 2018. They indicated that K.B. had been formally diagnosed with autism on December 6, 2017, that he had

---

[10] Petitioners asserted, through the testimony of Mr. K.B. and Ms. Guy, that the Indiana Education Evaluation Report was provided to MSCS as early as the fall of 2020.  Respondents disputed that contention, through the testimony of its witnesses, instead arguing the first MSCS knew about this document was when they received it on April 20, 2021.  There is no evidence to corroborate the Petitioners' testimonial assertion, and this question therefore ends in equipoise.  Thus, it is determined that April 20, 2021, was the date MSCS first became aware of the Indiana Education Evaluation Report.

been previously evaluated, and that, as of April 25, 2018, K.B. was receiving services for developmental delay and language impairment. Per the evaluation, he obtained a composite score in the 1st percentile (extremely low range) for conceptual behavior, which included those needed to communicate with others, apply academic skills, and manage and accomplish tasks. He obtained a composite score in the 3rd percentile (low range) for social behavior, which include behaviors needed to engage in interpersonal interactions, act with social responsibilities, and use leisure time. He obtained a composite score in the 16th percentile (below average range) for practical behavior, which include behaviors needed to address personal and health needs, take care of home and classroom work, and function in a community. He obtained a score in the 12th percentile (below average range) in a test said to be "developed to measure the abilities of young children" in the areas of cognition, communication, social-emotional, physical development, and adaptive behavior. He was using a "mature grasp" on his pencil and was unable to fold paper or use scissors except to "snip." He scored "within the very likely probability of ASD [Autism Spectrum Disorder] range, requiring very substantial support-level 3." The report concludes that K.B. met the criteria for autism spectrum disorder and language impairment, but that he no longer met the criteria for developmental delay. It goes on further to say that K.B.'s eligibility for special education as a student with autism spectrum disorder disability "shall be determined by the multidisciplinary team."

At the May 24, 2021, meeting, MSCS intended to discuss whether K.B. should be treated as an "out-of-state transfer student" based on the Indiana documents. But the meeting did not take place because Mr. K.B. cancelled the meeting due to either a scheduling conflict or a family emergency. While there were conversations about trying to reschedule the meeting prior to end of the 2020-2021 school year, no date was ever agreed upon. No meetings were held nor any

evaluations performed (other than the completion of the hearing and vision screening) over the summer between the 2020-2021 and 2021-2022 school years.

K.B.'s disabilities (autism and intellectual disability) are such that he cannot attain educational standards in the general education environment. K.B.'s disabilities are so profound that it would have been extremely unlikely that a teacher or other school employee (in-person or remotely) would not have questioned his behavior, including his inability to attend, lack of speech, echolalia, inability to write or produce any written work independently, and his general inability to perform anywhere close to grade level. These issues would or should have been either immediately apparent or should have drawn the attention of MSCS employees during the 2020-2021 school year (e.g., K.B.'s grades, or lack thereof, on his 2020-2021 report card (Hrg. Ex. 30), and the IOL records). They were also borne out by the evaluations made available to MSCS (the Indiana documents and the Independent Educational Evaluation), or those evaluations that MSCS belatedly conducted (e.g., MSCS' psychoeducational evaluation (Hrg. Exs. 24 and 25) and MSCS' speech (Hrg. Ex. 9) and occupational (Hrg. Ex. 26) evaluations), and the resultant IEP and draft IEPs that progressively saw the level of supports and services rise to the level at which they stood as of the date this case came for hearing.[11] K.B.'s progress monitoring reports for the 2021-2022 school year (Hrg. Ex. 35) are yet more proof of the deficits that should have been apparent to MSCS long before MSCS began the process of developing an IEP.

---

[11] The last list of services proposed, in the draft March 14, 2022, IEP, include OT services (10 30-minute sessions per IEP cycle), social emotional services (using ABA methodologies) at 2 times per week of 30-minute sessions, adding an additional support person (with Registered Behavioral Technician Credentials) to focus on K.B.'s needs, and speech language therapy. K.B.'s placement for academic instruction was said to be the functional skills class, with lunch, recess, and support classes (such as P.E.) in the general education setting. While these services are not determinative on the issue of whether they are precisely what was required to provide FAPE to K.B., the breadth and depth of these services clearly shows that K.B. cannot attain educational standards in the general education environment. (Hrg. Ex. 46).

For these same reasons, the Petitioners have overwhelmingly shown that K.B. suffered substantive harm as a result of the child find violation.  The contrary cannot be credibly argued based on the available facts.  K.B., with all his deficits, was not provided with an IEP and received no supports and services during the entirety of the 2020-2021 school year.  Moreover, the lack of an IEP and the meetings that should have accompanied the IEP process would have provided Mr. K.B. an opportunity to participate in the formulation of K.B.'s education plan.  Mr. K.B. was deprived of that right.

