**State of Tennessee**

**Department of State**

Administrative Procedures Division
312 Rosa L. Parks Avenue
6th Floor, William R. Snodgrass Tower
Nashville, Tennessee 37243-1102
Phone: (615) 741-7008/Fax: (615) 741-4472

**January 6, 2025**

Janet Goode, Esq.
Goode Law
917 South Cooper Street
Memphis, TN 38104
Sent via email only to: janet@janetgoodelaw.com

Michael F. Braun, Esq.
Law Office of Michael Braun
5016 Centennial Blvd., Ste. 200
Nashville, TN 37209
Sent via email only to:

Taylor Jenkins, Esq.
Andrew Johnson Tower, 9th Floor
710 James Robertson Parkway
Nashville, TN 37243
Sent via email also to: Address on File

KaShonda Day, Esq.
Adams and Reese, LLP
1018 Highland Colony Parkway, Suite 800
Ridgeland, MS 39157
Sent via email only to: kashonda.day@arlaw.com

Laura Bailey, Esq.
Shelby County Schools
160 S. Hollywood, #218
Memphis, TN 38112
Sent via email only to: baileyla@scsk12.org

**RE: K.B., THE STUDENT, AND K.B., THE STUDENT'S PARENT V. SHELBY COUNTY SCHOOLS, APD Case No. 07.03-214603J**

Enclosed is a *Final Order*, including a *Notice of Appeal Procedures,* rendered in this case.

Administrative Procedures Division
Tennessee Department of State

Enclosure(s)

**BEFORE THE TENNESSEE DEPARTMENT OF EDUCATION DIVISION OF SPECIAL EDUCATION**

| | |
|---|---|
| **IN THE MATTER OF:**<br><br>**K.B., THE STUDENT, and**<br>**K.B., THE STUDENT'S PARENT,**<br>***Petitioners,***<br><br>***v.***<br><br>**MEMPHIS-SHELBY COUNTY SCHOOLS,**[1]<br>***Respondent.*** | **APD Case No. 07.03-214603J** |

**FINAL ORDER ON REMAND**

This contested case, pursuant to the Individuals with Disabilities Educational Act (IDEA), was heard on March 22, 2022, and April 8, 2022, by Chief Administrative Judge Phillip R. Hilliard. The Petitioners, student K.B. and his father, K.B., are represented by attorneys Janet Goode and Michael Braun. The Respondent, Memphis-Shelby County Schools (MSCS), is represented by attorneys Laura Bailey and KaShonda Day.

A Final Order was issued in this case on May 17, 2022. The Petitioners appealed that order to the United States District Court for the Western District of Tennessee (District Court). The matter was remanded after further hearings by Judgment on the Administrative Record issued on March 12, 2024.[2] On March 21, 2024, the Petitioners filed a Notice of Remand and Status Conference Request. This Final Order is now being issued on remand.

[1] The administrative record contains references to the local education agency (LEA) as both Shelby County Schools and Memphis-Shelby County Schools. The District Court lists the LEA as Memphis-Shelby County Schools for the style of the case. For continuity, this Final Order on Remand does likewise.

[2] The parties stipulated to the admissibility and use of the testimony given in front of the District Court for purposes of this Final Order on Remand.

## ISSUES ON REMAND

1. Were the Petitioners' claims for the period of March 14, 2022, through May 17, 2022, allowable under 20 U.S.C. § 1415(f)(3)(B)?
    a. If so, whether the October 2021 or March 2022 individual education plan (IEP) governed from March 14, 2022, through May 17, 2022; and
    b. If the March 2022 IEP governed,[3] whether K.B. was provided a free appropriate public education (FAPE) from March 14, 2022, through May 17, 2022.
2. Would a private placement (to be paid for by the Respondent) be an appropriate compensatory award for all FAPE violations found (versus compensatory services being provided by the Respondent); and if so, would that private placement provide a FAPE?

## SUMMARY OF DETERMINATION

Based on a review of all of the evidence and the entire record in this case, as to issue number one, it is determined that the Petitioners' claims for the period of March 14, 2022, through May 17, 2022, are not allowable under 20 U.S.C. § 1415(f)(3)(B). In the alternative, if these claims were allowable, the October 2021 IEP governed during that period, and, as already determined by the District Court, K.B. was denied a FAPE from March 14, 2022, through May 17, 2022.

As to the second issue, based on the evidence presented at the hearing and the Petitioners' request for relief in their posthearing brief, the Petitioners no longer seek a private placement. Instead, the Petitioners seek that any compensatory services be delivered "by Providers of Petitioners choosing" or that the tribunal "monetize the award of services in order for Petitioners to choose who, how, and when the compensatory services to which K.B. is entitled are provided." (Petitioners' December 26, 2023 posthearing brief, p. 49). Based on the entire record

[3] The District Court has already determined that if the March 14, 2022 through May 17, 2022 claims are allowable and the October 2021 IEP governed, then K.B. was denied a FAPE for March 14, 2022, through May 17, 2022.

in this matter, the tribunal concludes that the award of compensatory education should be as follows:

(1) 3,105 hours of Applied Behavioral Analysis (ABA) therapy services provided by a Registered Behavior Technician (RBT) supervised by a Board Certified Behavior Analyst (BCBA). These services shall be made available through a fund provided by MSCS, which will allow parent K.B. to select from whom, how, what, and when compensatory services are provided; and

(2) 18 hours of speech/language therapy services to be provided by MSCS through a licensed speech-language pathologist while K.B. is at school.