In light of this evidence, the Sixth Circuit's standard enunciated in *Board of Education of Fayette County* is met.  MSCS overlooked clear signs of K.B.'s disability and was negligent in its failure to order the testing required when presented with such evidence. There is no rational justification for MSCS' failure to timely evaluate K.B., to identify him as a child with a disability in need of special education and related services, and to develop and implement an appropriate IEP.  While there is no statutory time frame for a student to be identified as one with a suspected disability, it must be done "within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability."  *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 250 (3rd Cir. 2012).  Under these facts, MSCS did not act within a reasonable amount of time.  As such, MSCS violated its child find obligations.  *See, e.g., Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 766-767 (6th Cir. 2001) (both the absence of an IEP and the failure to have an IEP, for an entire year, caused student to lose educational opportunity).

### No IEP for the 2020-2021 School Year

Under the IDEA, the District is required to have an IEP in effect at the beginning of each school year for each child with a disability within its jurisdiction. *See* 20 U.S.C. § 1414(d)(2)(A)-(C); 34 C.F.R. § 300.323(a); *see also* 34 C.F.R. § 300.320. A "child with a disability" is a child who has been evaluated in accordance with the IDEA as qualifying in one of the enumerated

categories of disability, including autism. *See* 34 C.F.R. § 300.8. In evaluating any child, the district "must administer such assessments and other evaluation measures as may be needed to produce the data identified under" the IDEA. 34 C.F.R. § 305(c). These include evaluations provided by the parent, current classroom-based, local, or State assessments, classroom-based observations, and observations by teachers and related service providers, including records from prior institutions, where applicable. *Id. See also,* 20 U.S.C. 1414(d)(2)(C)(iii); 34 C.F.R. § 300.323 (requiring, in the case of transfer students, the new school district "in which the child enrolls must take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous public agency in which the child was enrolled.").

It is undisputed that MSCS failed to have an IEP in effect for K.B. at the beginning of the 2020-2021 school year. While it is true, at the start of the year, that MSCS may not have had all of the information available in order to fashion an IEP given that Mr. K.B. only began to converse with MSCS about registering K.B. in July of 2020 (not long before the 2020-2021 school year began), it cannot be said that MSCS did not have ample opportunity to put an IEP into effect at some point during the 2020-2021 school year. And while not having an IEP would seemingly be somewhat subsumed into the child find violation for the 2020-2021 school year, for the same reasons as noted above in the section regarding child find in the 2020-2021 school year, not having an IEP for that school year resulted in substantive harm to K.B.

### Bus Transportation

Petitioners assert that K.B. was not provided a FAPE due to MSCS' failures in transportation.[12]  On two occasions during the 2021-2022 school year, K.B. boarded the wrong bus.  On one day during the first week of the 2021-2022 school year, which began on August 9,

---

[12] Petitioners provided no case law in support of the argument.

2021, K.B. boarded the wrong bus coming home from school.  He and his siblings were brought home by an MSCS employee.  At the time, neither Mr. K.B. nor Ms. Guy owned a vehicle. Though they intended to purchase a vehicle, the first bus incident accelerated that intention, and they purchased a vehicle on or about August 14, 2021.  Unfortunately, the car was stolen in January or February of 2022 when Ms. Guy was the victim of a carjacking incident.  At that point, Mr. K.B. requested special transportation for K.B., and MSCS, after an IEP meeting on this issue, agreed.  Unfortunately, on the first day of his scheduled special transportation, the bus took K.B. to Lucy Elementary School instead of Lucie E. Campbell Elementary School.

It is disturbing that MSCS had two transportation incidents regarding K.B.'s transportation.  However, even assuming that these incidents constituted a procedural violation of the IDEA, there is no indication that K.B. missed school or otherwise suffered any deprivation of an educational benefit.  34 C.F.R. § 300.513(a)(2).  Therefore, the Petitioners have not met their burden of proof to show that they are entitled to relief regarding these two incidents.  *See, e.g., Winkelman v. Parma City Sch. Dist. Bd. of Educ.*, No. 1:07-CV-3860, 2009 WL 4456297, at *16 (N.D. Ohio November 30, 2009) (holding that the school bus failing to pick up student on the first day of school did not deny student a FAPE).

## Child Find and IEPs in the 2021-2022 School Year

MSCS' position is that once it had the Indiana documents, it moved forward in a timely fashion with the evaluative process for K.B. in the 2021-2022 school year, which began on August 9, 2021.  However, this argument misses the point because the receipt of the Indiana documents was not the trigger for MSCS' responsibility to timely evaluate K.B.  According to the testimony of MSCS' own employee and witness Ms. Fik, that trigger was the receipt of the Innovations in Learning records, which again were available to MSCS on October 5, 2020.