**CLAIMS FOR MARCH 14, 2022, THROUGH MAY 17, 2022**

The Petitioners argue that when they identified "the entire school year of 2021-2022" in their due process complaint, that is all that is required to maintain claims from March 14, 2022, through May 17, 2022. This tribunal disagrees based on the District Court's interpretation of 20 U.S.C.A. § 1415(f)(3)(B), the District Court's determination that IDEA claims are not continuing offenses, and because the Petitioner's argument would both hamper the tribunal's ability to prevent surprise to either party, or the tribunal itself, and directly contravene the time period agreed on by the parties to be litigated.

The first reason the March 14, 2022 through May 17, 2022 claims are not allowable is based on the District Court's interpretation of 20 U.S.C.A. § 1415(f)(3)(B) that affirmative agreement is required to allow any claims that are outside the scope of the due process complaint. The Petitioners filed their due process complaint in October of 2021. At that time, the 2021-2022 school year had been ongoing for less than two months. On March 10, 2022, the parties filed Updated Joint Stipulations of Fact and Issues for Determination (Updated Stipulations). With respect to the 2021-2022 school year, the document states the issue to be

"[w]hether Memphis-Shelby County Schools has provided K.B. with a free and appropriate public education during the 2021-2022 school year *to date*?" (Emphasis added). The original due process complaint and the Updated Stipulations both note the Petitioners' ability to amend their complaint, but they have never done so.

In the Judgment on the Administrative Record issued on March 12, 2024, at p. 17, the District Court specifically identified that there was never affirmative agreement on the admissibility of the March 14, 2022 through May 17, 2022 claims. In accompanying footnote 3, the District Court further stated that "the statute requires agreement." Given that interpretation, among other reasons, the District Court questioned whether the March 14, 2022 through May 17, 2022 claims were properly before it.

The Petitioners' argument also fails because the District Court has held that IDEA claims are not considered continuing offenses. *K.B. by and through K.B. v. Memphis-Shelby County School District*, 2003 WL 5737804, at *4 (W.D. Tenn. September 5, 2023). Not addressing the impact of that holding on its position here, the Petitioners argue that because the District Court, in that same decision, set the cutoff to exhaust their administrative remedies at the date of the tribunal's final order (May 17, 2022), it definitively means that the March 14, 2022 through May 17, 2022 claims are allowable. This argument is misguided because the requirement to exhaust does not necessarily equate to the allowance of a claim. Instead, exhaustion only requires the Petitioner to attempt to avail itself of the opportunity to have a claim adjudicated at the administrative level before taking that claim to court. To adopt the Petitioners' reading of the exhaustion requirement could render § 1415(f)(3)(B)'s prohibition and other bars to claims, such as the IDEA's statute of limitations, meaningless.

Lastly, considering claims up to the date of the hearing should not be allowed because it would potentially prevent the administrative judge from setting discovery cutoff dates designed

to ensure that neither party (nor the judge) suffers a surprise at the final hearing, which is intended to be completed expeditiously to comply with what is often a very short timeframe to issue the final order. And here, specifically, the March 10, 2022 Updated Stipulations clearly intended to set the scope for the administrative hearing, stating the issue to be "[w]hether Memphis-Shelby County Schools has provided K.B. with a free and appropriate public education during the 2021-2022 school year *to date*?" (Emphasis added). *K.B. by and through K.B. v. Memphis-Shelby County School District*, 2003 WL 5737804, at *7 (W.D. Tenn. September 5, 2023) (stating that even if the Defendant (Respondent MSCS) had agreed to litigate issues regarding an ongoing alleged FAPE denial, the "to date" language limited the time period to the date of that filing)).

For these reasons, while the tribunal agrees with the Petitioners that, as a practical matter, the final outcome and award of compensatory education will not change whether this two-month period is considered, it is determined that the March 14, 2022 through May 17, 2022 claims are not allowable pursuant to 20 U.S.C. § 1415(f)(3)(B). Instead, the Petitioners' claims are addressed through March 10, 2022.[4]

## **FINDINGS OF FACT[5]**

1. K.B. entered MSCS for his second-grade year during the 2020-2021 school year. K.B. would have been 7 to 8 years old during the second-grade year.

2. K.B., an autistic child with significant deficits, received no special education supports or services during the 2020-2021 school year.

---

[4] Given that determination, references in this Final Order on Remand to the relief for the 2021-2022 school year should be understood to stop at March 10, 2022.

[5] Though not exhaustive, the tribunal has included some citations to the record. The transcript for the March 22 and April 8, 2022 due process hearing is referred to as T.R. Vol.___, p.___. Exhibits from those proceedings are referred to as Ex.___. The transcript for the October 21 and December 3, 2024 due process remand hearing is referred to as Remand T.R. Vol.___, p.___. Exhibits from those proceedings are referred to as Remand Ex.___. The transcript from the District Court proceedings was filed in this administrative case on March 21, 2024, and included "PageID" numbers in the top right corner of the pages. That transcript is referred to as ECF PageID___.

3. During the 2021-2022 school year, K.B. was not provided with any ABA services, and his schedule included a second lunch period.

**Comparison Between VB-MAPP and ABLLS**

4. Skills learned through ABA services compound and allow for more rapid skill development during continued ABA therapy. (ECF PageID 4972-4973).

5. In the first year of ABA therapy, a baseline of functioning is established. The progress made during the first year is a good predictor of how much progress will be made with future years of services. (Remand T.R. Vol. I, p. 82).

6. Based on the trajectory of progress that K.B. was making at Innovations in Learning, a learning center at which K.B. received services from 2018-2020, it is likely that over time K.B. would have been able to "catch up" to his non-disabled peers in many areas. He would probably still need support throughout his life but would have likely been able to do many things independently. (Ex. 14; Remand T.R. Vol. I, pp. 82-83).

7. The Assessment of Basic Language and Learning Skills (ABLLS) is one tool used to measure skill development, including basic building blocks of language and conversation, in children with autism. (ECF PageID 4949, Remand T.R. Vol. I, p. 100).