Thus, the procedural and substantive violation of child find continued into the 2021-2022 school year, as did the violation of K.B. not having an IEP.[13]

The beginning of the 2021-2022 school year saw a flurry of activity, highlighted by an insufficient IEP offering said to be tied to K.B.'s status as an "out-of-state transfer" (the August 23, 2021, IEP (Hrg. Ex. 38)), a deficient psychoeducational evaluation (September 14, 2021 (Hrg. Exs. 24 and 25)), a second IEP (October 18, 2021 (Hrg. Ex. 47)), an independent educational evaluation (IEE) (December of 2021 through January of 2022 (Hrg. Ex. 5)), and a final draft IEP (March 14, 2022 (Hrg. Ex. 46)) that closely resembles the recommendations of the IEE, with a few exceptions. These highlights inform the question of how long the child find violation lasted, whether substantive harm was proven as a result of the child find violation, and, relatedly, whether the IEPs were appropriate. The psychoeducational evaluation and the IEPs (August 23, 2021, and October 18, 2021, IEPs) that predate the IEE all constitute a continuation of procedural child find violations. Further, substantive harm was shown regarding the August 23, 2021, IEP. However, no substantive harm was shown – which is required for the Petitioners to prove that K.B. was not provided a FAPE – regarding the October 18, 2021, and March 14, 2022, IEPs.

---

[13] MSCS argues, in RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, without a citation, that it could not have performed the necessary evaluations of K.B. over the summer because "Tennessee standards requires[sic] two observations in school settings." It similarly argues that it could not evaluate K.B. because it did not receive a "medical certification form for K.B., certifying that he had previously had a medical diagnosis of autism" until July 29, 2021, and that it was similarly lacking a hearing and vision screening report. This entire line of argument is a red herring. MSCS had plenty of opportunity to seek out both medical records as well as a hearing and vision screening long before it did so. The germane point is that MSCS failed to conduct the evaluations in a timely fashion that clearly would have led it to the conclusion that K.B. is a child with a disability.

**The August 23, 2021, IEP**

The August 23, 2021, IEP[14] is insufficient for two reasons.  One, because when the IEP was written MSCS had yet to properly evaluate K.B. in order to make an informed decision as what services should be made available to him.  And two, because the IEP was substantively deficient.  While one might suggest that MSCS was trying to make as much progress as it could in a short span by attempting to cast K.B.'s situation as one of an out-of-state transfer, such a suggestion would discount the fact that K.B. was not an out of state transfer – at that point, he had been in MSCS schools for almost a year.  MSCS not having conducted an evaluation before writing the IEP put the proverbial cart before the horse, evidencing a procedural violation. Moreover, the IEP continued the provision of K.B.'s academic instruction in the general education setting, which MSCS employee and witness Ms. Rebecca Fik admitted was not appropriate for K.B.  To be fair, Ms. Fik had the benefit of hindsight when making this judgment when she provided her testimony.  But more importantly, Ms. Fik's testimony illustrates the significance of MSCS not having acted timely to begin and complete the evaluative process.

**The MSCS Psychoeducational Evaluation**

 The psychoeducational evaluation performed by Lucie E. Campbell Elementary School psychologist William Graves was deficient because it did not analyze all of the data that MSCS had in its possession when evaluating K.B., including the most complete version of the Indiana documents, which was in MSCS' possession at the time of the psychoeducational evaluation, the Innovations in Learning records, and a speech language report from August 17, 2021.  As to "Previous Testing," the September 14, 2021, report states that "psycho-educational records were not able to be obtained from the school district in Indiana."  But MSCS clearly had the Indiana

---

[14] Mr. K.B. signed the IEP but did not check the box that he agreed with its content.

records at the time of the evaluation.  And the "Sources of Information" section only mentions the vision and hearing screening – not the Indiana documents, the Innovations in Learning documents, or the August 17, 2021, speech language report.  Moreover, the report notes that K.B. "received services in special needs programs in Nebraska and Indiana prior to moving to Memphis last school year."  This is the first mention of MSCS being aware of Nebraska records, but there is no indication beyond this mention in the report that Mr. Graves, or anyone else at MSCS, attempted to procure any records from Nebraska though they apparently knew or should have known of the existence of the same.

MSCS had a responsibility to seek to obtain the records from any prior institutions that it was aware K.B. had either been evaluated by or from which he had received services.  The only citation in the IDEA explicitly requiring that MSCS look for, and use, records from prior institutions is found at 20 U.S.C. § 1414(d)(2)(C)(iii)(see also 34 C.F.R. § 300.323), which relates to students transferring from a different school district within the same academic year. While K.B. was not such a transfer student, as a matter of common sense, if a school desired to get the full picture of a child, which is undeniably what it should do in the evaluative process, that school would at least attempt to procure information from a child's previous learning institutions.  Indeed, MSCS employee and witness Ms. Rebecca Fik testified that if a child came from out of state and had been receiving services in a non-school setting, then MSCS would need to gather all the information available from those sources.  The failure to obtain and review all available records, including those from prior institutions of learning that had either evaluated K.B. or which had provided him special education services and supports, renders MSCS' psychoeducational evaluation deficient and does not satisfy its child find obligation.  *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 250 (3rd Cir. 2012) (holding that a "poorly designed and ineffective round of testing does not satisfy a school's Child Find obligations")).  Moreover, the

deficient evaluation also causes the October 18, 2021, IEP to be procedurally insufficient because when the IEP was written MSCS had still yet to properly evaluate K.B. in order to make an informed decision as to what services should be made available to him.