8. The Verbal Behavioral Milestones Assessment Planning and Programming Assessment (VB-MAPP) is similarly used to track verbal behavior development in children with autism. It is typically used for autistic children who are receiving ABA therapy. (ECF PageID 4941). It measures skills generally expected to be acquired within the first 48 months of a child's life. (Remand T.R. Vol. II, p. 147).

9. The skills represented in the VB-MAPP are also represented in the ABLLS. The ABLLS then continues with more advanced skills. (ECF PageID 4949). The ABLLS measures

skills in children up to approximately 6-7 years of age. (ECF PageID 4949; Remand T.R. Vol. VI, p. 730).

10. VB-MAPP data was collected for K.B. in 2018 by the Innovations in Learning clinic in Indiana when he was six years old. At that time, he was functioning at an 18-22-month-old level—roughly four years behind his typical peers. (ECF PageID 4943).

11. Testing for the VB-Mapp is normally done every six months, but longer periods between testing could also be justifiable. Innovations in Learning tested K.B. over six-month cycles during which he received 37.5 hours of ABA therapy per week according to the treatment plan. After the first cycle, K.B.'s rate of improvement was 16 percent. After the second cycle, his rate of improvement was approximately 57 percent. (ECF PageID 4943-4944; 4970-4972).

12. MSCS has administered the ABLLS to K.B. three times, once in May of 2022 (when K.B. was nine years old), then in April of 2023 (when K.B. was ten years old), and lastly in September of 2024 (when K.B. was eleven years old). (Remand T.R. Vol. II, p. 151; Remand T.R. Vol. III, pp. 366-367; Remand Ex. 5). During the 11-month period between May of 2022 and April of 2023 at MSCS, K.B.'s overall rate of improvement was approximately 30 percent. (ECF PageID 4950; Remand Ex. 4).

13. MSCS did not obtain similar data showing whether K.B. made any progress in the school year 2020-2021.

14. Some categories between the ABLLS and the VB-MAPP are more comparable than others.

15. In some of the more comparable categories, the May 2022 ABLLS results show that K.B. accomplished most or all the measured skills. These included the following:

- Cooperation & Reinforcer Effectiveness (cooperation with adults, following directions, and working to complete tasks without external reinforcement)—accomplished the majority of skills
- Group Instruction (raising hand to be recognized by a teacher, naming items, and trying to answer questions)—all skills accomplished
- Spontaneous Vocalizations (using models and independently speaking in phrases in a way that can be understood; exhibiting conversation skills)—one skill short of accomplishing all skills

(ECF PageID 5173-5188; Remand Ex. 4).

16. In other such categories, K.B. did not fare as well:

- Visual Performance (matching designs)—approximately half of the skills accomplished
- Receptive Language (following instructions regarding colors and shapes)—approximately two-thirds of the skills accomplished
- Labeling (recognizing stimuli in one's environment to assist in expressive language (T.R. Remand Vol. VI, p. 733)—roughly half of the skills accomplished

(Remand Ex. 4).

17. The skills K.B. accomplished in group instruction and visual performance on the May 2022 ABLLS are more complex than those he completed on the VB-MAPP at Innovations in Learning. (ECF PageID 5183 and 5186).

18. The skills K.B. accomplished in spontaneous vocalizations on the May 2022 ABLLS are slightly more complex than those he completed on the VB-MAPP at Innovations in Learning. (ECF PageID 5188).

19. ABLLS results based on data from May 2022 to April of 2023, when compared to the VB-MAPP results, show that he was able to perform more complex skills in reading (e.g., recognition of letters) after he began receiving ABA therapy services at MSCS. (ECF PageID 5189-5193).

20. However, according to the present levels of performance on K.B.'s September 2024 IEP, he was still reading on the same level—kindergarten—as he had been two years prior. (Remand T.R. Vol. V, pp. 624-626; Ex. 46; Remand Ex. 6).

21. The April 2023 and September 2024 ABLLS results for K.B.'s more academic-related goals, when compared to the VB-MAPP results, show that he was able to perform more complex skills in reading (e.g., recognition of letters) after he began receiving ABA therapy services. (ECF PageID 5189-5193).

22. The same is true for his math skills when comparing the VB-MAPP scores to the goals and present levels of performance in K.B.'s October 18, 2021 IEP. (ECF 5194-5198).

23. As of September 2024, K.B. continued to make progress in performing more tasks, but he remained behind in syntax and grammar, math, requests, labeling, and especially interverbals. (Remand Ex. 4).

24. Interverbals are reciprocal communication skills for back-and-forth conversations. They are the initial basic building blocks that allow one to participate in spontaneous, social conversations. (Remand T.R. Vol. VI, pp. 732-734).

25. K.B. was able to perform a small percentage of the interverbal skills at the time of the May 2022 ABLLS. He improved at the time of the April 2023 ABLLS (after ABA services had begun) but was still unable to perform the majority of interverbal skills as of September of 2024. (Remand Ex. 4).

26. The ABLLS data, when compared to the VB-MAPP data, showed a loss of skills in visual perception, "match to sample" (ECF PageID 4973-4977; Remand T.R. Vol. II, pp. 148-150), and multi-step identification of prepositions and pronouns. (Remand T.R. Vol. II, p. 50).

27. As of September 2024, K.B. still had difficulty answering questions, often repeating what others said (echolalia). This is further evidence of continuing issues with K.B.'s spontaneous verbal fluency. (Remand T.R. Vol. II, p. 735-736; Remand Ex. 6).