While MSCS' conduct, or lack thereof, evidences significant procedural violations, this is not enough to entitle the Petitioners to relief.   The Petitioners must further show substantive harm.  *Knable v. Bexley City Sch. Dist*., 238 F.3d 755, 764 (6th Cir. 2001); *see also Bd. of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007).  The "IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense. The statute only requires that a public school provide sufficient specialized services so that the student benefits from his education."  *Nack ex rel. Nack v. Orange Cty. Sch. Dist.*, 454 F.3d 604, 613 (2006) (quoting *Fort Zumalt Sch. Dist. v. Clynes*, 119 F.3d 607, 612 (8th Cir. 1997) (citing *Rowley*, 102 S. Ct. at 3049; *A.W. By and Through N.W. v. Northwest R-1 Sch. Dist.*, 813 F.2d 158, 163-164 (8th Cir. 1987)).  The IEP must only be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F. ex rel. Joseph F. Douglas Cty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017).  Furthermore, the IDEA "guarantees access to education – not that a child will achieve a particular outcome."  *Barney v. Akron Bd. of Educ.*, 763 Fed.Appx. 528, 533 (6th Cir. 2019).

The case at bar is analogous to *R.F. through R.F. v. Southern Lehigh School District*, No. 18-1756, 2019 WL 3714484 (E.D. Penn. August 7, 2019).  Therein, the court upheld a hearing officer's determination that the Petitioner-Plaintiffs had not met their burden of proof in challenging the school's IEPs, in large part because they failed to "compare, contrast, or reconcile" the services offered by the school with an IEE.  The hearing officer also found that the "IEE evaluator did not state that the proposed IEP[s] . . . were inappropriate, inadequate or insufficient."  *Id.* at n. 34.  In *R.F.*, the court had an occasion to weigh the testimony of the IEE

evaluator against the testimony provided by school personnel and found it to be in equipoise. *Id.* at \*19. In the instant case, MSCS provided little testimony about K.B.'s progress, and in a vacuum this would seem odd, indeed. But the burden of proof does not rest on MSCS.

The Petitioners provided no proof of what manner, or type, of progress should have been made by K.B. during the 2021-2022 school year to challenge the October 18, 2021, and March 14, 2021, IEPs, and rather simply argue that not enough progress was made. This is insufficient to show a denial of FAPE. *J.B. by and through Belt v. Dist. of Columbia*, 325 F.Supp.3d 1, 9 (D.D.C. 2018) ("Limited academic progress does not *ipso facto* signal a violation of the IDEA.")).[15] There can be no dispute that K.B. has deficits. But this does not answer the question of whether MSCS' IEPs were appropriate. To answer that question, the Petitioners must show what progress K.B. can make, that he did not make that progress, and that some deficiency in the IEP was the cause. And this they did not do.

Regarding the October 18, 2021, and March 14, 2021, IEPs, the documents entered into evidence present a mixed-bag – in some areas K.B. made progress, and in others he did not. Without some measure of testimonial evidence,[16] no more can be gleaned from these documents[17] (iReady scores (Hrg. Ex. 28) and progress monitoring reports (Hrg. Ex. 35)). While the undersigned does not doubt Dr. Irby's credentials, acumen, credibility, or that she has the best interests of K.B. in mind, her testimony is insufficient to show that MSCS must follow her

---

[15] The *J.B.* court also notes that neither does uneven progress necessarily equate to a violation of the IDEA.

[16] During the hearing, the tribunal cautioned the parties about the large-scale use of documentary evidence without providing contextual, testimonial support.

[17] The Petitioners also reference K.B.'s "Teachtown Records," but, with no context provided, nothing can be gleaned from these documents. (Hrg. Ex. 29).

recommendations.[18]  Thus, the Petitioners failed to meet their burden of proof to show that K.B.'s October 18, 2021, and March 14, 2022, IEPs were not reasonably calculated to enable him to make progress appropriate in light of his circumstances.

Turning more specifically to the violations the Petitioners allege regarding the October 18, 2021, IEP does not change the outcome.  The Petitioners take the issue with the October 18, 2021, IEP (Hrg. Ex. 47) for the following alleged reasons:

- That the IEP does not conform to what the IEP team agreed to because it does not reflect the time that K.B. was to spend in the general education setting;

- That K.B. was not provided a copy of the draft IEP; and

- That K.B. goes to lunch twice daily.

While the October 18, 2021, IEP does not specifically reflect the time that K.B. was to spend in the general education setting, this does not prove that he was not actually spending time in the general education setting in accordance with what the IEP team agreed upon.  Therefore, no substantive harm was shown by the Petitioners.

Next, the testimony is unclear on when Mr. K.B. received a copy of the October 18, 2021, IEP.  He testified that he did not receive the document, and his signature does not appear on one copy of the draft IEP.  (Hrg. Ex. 47).  However, his signature does appear on a document dated October 18, 2021, that has a box checked to signify that "[a] draft IEP was developed, and a copy was provided at least 48 hours prior to my child's IEP team meeting."  The bottom of the form states the "[d]ate IEP was given to the parent(s)" was November 31, 2021.  (Hrg. Ex. 5, p. 147).  Thus, no violation was proven.