28. Compared to his time receiving ABA therapy at Innovations in Learning (57% rate of improvement over the last testing period), K.B. was on a flatter, lesser trajectory toward progress with skill acquisition at MSCS through April of 2023 (30%). His rate of improvement was more on track with his typical peers when he was receiving ABA therapy services at Innovations in Learning. (Remand T.R. Vol. III, pp. 344-346; Remand T.R. Vol. I, pp. 82-83).

29. Information from April 2024, when K.B. was 11 years old and in the fifth grade, showed his grade-level proficiency to be as follows:

- 2nd grade level in Adaptive Skills (was preschool previously)
- KK[6] grade level in Cognitive Skills (was beginning learning previously)
- 3rd grade level in Language Arts (was KK previously)
- Early Learning in Language Development (was beginning learning previously)
- 2nd grade level in Math (was beginning learning previously)
- Preschool level in social emotional (was beginning learning previously)

(Remand Ex. 3; Remand T.R. Vol. III, pp. 319-321).

**ABA Compensatory Education**

30. Dr. Irby typically recommends between 25-40 hours of ABA services for autistic children. (Remand T.R. Vol. I, p. 60).

[6] KK is presumed to mean pre-kindergarten or kindergarten.

31. While at Innovations in Learning, K.B. received 37.5 hours per week of ABA services. (ECF PageID 4944).

32. K.B. is currently receiving 23.5 hours of ABA services per week at MSCS. (Remand Ex. 6). Ms. Keva Weaver serves as his RBT, and Ms. Jennifer Wyatt serves as his BCBA. (Remand T.R. Vol. III, p. 358).

33. Madonna Learning Center (Madonna), a placement previously proposed by the Petitioners, is not currently an appropriate placement because K.B. has progressed to a level higher than most or all the students at Madonna, and he has "skilled out" of many of the programs specifically designed for children with autism. He has essentially outperformed that placement and a majority or all other similar placements in the Memphis-Shelby County area. (Remand T.R. Vol. I, pp. 61-62; 114).

34. Additionally, Madonna has neither a licensed BCBA nor an RBT on staff. (Remand T.R. Vol. III, pp. 381-383).

35. There are currently no private placements in the Memphis area that would be appropriate for K.B. (Remand T.R. Vol. I, pp. 61-62).

36. ABA services not planned, overseen, or rendered (if not by an RBT) by a BCBA are not advisable and can be harmful. (Remand T.R. Vol. VI, pp. 678-679).

37. A BCBA must oversee an RBT. (Remand T.R. Vol. III, pp. 354-355).

38. The progress of a child with autism is significantly cumulative, but children with autism commonly lose skills or plateau if they are not receiving consistent, appropriate treatment. (ECF PageID 4945-4946). This is because the brain becomes less plastic and malleable with age. (ECF PageID 4947-4948, 4978; Remand T.R. Vol. I, pp. 57-58, 80-81; Remand T.R. Vol. III, p. 272).

39. Early intervention is critical to obtain results from ABA therapy services; missing ABA therapy services will likely impair a child's ability to make progress in the future. (Remand T.R. Vol. VI, pp. 680-681).

40. For those reasons, it will be very difficult and perhaps impossible to put K.B. in the same place now that he would have been in but for the lack of ABA services.

41. Adults with autism who received early services typically don't require as many hours of intensive services as those who did not, and their negative behaviors tend to be milder. (T.R. Remand Vol. III, p. 286).

42. ABA services are typically provided for five years for school-age children. (Remand T.R. Vol. II, p. 152).

43. Most children receive ABA therapy at a higher intensity for the first two years, and the goal is then to taper down the services. (Remand T.R. Vol. I, pp. 88-89; Remand T.R. Vol. III, pp. 273-274).

44. K.B.'s compensatory education for ABA services should be year-round to prevent regression. (Remand T.R. Vol. I, p. 71).

**MSCS' Provision of ABA Services**

45. In March of 2022, K.B.'s IEP team agreed that he would receive ABA services from an RBT under the supervision of a BCBA. (ECF PageID 5217).

46. At that time, MSCS did not employ an RBT. The first RBT was licensed and began working for MSCS in October 2022. (ECF PageID 5213; Remand T.R. Vol. III, p. 366).

47. Until that RBT began working at MSCS, Ms. Wyatt served both as the RBT and BCBA for K.B. (ECF PageID 5212; Remand T.R. Vol. III, pp. 367-368).

48. MSCS currently employs one BCBA and three RBTs and plans to hire more of each as soon as the funding is available. (Remand T.R. Vol. IV, pp. 457-467).

49. There are between 100,000 and 110,000 students in MSCS. (Remand T.R. Vol. IV, p. 460).

**Speech/Language Services and Occupational Therapy**

50. Autism often includes language processing problems. Speech-language services can assist autistic children like K.B. with such problems. (ECF PageID 4981, 4996-4997).

51. An Indiana Education Evaluation Report from May 31, 2018, recommended occupational therapy (OT) for K.B. The report also noted that K.B. was already receiving "services for … [a] Language Impairment [disability]." (Ex. 1, p. 1).

52. K.B. was mostly nonverbal during the 2020-2021 MSCS school year. (T.R. Vol. VII, p. 810).

53. K.B. was evaluated on August 17 and October 7, 2021, by an MSCS speech-language pathologist. MSCS' speech-language evaluations showed that K.B. lacked spontaneous speech and used echolalic speech (simply echoing what one hears). (Ex. 41, p. 13).

54. After an August 23, 2021 IEP meeting, K.B. was to receive speech-language therapy "2 per month 15 minutes." (Ex. 37, p. 3).

55. Following an IEP meeting on October 18, 2021, speech-language services were added to his IEP. (Ex. 14, p. 14).

56. MSCS performed an OT evaluation of K.B. on October 26-27, 2021, which resulted in a recommendation of ten 30-minute sessions of OT per IEP cycle (a total of 5 hours per year). (Ex. 26, p. 7).