---

[18] It is noteworthy that it appears, by virtue of the draft March 14, 2021, IEP, that MSCS has agreed to much of what Dr. Irby recommended in her IEE (though it disputes its strict legal obligation to do so based on the proof presented during the hearing), which the tribunal sees as a positive development, going forward.

Lastly, while it is peculiar that a child would go to lunch twice in a day, and the IEP only mentions K.B. going to lunch with his general education peers, the Petitioners did not provide proof of substantive harm as a result.  For example, there is no proof as to whether or what K.B. missed by going to two lunches as opposed to one and what impact it had on him.  The Sixth Circuit requires that the proof show a failure to implement substantial or significant provisions of the IEP resulting in a lack of progress according to the student's potential.  *Woods v. Northport Public School*, Nos. 11-1493, 11-1567, 2012 WL 2612776, at *6 (6th Cir. July 5, 2012).  The lack of proof on what manner, or type, of progress should have been made by K.B. and how the second lunch prevented that progress results in the Petitioners having not met their burden of proof to show substantive harm as a result of the second lunch.

The last IEP at issue is a draft March 14, 2022, IEP. The following changes were made from the October 18, 2021, IEP and memorialized on a draft[19] IEP dated March 14, 2022 (Hrg. Ex. 46):

- The addition of "social emotional services"[20] twice per week in 30-minute sessions;

- Adding an additional support person, who was credentialed as a Registered Behavioral Technician, to K.B.'s classroom to focus on K.B.'s needs;

- Adding 10 sessions, at 30-minutes per session, of occupational therapy per IEP cycle; and

- The provision of half of K.B.'s speech therapy in one-on-one sessions and the remaining sessions in a small group setting.

Petitioners take the issue with the March 14, 2022, draft IEP for the following alleged reasons:

---

[19] The record does not contain a prior written notice that was provided to Mr. K.B.  Therefore, it is presumed that the proposed March 14, 2022, IEP never went into effect.  20 U.S.C. 1415(b)(3) (requiring prior written notice of any change in the provision of a free appropriate public education).

[20] "Social emotional services" are how MSCS identifies in-house ABA therapy services in an IEP.

- That MSCS waited too long after the occupational and physical therapy evaluations being conducted in October of 2021, to put services into K.B.'s IEP;

- That the IEP did not specify an RBT be added to K.B.'s classroom;

- That the IEP did not specify that the RBT be assigned primarily to K.B.;

- That the IEP does not specify the half-and-half split of K.B.'s language therapy between individual and group sessions;

- That the IEP does not specify that K.B. is to participate with the general education population during lunch, recess, and support classes; and

- That while the IEP agreed to have a qualified RBT in K.B.'s classroom, MSCS did not employ such a person at the time of the IEP meeting or when the March 14, 2022, draft IEP was "issued."

Determining whether the March 14, 2022, draft IEP is violative of the IDEA is particularly problematic because that IEP is now less than two months old, and there is little to no data available to show whether K.B. is being deprived of an educational benefit due to the allegations made by the Petitioners. This problem underscores the difficulty in deciding the outcome of a legal proceeding in situations that continue to evolve after the filing of the initiating document (i.e., the due process complaint, here filed on October 6, 2021, more than 5 months prior to the March 14, 2022). While MSCS did not object to the proof taken relative to events occurring after the filing of the due process complaint (20 U.S.C. § 1415(f)(3)(B) provides that issues not raised in the notice (due process complaint) shall not be allowed unless the other party agrees), this makes it no less difficult to entertain the Petitioner's post-filing claims.

In any event, based on the same reasoning applied to the Petitioners allegations regarding the October 18, 2021, IEP, the Petitioners have not met their burden to show substantive harm to K.B. as a result of the alleged conduct. The Petitioners provided no proof of what manner, or type, of progress K.B. should have been making, and that the IEP was the cause of any failure to

do so.  Therefore, the Petitioners failed to show that the March 14, 2022, IEP was not reasonably calculated to enable K.B. to make progress appropriate in light his circumstances.

## **Compensatory Education**

When a FAPE has been denied, compensatory education is one type of relief that may be awarded.  The aim of compensatory education is to place the student in the position that they would have occupied but for the school's violations of the IDEA.  *Bd. of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307, 317 (6th Cir. 2007) (citing *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005)).  It is "'relief designed to ensure that the student is appropriately educated within the meaning of the IDEA."  *Id.* at 316 (quoting *Parents of Student W. v. Puyallup Sch. Dist. No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994).  The Sixth Circuit has adopted the approach taken by the D.C. Circuit in *Reid*, which is a flexible approach (qualitative) rather than a rote hour-by-hour (quantitative) compensation award.  *Bd. of Educ. of Fayette County, Ky. v. L.M.*, 478 F.3d 307 (6th Cir. 2007).