57. As of October 2021, K.B. began receiving speech-language services and OT. (Remand T.R. Vol. III, pp. 203-204).

58. Dr. Sara Irby's Independent Education Evaluation (IEE) (from late December of 2021 and early January of 2022) recommended "speech/language" and OT for K.B. (Ex. 5, p. 13).

59. At a February 28, 2022 IEP meeting, MSCS' Occupational Therapist reiterated her recommendation that K.B. receive 5 hours per year of OT. At that meeting, MSCS' speech-language therapist noted that K.B. had made some progress and recommended that K.B. continue receiving speech-language services. (Ex. 45, pp. 8-10).

60. A March 14, 2022 draft IEP included 5 hours per year of OT services and 2 sessions of language therapy per week at 30 minutes per session (36 hours per year). (Ex. 46, p. 19).

61. The last IEP in the record, from September 17, 2024, continues to provide speech-language services for K.B. but no OT. (Remand Ex. 6).

62. Ms. Courtney Bauer has been a licensed speech-language pathologist since 2002, practicing in schools (for more than 10 years, including a time for MSCS), hospitals, and nursing homes. (ECF PageID 4876-4878).

63. Ms. Bauer reviewed several documents to opine (in her testimony before the District Court) about what compensatory education speech-language services K.B. should receive. Those included MSCS' language evaluation from August 2021, MSCS' psychoeducational report from 2021, an October 2021 IEP, Dr. Irby's IEE, and an assistive technology report from July of 2022. (ECF PageID 4879).

64. K.B. was more likely than not capable of improving his speech-language skills with appropriate services. (ECF PageID 4891-4892; 4901).

65. The likelihood of K.B. being able to make progress was borne out, in part, by assistive technology reports (at least some of which were entered as exhibits in the District Court

proceeding) showing K.B. was increasing with verbal language. An undated progress report also showed K.B. could make progress. In addition to these reports, K.B.'s ability to make progress was supported by Ms. Bauer's experience with similarly situated autistic children. (ECF PageID 4901, 4910, and 4919).

66. Based on her review of these documents and her experience in speech pathology, Ms. Bauer testified in the District Court proceedings that at least 18 additional hours (one additional 30-minute session per week) should be provided for the loss of speech-language services that K.B. suffered during the 2020-2021 school year. (ECF PageID 4895).

## ANALYSIS

Having disposed of the first issue regarding the period of March 14, 2022, through May 17, 2022, above, the remaining issue is what compensatory education should be provided to K.B. The Petitioners, principally relying on *Somberg v. Utica Cmty. Schs.*, 908 F.3d 162, 173 (6th Cir. 2018), argue for at least two years of ABA services by providers of parent K.B.'s choosing through a compensatory education fund. They also argue for one year of speech-language services, two years of OT, and special transportation to/from any compensatory education services provided. MSCS argues, also citing *Somberg,* that no additional compensatory education is due beyond what was provided under this tribunal's Final Order entered on May 17, 2022, because of K.B.'s progress; in essence, they say the remedy of compensatory education has become moot. Further, citing *Bd. of Educ. of Fayette Cnty. V. L.M.*, 478 F.3d 307, 316 (6th Cir. 2007), MSCS asserts, in Respondent's Proposed Findings of Fact and Conclusions of Law for Remand Hearing filed December 26, 2024, that the additional compensatory education the Respondent seeks would be punitive. The tribunal concludes that the Petitioners' argument regarding ABA and speech-language services is more persuasive than the Respondent's.

However, the record does not support the Petitioners' request for OT services and special transportation.

Compensatory education aims to place the student in the position they would have occupied but for the school's IDEA violations. *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 317 (6th Cir. 2007) (citing *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005)). It is "'relief designed to ensure that the student is appropriately educated within the meaning of the IDEA.'" *Id.* at 316 (quoting *Parents of Student W. v. Puyallup Sch. Dist. No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994)). The Sixth Circuit has adopted the approach taken by the D.C. Circuit in *Reid*, which is a flexible approach (qualitative) rather than a rote hour-by-hour (quantitative) compensation award. *Bd. of Educ. of Fayette Cnty.*, 478 F.3d at 316.

**ABA Therapy**

Petitioners' request for at least two years of ABA services is supported by testimony from their three expert witnesses—Dr. Sara Irby, Geoffrey Ferris, and Dr. Eric Larson—all three of whom are BCBAs. Dr. Irby is also a licensed psychologist, Dr. Larson holds a master's degree in experimental psychology and a doctorate in developmental and child psychology, and Mr. Ferris holds a master's degree in early childhood special education and applied behavioral analysis.

While receiving ABA therapy services at Innovations in Learning, K.B. was on pace to eventually function on a level close to his non-disabled peers. Dr. Irby's testimony established that the trajectory of K.B.'s learning was lower than but similar to non-disabled peers when he was receiving 37.5 hours per week of ABA therapy services at Innovations in Learning in Indiana. She opined that at that rate of improvement K.B. would likely have been able to "catch up" to his non-disabled peers in many areas. He still would have needed some support throughout his life but would have been independent in many ways. His final testing at

Innovations in Learning showed a rate of improvement of approximately 57%. His next educational experience came at MSCS.

After being in MSCS schools for the 2020-2021 and 2021-2022 school years without any services in the first year[7] and no ABA therapy services in the second, K.B. significantly fell off his previous pace of improvement.[8] When MSCS performed ABLLS assessments in May of 2022 and again in April of 2023, K.B.'s rate of improvement was approximately 30%, down approximately 27% from his time at Innovations in Learning. A comparison between his VB-MAPP scores at Innovations in Learning and the ABLLS scores at MSCS offers more detail.