Despite the tribunal's direction, on more than one occasion during the hearing, to the Petitioners that they must provide evidence of what a compensatory education should be based on, in accordance with the *Reid* qualitative approach, the Petitioners failed to do so.  On the first day of hearing, after the Petitioners' expert, Dr. Irby, had given at least part of her testimony and then had to leave for the day, the tribunal raised the issue of compensatory education.  In that discussion, the tribunal advised the parties of the expectation to hear testimony regarding compensatory education so as not to run the risk of a remand from a reviewing court.  Further, the tribunal specifically advised the parties that the proof should provide the basis for a qualitative conclusion.  The parties were given the opportunity to give their respective positions at the outset of day 2 of the hearing on the issue of compensatory education.

On the second day of hearing, the Petitioners agreed that the approach is qualitative and not quantitative, and that proof on the issue would be provided (noting the IEPs that would be sought to be introduced into evidence and Dr. Irby's testimony about her recommendations). However, the Petitioner also mentioned guidance from both the State of Tennessee's Department of Education and the United States Department of Education (regarding compensatory education in the COVID pandemic context) purporting to state that related services should be provided on an hour-for-hour basis.  The Petitioners' counsel concluded by stating that a metric or tools would be provided to assist the tribunal in the fashioning of a compensatory education award.

On the third and final day of the hearing, at roughly 3:00 p.m., the Petitioners closed their proof without any testimonial evidence being offered to directly address the question of what a compensatory education award should be.  The Petitioners did offer that the tribunal had several options, including providing a year's worth of the same level of services – 35 hours per week of ABA therapy – that K.B. had previously received from Innovations in Learning before moving to Tennessee; taking the latest draft IEP and replicating it for the time missed in the 2020-2021 school year; or a private placement, but again there was no direct testimonial support for any of these options.

Of course, this put the Respondent in the difficult position of having to decide whether the put on proof of what a compensatory education award should consist of if a FAPE violation were found, or to be silent and stand on its position that the Petitioners had not met their burden of proof.[21]  After a brief colloquy about those options, the Respondents recalled Ms. Rebecca Fik

---

[21] The Respondent made a motion for involuntary dismissal at the close of the Petitioners' proof.  Due in large part to the record containing so much documentary evidence regarding which no testimony was provided, the tribunal did not feel it wise to rule on the motion and instead declined to render judgment and allow the remainder of the proof to be put on, in accordance with TENN. R. CIV. P. 41.02.

to the stand to provide testimony on several issues, including the issue of compensatory education.

The case law in the Sixth Circuit does not reveal an answer on which party should bear the burden of proof as to the amount of an award of compensatory education. The case law appears to be scant, in general, on this issue. However, at least one case from a federal district court in the D.C. Circuit (the same circuit that rendered the *Reid* opinion) does appear to address the question. In *Phillips ex rel. T.P. v. District of Columbia*, the court held that the "plaintiff has the burden of 'proposing a well-articulated plan that reflects [the student's] current education abilities and needs and is supported by the record.'" 736 F.Supp.2d 240, 248 (D.D.C. 2010) (quoting *Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbit*, 583 F.Supp.2d 169, 172 (D.D.C. 2008)). In *Phillips*, the court found that the Petitioners' expert did not provide testimony regarding *how* the hours of compensatory education he recommended would "'provide the educational benefits that likely would have accrued' had the services been 'supplied in the first place,'" but instead was nothing more than a presumptive hour-for-hour "cookie-cutter approach" that *Reid* rejected. *Id.* at 249 (citing *Reid*, 401 F.3d at 524). The case was remanded to the hearing officer for an opportunity to supplement the record with evidence necessary to support a compensatory award consistent with *Reid*, noting, at footnote 4, that if the Petitioners were unable to provide such evidence, then the hearing officer may conclude no compensatory award should issue. *Id.* at 250.[22]

In the PETITIONERS' AMENDED POST-HEARING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, they state the lack of an expert and the lack of the ability to precisely

---

[22] Ultimately, two-and-one-half years later, the case made its way back to the district court. By that time, the hearing officer had taken more proof on remand, denied any compensatory education, and the Petitioner had again appealed to the district court. Cross-motions on summary judgment were filed and the court granted the motion of the school district. *Phillips ex rel. T.P. v. District of Columbia*, 932 F.Supp.2d 42 (D.D.C. 2013).

measure K.B.'s educational deficit as reasons why any deficiencies in their case should not preclude compensatory education in the form they ultimately seek – private placement for K.B. The Petitioners also point to a guidance document from the Tennessee Department of Education on COVID-related compensatory education issues to suggest that there should be an hour-for-hour floor but conclude that the floor is insufficient in this case and that only a private placement will suffice.  None of these arguments is availing.

The tribunal repeatedly directed the Petitioners to put on the proof during the days scheduled for hearing sufficient to support a specific award of compensatory education.  They simply did not do so.  The PETITIONERS' AMENDED POST-HEARING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW first laments the difficulty that low-income children can face in due process cases because of their inability to afford experts.  The lament rings hollow in this case because the Petitioners had ready access to an expert, Dr. Irby, who is well-qualified to provide an expert opinion on compensatory education.