At MSCS, through September of 2024, when K.B. was 11 years old, while he did make progress, he was not close to grade level and had yet to accomplish all the ABLLS skills, which are typical of a six to seven-year-old child. According to "learning domain" reports from April of 2024, when K.B. was 11 years old and in the fifth grade, he was performing at the following levels:

- 2nd grade level in Adaptive Skills (was preschool previously)
- KK[9] grade level in Cognitive Skills (was beginning learning previously)
- 3rd grade level in Language Arts (was KK previously)
- Early Learning in Language Development (was beginning learning previously)
- 2nd grade level in Math (was beginning learning previously)
- Preschool level in social emotional (was beginning learning previously)

Looking at examples from K.B.'s ABLLS scores, he accomplished (or mostly accomplished) the skills of cooperation and reinforcer effectiveness, group instruction, and spontaneous

---

[7] MSCS did not obtain data to show whether K.B. made progress during the 2020-2021 school year.

[8] As approved of by the Sixth Circuit in *Somberg*, this decision relies on evidence from the time period before after the IDEA violations. *Somberg*, 908 F.3d at 175.

[9] KK is presumed to mean pre-kindergarten or kindergarten.

vocalizations. He did not fare as well on individual performance and labeling (approximately 50% of skills accomplished) or receptive language (approximately 66% of skills accomplished). He made some progress on the more academic-related goals of reading and math, more so after beginning to receive ABA therapy services at MSCS. However, he remained on the same grade level for reading—kindergarten—as he had two years prior. K.B. made the least progress with interverbals (the ability to effectively communicate through spontaneous speech), making most of his limited progress after beginning to receive ABA therapy services at MSCS. His lack of progress with spontaneous verbal fluency was further borne out by an IEP document from September of 2024 that noted K.B. still has difficulty answering questions, often repeating what others said (echolalia). Lastly, K.B. showed a regression while at MSCS in the areas of visual perception, "match to sample," and multi-step identification of prepositions and pronouns. Given the loss he experienced, the question becomes what is required to compensate K.B. and return him to where he would have been but for the lack of ABA therapy services?

MSCS' argument—that Petitioners' proof is not individually tailored to K.B. and that the proof instead shows that K.B. needs no further services due to the progress that K.B. has already made—is not persuasive. MSCS presented testimony from Ms. Jennifer Wyatt,[10] a BCBA who holds a master's degree in special education and who is a licensed special education teacher; and Ms. Rachel Waldron, who is a special education teacher with a license in severe profound special education, to show K.B.'s progress. There is no dispute about whether K.B. has made progress; he has. There is also no dispute about where K.B. now stands regarding his grade-level abilities and the skills measured by the ABLLS assessment. But, as set forth above, Petitioners provided evidence specific to K.B. to show a loss of learning trajectory that he experienced due to the lack

[10] Ms. Wyatt also testified in the District Court proceedings.

of services during the 2020-2021 and 2021-2022 school years. MSCS' reliance, mainly on the testimony of Ms. Waldron,[11] did not sufficiently rebut that evidence.

Ms. Waldron's testimony that K.B. is "fully verbal" and has no problem communicating verbally and her opinion that K.B.'s lack of services during previous school years did not create a deficit are at odds with the remainder of the record and were otherwise sufficiently rebutted by the testimony of Dr. Irby. Regarding K.B.'s verbal capabilities, as discussed above when describing K.B.'s ABLLS testing results, he still struggles to attain some of the skills of a six to seven-year-old, especially in interverbals (the basic building blocks of spontaneous, social conversations), which shows his continuing difficulty with speech capabilities. Similarly, he also continues to struggle with labeling (recognizing stimuli in one's environment to assist in expressive language). Moreover, an IEP document from September 17, 2024, describes K.B. as still having difficulty answering questions, often repeating what others said (echolalia). Ms. Waldron's opinion that K.B.'s lack of services during previous school years did not create a deficit fares no better.

For the reasons discussed at length above, K.B.'s lack of services during the 2020-2021 and 2021-2022 school years created a deficit. His learning trajectory fell by 27%, and, at least in part, as a result, he remains significantly behind his non-disabled peers in all grade-level domains and still struggles to attain the ABLLS skills of a six-to-seven-year-old child. MSCS attempts to use Ms. Waldron's testimony about a 2024 IEP progress report to show that K.B. made progress. However, that argument is misplaced because, again, the fact that K.B. has made progress does not show that he made the same progress that he would have made but for the lack of services he experienced. Therefore, MSCS' argument that K.B. does not need compensatory education fails.

[11] Ms. Wyatt could not provide an answer to the tribunal's question of what compensatory education services would put K.B. in the same place today as he would have been if he had not suffered a lack of services. (Remand T.R. Vol. IV, pp. 428-429).

The question then becomes what amount of ABA therapy services will compensate K.B. for the loss of ABA therapy services?

It will be very difficult and perhaps impossible to put K.B. in the same place now that he would have been in but for the lack of ABA therapy services. Dr. Irby and Mr. Ferris credibly testified that it is likely that no amount of ABA services will allow K.B. to be placed in the same position he would have been in if the services had been provided. Dr. Irby specifically testified that the progress of a child with autism is significantly cumulative but that children will commonly lose skills or plateau if they are not receiving appropriate, consistent treatment. This is because the brain becomes less plastic and malleable with age. Dr. Larson similarly testified about the critical nature of early intervention and the resulting impairment to an older child's ability to make progress. Mr. Ferris added that adults with autism who received early services typically don't require as many hours of intensive services as those who did not, and their negative behaviors tend to be milder. While the Petitioners' experts all noted the difficulty of quantifying compensatory ABA therapy services for K.B. given the extent of the loss, Dr. Irby and Mr. Ferris were able to opine about what they felt was appropriate to attempt to recoup as much for K.B. as possible, and the tribunal credits their testimony.