Next, the Petitioners assert that because they cannot "precisely measure [K.B.'s] educational deficit" this does not mean K.B. should go without compensatory education.  The tribunal agrees with this statement as the courts have held that one need not make out a perfect case to be awarded compensatory education.  *Phillips*, 736 F.Supp.2d at 248.  But, as discussed in detail throughout this FINAL ORDER, the Petitioners must meet their legal burden of proof, including a well-articulated plan that reflects K.B.'s current educational abilities and needs. Despite having an expert capable of testifying on the points relevant to the Petitioners' burden, no such plan was provided.

Instead, the Petitioners now rely on a recommendation from the Tennessee Department of Education on COVID-related compensatory education issues to suggest that an hour-for-hour floor has been established, but that due to "what has been lost, the harm suffered, and the

ongoing harm in a now completely fractured relationship and loss of trust," the tribunal should consider a private placement for K.B.  To the extent the argument is that K.B. is entitled to a floor, based on the guidance, of a compensatory education award, this argument does not comport with the relevant law cited above.

In the end, the tribunal is left to choose between denying any compensatory education, allowing more proof to be taken, or relying on the testimony of Ms. Fik to determine the award of compensatory education.  The first option is one regarding which most federal courts take a dim view and is therefore not appropriate.  The second option would prolong this hearing, reward the Petitioner for not abiding by the tribunal's direction during the hearing, and place the Respondent at an unfair disadvantage having already provided its proof on the subject though it did not bear the burden to do so. For those reasons, the tribunal declines that option.  This obviously leaves the third option.

Ms. Fik's experience in the field of special education is substantial – she has been in the field for almost 50 years.[23]  Over her career, she has taught every age group of special education student from 7 to 22 years of age. Early in her career, many of her special education students remained her pupils from year to year for 6 to 7 years.  She was first based at an all-special education school that ultimately became a school for students 18-22 years of age who could participate in a work-based learning program.  She has taught many children with differing levels of autism.  In 2002, she went into management for MSCS, and is now one of three directors who serve under the executive director for MSCS' Department of Exceptional Children.

---

[23] While not necessary to again list here – as it is specifically set forth in the findings of fact section – Ms. Fik also has a substantial educational background in the field of special education as well as school administration.

The tribunal finds Ms. Fik to be credible.  Like any witness, she was not perfect in her testimony.  What is more striking is that she provided a significant amount of testimony that she had to have been aware would not be favorable to her employer, MSCS.  Indeed, the tribunal has used several of Ms. Fik's statements as part of the basis for finding that MSCS committed child find violations.

Ms. Fik opined that 30 minutes of social emotional/ABA methods, performed at Lucie E. Campbell Elementary School by a Registered Behavior Technician supervised by a BCBA, for each day that the child was denied a FAPE would constitute services sufficient to bring K.B. current to where he would have been if he had received the supports and services during the period of deprivation.  Ms. Fik testified that she was basing her opinion, at least in part, on an analogy to the individualized instruction provided to somewhat similarly situated children who are homebound.[24]  She further noted that one-on-one time with a teacher, in appropriate moderation so as not to take too much time away from learning with and from peers, can provide more educational benefit than a student would get in a group setting.

In addition to Ms. Fik's opinion regarding a 30-minute session of in-house ABA methodology, the tribunal is again mindful that in the last draft IEP (March 14, 2022), several items were sought to be added to K.B.'s IEP though there was never an agreement by the parties to implement these changes.  By virtue of the March 14, 2022, IEP, MSCS agreed to provide most, if not all, of what the IEE recommended.  In addition to the items already provided in the

---

[24] The analogy finds some support in the case law.  *Maple Heights City Sch. Bd. of Educ. v. A.C. Individually and on behalf of A.W.*, No 1:14CV1033, 2016 WL 3475020, at *12-13 (N.D. Ohio June 27, 2016) (upholding hearing officer's computation of compensatory education based on analogy to home instruction program).  While it is true that the number of hours per day awarded in *Maple Heights* is more than provided for herein, the analogy is still relevant.  And though it would have been preferable for Ms. Fik to have elaborated more on the subject, it is also noteworthy that her opinion on this subject was not attacked on cross-examination in such a manner to discount her conclusion.

October 18, 2021, IEP, the March 14, 2022, draft IEP included adding 2 sessions per week, at 30 minutes per session, of "social behavior" services;[25] adding an additional support person who is credentialed as a Registered Behavioral Technician to K.B.'s classroom to focus on K.B.'s needs; adding 10 sessions, at 30-minutes per session, of occupational therapy per IEP cycle; and the provision of half of K.B.'s speech therapy in one-on-one sessions and the remaining sessions in a small group setting.   While the Petitioners have not met their burden to show these additional services to be legally awardable based on the proof provided during the hearing of this matter, the tribunal is hopeful that MSCS will maintain its willingness to offer these services, which the Petitioners certainly want for K.B., and that MSCS evidently believes there is value in providing.

## <u>CONCLUSIONS OF LAW</u>

1.      The Petitioners have met their burden of proof to show that MSCS committed a child find violation and denied K.B. a FAPE from October 5, 2020, through the end of the 2020-2021 school year and from August 9, 2021, to October 18, 2021, of the 2021-2022 school year. This is roughly one full school year, which would equate to 180 days.