To recoup as much of the loss (roughly 2,160 hours over two years, as calculated by Dr. Irby) as possible, K.B. will need two years of intensive ABA therapy services (equaling the 2,160 hours he lost), which should then be tapered down yearly by 50% in years three (540 hours), four (270), and five (135). An RBT supervised by a BCBA should provide these services. If K.B.'s educational experience had followed the standard for a child with his deficits, this is approximately what he would have been expected to receive. While he did receive ABA therapy services at Innovations in Learning, those services were obviously interrupted. Given the loss of otherwise cumulative effects of ABA therapy services in autistic children, as borne out by K.B.'s

decline after the services were not provided at MSCS, he is somewhat starting over. And though he is now receiving ABA therapy services at MSCS, as pointed out by MSCS to argue that he needs nothing additional, those services do not represent compensatory education; they are services K.B. is receiving to presumably to provide him a FAPE going forward. The next question is who should provide the compensatory ABA therapy services?

Taking the record as a whole, it is determined that a compensatory education fund provided by MSCS for ABA therapy services will serve K.B.'s best interests and be the most equitable solution for reasons very similar to those noted in *Somberg*, as well as continuing questions surrounding MSCS' ability to provide the services. The *Somberg* court approved of the district court's use of a compensatory education fund due to the contentious relationship between the parties over the course of the case's long history and the myriad disagreements between the parties as raised in their briefs during the litigation. *Somberg*, 908 F.3d at 176-177. This matter has likewise been vigorously litigated over several years, with the parties agreeing on very little. Additionally, the contentious relationship has been evidenced by the Respondent seeking to disqualify the Petitioners' counsel (a motion denied by this tribunal in an Order entered February 2, 2022). In turn, Petitioners suggested that Respondent's counsel should be subject to criminal contempt for attaching Juvenile Court records to a motion. (Petitioners' Response to Respondent's Sealed Motion to Disqualify, filed January 31, 2022). In addition to the similarities with *Somberg*, the questionable ability of MSCS to provide the services also supports a compensatory education fund.

Given MSCS's lack of resources, it is questionable whether they can provide compensatory ABA therapy services. MSCS has a student population of between 100,000 to 110,000 students. When this tribunal originally ordered ABA therapy services in May of 2022, MSCS only employed one BCBA and no RBTs. It was not until October of 2022 that MSCS

hired a licensed RBT and began implementing the services in accordance with this tribunal's order. MSCS still only has one BCBA, though they now have 3 RBTs. MSCS' own witnesses could not testify to how many MSCS students receive ABA therapy services. In conclusion, as in *Somberg* and due to MSCS' questionable capacity to provide compensatory ABA therapy services, a compensatory education fund paid for by MSCS is the most appropriate form of relief, allowing Petitioners to select from whom, how, and when compensatory ABA therapy services are provided.

To quantify the dollar amount of the fund, the parties shall have until January 10, 2025, to confer and file a stipulated agreement on prevailing rates in the Memphis-Shelby County area for ABA services from: (1) BCBAs and (2) RBTs.[12] If no such agreement can be reached, the parties shall brief the issue of prevailing rates with supporting affidavits (a maximum of three). The briefs shall be filed on or before January 15, 2025, and be no more than three pages in length for each party, double-spaced with 12-point font and one-inch margins. An appropriate order will then follow.

**Speech-Language Services, OT, and Transportation**

The Petitioners have established that K.B. should receive compensatory speech-language services for reasons similar to those that formed the basis for the award of compensatory ABA therapy services. K.B. has shown that he could have made progress with sufficient services, and he can recoup that loss with compensatory services. Speech-language pathologist Courtney Bauer and Dr. Irby provided testimony to the District Court to show the need for such services. Dr. Irby and Mr. Ferris testified at the due process remand hearing consistent with Ms. Bauer's District Court testimony. According to Dr. Irby, autism often includes language processing problems that can be helped through speech-language services, which K.B. was receiving when

[12] The Petitioners' included the dollar amount of $120 per hour in their posthearing brief. However, the supporting citations were websites, which are not evidence and are inappropriate for official or judicial notice.

he was at Innovations in Learning. He was mostly nonverbal during the 2020-2021 school year at MSCS when he received no services. Thereafter, each evaluation performed by MSCS has shown a need for speech-language services, and, as of August 23, 2021 (the beginning of the 2021-2022 school year), they have been a part of K.B.'s subsequent IEPs. During her testimony in the District Court, Ms. Bauer opined that K.B. was more likely than not capable of improving his speech-language skills based on MSCS records (an assistive technology report and a progress report) that showed K.B. making progress with services. Based on these reports and her experience with similarly situated autistic children, Ms. Bauer recommended compensatory speech-language services of at least 18 additional hours (one additional 30-minute session per week) for the loss of speech-language services that K.B. suffered during the 2020-2021 school year.

MSCS did little to argue to the contrary. MSCS did not present witnesses to rebut the Petitioners' testimony either in the District Court or in front of this tribunal and made no substantive argument in their proposed findings of fact and conclusions of law on the issue. MSCS did take exception, during the due process remand hearing, to Dr. Irby and Mr. Ferris being qualified to opine on whether K.B. needed speech-language services. But MSCS made no argument that Ms. Bauer was unqualified to provide her opinion, which the tribunal credits in determining that K.B. should receive 18 hours of compensatory speech-language services, provided by MSCS while K.B. is at school.