2.      The Petitioners have met their burden of proof to show that MSCS failed to provide K.B. an IEP reasonably calculated to enable K.B. to make progress appropriate in light his circumstances and thereby denied him a FAPE from October 5, 2020, through the end of the 2020-2021 school year and from August 9, 2021, to October 18, 2021, of the 2021-2022 school year.

3.      The Petitioners have failed to meet their burden of proof to show that MSCS otherwise committed a child find violation or that MSCS failed to provide K.B. an IEP

---

[25] These are the same type services that have been previously discussed herein as in-house ABA services.

reasonably calculated to enable K.B. to make progress appropriate in light his circumstances during the time contemplated by the proof provided at the hearing of this matter.

4.      The Petitioners failed to meet their burden of proof to show that MSCS denied K.B. a FAPE due to transportation issues.

5.      The Petitioners have met their burden of proof to show that K.B. is entitled to compensatory education.

6.      The Petitioners have not met their burden of proof on any other claims.

7.      The Petitioners are the prevailing party on all claims for which they have met their burden of proof, as noted above.  The Respondents are the prevailing party on all other claims.

## REMEDY

MSCS shall provide 180 sessions, at 30 minutes per session, of in-house ABA services to K.B.  These services shall be provided by a Registered Behavior Technician, supervised by a BCBA.  These services shall be provided in addition to the services already being provided to K.B. under his current IEP.

## POLICY STATEMENT

The policy reason for this decision is to uphold the federal and state laws pertaining to the education of children with disabilities.

It is so **ORDERED**.

This FINAL ORDER entered and effective this the **17th day of May, 2022.**

PHILLIP R. HILLIARD
ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

      Filed in the Administrative Procedures Division, Office of the Secretary of State, this the **17th day of May, 2022.**

STEPHANIE SHACKELFORD, DIRECTOR
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

**IN THE MATTER OF:**
**K.B., THE STUDENT, AND K.B., THE**
**STUDENT'S PARENT V. SHELBY COUNTY**
**SCHOOLS**

**APD CASE No. 07.03-214603J**

## NOTICE OF APPEAL PROCEDURES

### REVIEW OF FINAL ORDER

The Administrative Judge's decision in your case in front of the **Tennessee Department of Education**, called a Final Order, was entered on **May 17, 2022**. If you disagree with this decision, you may take the following actions:

1.  **File a Petition for Reconsideration:** You may ask the Administrative Judge to reconsider the decision by filing a Petition for Reconsideration with the Administrative Procedures Division (APD). A Petition for Reconsideration should include your name and the above APD case number and should state the specific reasons why you think the decision is incorrect. APD must **receive** your written Petition no later than 15 days after entry of the Final Order, which is no later than **June 1, 2022.**

    The Administrative Judge has 20 days from receipt of your Petition to grant, deny, or take no action on your Petition for Reconsideration. If the Petition is granted, you will be notified about further proceedings, and the timeline for appealing (as discussed in paragraph (2), below) will be adjusted. If no action is taken within 20 days, the Petition is deemed denied. As discussed below, if the Petition is denied, you may file an appeal no later than **July 18, 2022**. *See* Tenn. Code Ann. §§ 4-5-317 and 4-5-322.

2.  **File an Appeal:** You may file an appeal the decision in federal or state court within 60 days of the date of entry of the Final Order, which is no later than **July 18, 2022**, by:

    (a)  filing a Petition for Review "in the Chancery Court nearest to the place of residence of the person contesting the agency action or alternatively, at the person's discretion, in the chancery court nearest to the place where the cause of action arose, or in the Chancery Court of Davidson County," Tenn. Code Ann. § 4-5-322; or
    (b)  bringing a civil action in the United States District Court for the district in which the school system is located, 20 U.S.C. § 1415.

    The filing of a Petition for Reconsideration is not required before appealing. *See* Tenn. Code Ann. § 4-5-317.

### STAY

In addition to the above actions, you may file a Petition asking the Administrative Judge for a stay that will delay the effectiveness of the Final Order. A Petition for Stay must be **received** by APD within 7 days of the date of entry of the Final Order, which is no later than **May 24, 2022**. *See* Tenn. Code Ann. § 4-5-316. A reviewing court also may order a stay of the Final Order upon appropriate terms. *See* Tenn. Code Ann. §§ 4-5-322 and 4-5-317.

**IN THE MATTER OF:**                                          **APD CASE No.  07.03-214603J**
**K.B., THE STUDENT, AND K.B., THE**
**STUDENT'S PARENT V. SHELBY COUNTY**
**SCHOOLS**

## NOTICE OF APPEAL PROCEDURES

### FILING

Documents should be filed with the Administrative Procedures Division by email *or* fax:

Email:  APD.Filings@tn.gov

Fax: 615-741-4472

In the event you do not have access to email or fax, you may mail or deliver documents to:

Secretary of State
Administrative Procedures Division
William R. Snodgrass Tower
312 Rosa L. Parks Avenue, 8th Floor
Nashville, TN 37243-1102

Page **2** of **2**