However, the record does not support the Petitioners' request for compensatory OT services or transportation. No testimony was provided to the District Court on compensatory OT services, and there is no substantive mention of such services in the Judgment on the Administrative Record issued by the District Court on March 12, 2024. Dr. Irby and Mr. Ferris both testified that autistic children could benefit from and often receive OT. However, there was

insufficient testimony to show that K.B. requires compensatory OT services. And contrary to speech-language services, K.B.'s most recent IEP document (from September of 2024) does not contain OT services as a need. Therefore, the tribunal concludes that the record does not support the Petitioners' request for compensatory OT services.

The testimony provided to the District Court on transportation involved the Petitioner's request for MSCS to reimburse them for purchasing a vehicle. The District Court upheld this tribunal's May 17, 2022 Final Order denying that relief. And as in the District Court proceeding, the Petitioners, in their posthearing brief following the due process remand hearing, again included no citation to show they are entitled to relief on a transportation claim. Therefore, the tribunal concludes that the record does not support the Petitioners' transportation claim.

**CONCLUSIONS OF LAW and REMEDY**

1. The Petitioners' claims for the period of March 14, 2022, through May 17, 2022, are not allowable under 20 U.S.C. § 1415(f)(3)(B). Alternatively, if these claims are allowable, the October 2021 IEP governed during that period (as stipulated by the parties (Remand T.R. Vol. IV, pp. 436-437), and, as already determined by the District Court, K.B. was denied a FAPE from March 14, 2022, through May 17, 2022.

2. The Petitioners have shown that K.B. should receive 3,105 hours of compensatory ABA therapy services provided by an RBT supervised by a BCBA. These services shall be made available through a fund provided by MSCS, allowing parent K.B. to select from whom, how, what, and when compensatory services are provided.

3. The Petitioners have shown that K.B. should receive 18 hours of compensatory speech/language therapy services to be provided by MSCS through a licensed speech-language pathologist while K.B. is at school.

4. The Petitioners have not shown that K.B. should receive compensatory OT services or transportation relief.

5. The Respondent is the prevailing party on items 1 and 4.

6. The Petitioners are the prevailing party on items 2 and 3.

## POLICY STATEMENT

The policy reason for this decision is to uphold federal and state laws pertaining to the education of children with disabilities.

It is so **ORDERED**.

This FINAL ORDER ON REMAND entered and effective this the **6th day of January 2025**.

PHILLIP R. HILLIARD
CHIEF ADMINISTRATIVE JUDGE
ADMINISTRATIVE PROCEDURES DIVISION
OFFICE OF THE SECRETARY OF STATE

Filed in the Administrative Procedures Division, Office of the Secretary of State, this the **6th day of January 2025**.

**IN THE MATTER OF:**
**K.B., THE STUDENT, AND K.B., THE STUDENT'S PARENT V. SHELBY COUNTY SCHOOLS**

**APD CASE No. 07.03-214603J**

## NOTICE OF APPEAL PROCEDURES

### REVIEW OF FINAL ORDER

The Administrative Judge's decision in your case in front of the **Tennessee Department of Education**, called a Final Order, was entered on **January 6, 2025**. If you disagree with this decision, you may take the following actions:

1. **File a Petition for Reconsideration:** You may ask the Administrative Judge to reconsider the decision by filing a Petition for Reconsideration with the Administrative Procedures Division (APD). A Petition for Reconsideration should include your name and the above APD case number and should state the specific reasons why you think the decision is incorrect. APD must **receive** your written Petition no later than 15 days after entry of the Final Order, which is no later than **January 21, 2025.**

   The Administrative Judge has 20 days from receipt of your Petition to grant, deny, or take no action on your Petition for Reconsideration. If the Petition is granted, you will be notified about further proceedings, and the timeline for appealing (as discussed in paragraph (2), below) will be adjusted. If no action is taken within 20 days, the Petition is deemed denied. As discussed below, if the Petition is denied, you may file an appeal no later than **March 7, 2025**. *See* TENN. CODE ANN. §§ 4-5-317 and 4-5-322.

2. **File an Appeal:** You may file an appeal the decision in federal or state court within 60 days of the date of entry of the Final Order, which is no later than **March 7, 2025**, by:

   (a) filing a Petition for Review "in the Chancery Court nearest to the place of residence of the person contesting the agency action or alternatively, at the person's discretion, in the chancery court nearest to the place where the cause of action arose, or in the Chancery Court of Davidson County," TENN. CODE ANN. § 4-5-322; or
   (b) bringing a civil action in the United States District Court for the district in which the school system is located, 20 U.S.C. § 1415.

   The filing of a Petition for Reconsideration is not required before appealing. *See* TENN. CODE ANN. § 4-5-317.

### STAY

In addition to the above actions, you may file a Petition asking the Administrative Judge for a stay that will delay the effectiveness of the Final Order. A Petition for Stay must be **received** by APD within 7 days of the date of entry of the Final Order, which is no later than **January 13, 2025**. *See* TENN. CODE ANN. § 4-5-316. A reviewing court also may order a stay of the Final Order upon appropriate terms. *See* TENN. CODE ANN. §§ 4-5-322 and 4-5-317.

**IN THE MATTER OF:
K.B., THE STUDENT, AND K.B., THE STUDENT'S PARENT V. SHELBY COUNTY SCHOOLS**

**APD CASE No. 07.03-214603J**

## NOTICE OF APPEAL PROCEDURES

### FILING

Documents should be filed with the Administrative Procedures Division by email *or* fax:

Email: APD.filings@tnsos.gov

Fax: 615-741-4472

In the event you do not have access to email or fax, you may mail or deliver documents to:

Secretary of State
Administrative Procedures Division
William R. Snodgrass Tower
312 Rosa L. Parks Avenue, 6th Floor
Nashville, TN 37243-1102